Nos. 2017-1948, -2423

# United States Court of Appeals for the Federal Circuit

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

CLEAN HARBORS INDUSTRIAL SERVICES, INC.,

*Defendant-Appellee*

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

COKEBUSTERS USA INC.,

*Defendant-Appellee*

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:14-cv-01482-SLR, 1:14-cv-01483-SLR, Judge Sue L. Robinson

## CORRECTED PRINCIPAL BRIEF FOR APPELLANT QUEST INTEGRITY USA, LLC

Michael A. Morin
Gabriel K. Bell
Robert J. Gajarsa
Abigail A. Rives
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Plaintiff-Appellant*
*Quest Integrity USA, LLC*

March 20, 2018

Claim 24 of the U.S. Patent No. 7,542,874 reads:

> **24.** A computer-readable medium having computer-executable instructions for performing a method of displaying inspection data collected from a furnace, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:
>
> generating a plurality of data markers each of which identifies a location of a physical feature of said furnace;
>
> partitioning said inspection data at said data markers so as to correlate said inspection data to an appropriate one of said tube segments of said furnace;
>
> generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and
>
> wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

Appx92 (cl. 24).

# CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

1. Full Name of Parties represented by me:

   Quest Integrity USA, LLC

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

   N/A

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

   Quest Integrity USA, LLC states that it is a wholly-owned subsidiary of Quest Integrity Group, LLC, which is a wholly-owned subsidiary of TQ Acquisition, Inc., which is 100% owned by Team, Inc. Team, Inc. is publicly traded on the New York Stock Exchange under the symbol "TISI".

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   **Morris, Nichols, Arsht & Tunnell LLP**: Thomas C. Grimm, Jeremy A. Tigan, Stephen J. Kraftschik

   **Foster Pepper PLLC**: Douglas A. Grady, John R. Nelson, Richard T. Black, Emily R. Kelly, and Benjamin Hodges, Cristofer I. Leffler, Madeline D. Hepler

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

   *Quest Integrity USA, LLC v. A.Hak Industrial Services US, LLC,* No. 18-1002, is pending and is a companion case to the present appeal.

---

March 20, 2018 — Date

*/s/ Michael A. Morin* — Michael A. Morin

## TABLE OF CONTENTS


**Page**

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... 1

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 2

INTRODUCTION .......... 3

STATEMENT OF THE CASE .......... 4

A. Quest's Furnace Tube Inspection Systems .......... 4

1. Prior Furnace Tube Inspection Systems .......... 4

2. The Norco Project And Reports .......... 11

3. Quest's Improved FTIS System .......... 15

B. The '874 Patent .......... 16

C. The Accused Products .......... 22

D. Proceedings Below .......... 23

SUMMARY OF THE ARGUMENT .......... 26

ARGUMENT .......... 29

I. STANDARD OF REVIEW .......... 29

II. THE NORCO REPORTS DO NOT ANTICIPATE THE DISPLAY LIMITATION, AS PROPERLY CONSTRUED .......... 29

A. The Display Limitation Requires Representing The Actual Physical Geometry Of Stacked Tube Segments .......... 31

1. The Claim Language Compels Quest's Construction .......... 31

**Page**


2. The Invention's Purpose Supports Quest's Construction .........34

3. The Prosecution History Confirms Quest's Construction ........35

B. The District Court's Contrary Construction Is Erroneous ..................38

C. Strip Charts Do Not Represent The Physical Geometry Of Stacked Tube Segments .........................................................................43

III. THE NORCO REPORTS DO NOT ANTICIPATE THE COMPOSITE DATA MARKER LIMITATION OF CLAIM 30 ........................................47

A. The Content Of The Program That Generated The Norco Reports, Not Quest's Source Code Generally, Is Dispositive ...........47

B. Reversal Is Warranted Because The Executable Program That Created The Norco Reports Did Not Contain A Function For Generating Composite Data Markers..................................................50

C. At Minimum, Summary Judgment of Invalidity For Claim 30 Should Be Vacated.........................................................................57

1. The District Court Erroneously Weighed The Credibility Of Quest's Arguments And Evidence ......................................57

2. The District Court Erroneously Excluded The Inventors' Declarations ........................................................................58

3. The District Court Misread Mr. De Lorenzo's Deposition ......66

IV. THE NORCO REPORTS DO NOT ANTICIPATE THE SENSOR DATA MARKER LIMITATION OF CLAIM 40 ........................................67

A. Reversal Is Warranted Because Sensor Data Was Not Used To Create Data Markers In The Norco Reports .......................................68

B. At Minimum, The Summary Judgment Of Invalidity For Claim 40 Should Be Vacated.................................................................69

CONCLUSION...........................................................................................73

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Laboratories v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ....................40

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ....................29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................57, 59, 67, 70

*Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*,
73 F.3d 1573 (Fed. Cir. 1996) ....................41

*Baer v. Chase*,
392 F.3d 609 (3d Cir. 2004) ....................57, 61, 62, 64

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....................29

*Cohesive Technologies, Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ....................35

*Electric Storage Battery Co. v. Shimadzu*,
307 U.S. 5 (1939)....................49, 56

*Fantasy Sports Properties, Inc. v. Sportsline.com*,
287 F.3d 1108 (Fed. Cir. 2002) ....................72

*Fenner Investments, Ltd. v. Cellco Partnership*,
778 F.3d 1320 (Fed. Cir. 2015) ....................30, 37

*Finjan, Inc. v. Secure Computing Corp.*,
626 F. 3d 1197 (Fed. Cir. 2010) ....................72

*In re Gabapentin Patent Litigation*,
503 F.3d 1254 (Fed. Cir. 2007) ....................58, 65, 70

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ....................30, 35

**Page(s)**

*Gemmy Industries Corp. v. Chrisha Creations Ltd.*,
452 F.3d 1353 (Fed. Cir. 2006) ............................................29, 62, 63

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*,
855 F.3d 1356 (Fed. Cir. 2017) ......................................48, 49, 56, 72

*Intamin, Ltd. v. Magnetar Technologies, Corp.*,
483 F.3d 1328 (Fed. Cir. 2007) ..........................................................38

*Massey v. Del Laboratories, Inc.*,
118 F.3d 1568 (Fed. Cir. 1997) ..........................................................56

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ..........................................................37

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) ..........................................................58

*Pacing Technologies, LLC v. Garmin International, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015) ..........................................................38

*Pfaff v. Wells Electronics, Inc.*,
525 U.S. 55 (1998)..............................................................................48

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..........................................................29

*Primos, Inc. v. Hunter's Specialties, Inc.*,
451 F.3d 841 (Fed. Cir. 2006) ............................................................42

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)............................................................................29

*SRAM Corp. v. AD-II Engineering, Inc.*,
465 F.3d 1351 (Fed. Cir. 2006) ......................................47, 63, 65, 67

*Therasense, Inc. v. Becton, Dickinson & Co.*,
593 F.3d 1325 (Fed. Cir. 2010) ..................................................49, 56

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..........................................................40

**Page(s)**

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008) ....................................................................38

*TorPharm Inc. v. Ranbaxy Pharmaceuticals, Inc.*,
336 F.3d 1322 (Fed. Cir. 2003) ....................................................................37

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*,
264 F.3d 1111 (Fed. Cir. 2001) ..............................................................30, 37

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ....................................................................65

*Viskase Corp. v. American National Can Co.*,
261 F.3d 1316 (Fed. Cir. 2001) ....................................................................43

**STATUTES**

28 U.S.C. § 1295(a)(1)......................................................................................1

28 U.S.C. § 1331 ..................................................................................................2

28 U.S.C. § 1338 ..................................................................................................2

**OTHER AUTHORITY**

Quest Integrity, *Furnance Tube Inspection System FTIS*,
http://www.questintegrity.com/services/inspection-services/furnace-tube-inspection/ (last visited Mar. 19, 2018) ............................5

## STATEMENT OF RELATED CASES

These appeals arise from two consolidated proceedings in the District of Delaware that Plaintiff-Appellant Quest Integrity USA, LLC ("Quest") filed against Defendants-Appellees Clean Harbors Industrial Services, Inc. ("Clean Harbors") (No. 1:14-cv-01482-SLR) and Cokebusters USA Inc. ("Cokebusters") (No. 1:14-cv-01483-SLR) for infringing Quest's U.S. Patent No. 7,542,874 ("'874 patent"). Counsel is unaware of any appeal from those consolidated civil actions that was previously before this or any other appellate Court.

A companion appeal, which concerns the collateral effect of the judgments under review here, will be directly affected by this Court's decision in these appeals. *See Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*, No. 18-1002 (the "Companion Case"). Counsel is unware of any other case pending in this or any other Court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The district court entered final judgment in favor of Clean Harbors on March 28, 2017, and Quest timely appealed on April 24, 2017. Appx69; Appx19379. The district court entered judgment under Federal Rule of Civil Procedure 54(b) in favor of Cokebusters on July 12, 2017, and Quest timely appealed on August 10, 2017. Appx70-71; Appx37764-37765. This Court has exclusive jurisdiction under 28

U.S.C. § 1295(a)(1). The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1338.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in granting summary judgment of anticipation by construing the claims to encompass prior reports (the "Norco Reports") that do not display the physical geometry of furnace tubes, even though the claims expressly require displaying the physical geometry of furnace tubes, the invention's purpose is to allow visual inspection of problems corresponding to furnace tubes' physical geometry, and the patentee expressly amended the claims during prosecution to require displaying the physical geometry of furnace tubes.

2. Whether the district court erred in granting summary judgment that the Norco Reports anticipated claim 30 when extensive documentary evidence, inventor testimony, and expert testimony demonstrated that the reports lacked the "composite data markers" required by the claims and the software program used to generate the reports had no functionality for generating composite data markers.

3. Whether the district court erred in granting summary judgment that the Norco Reports anticipated claim 40 when extensive documentary evidence, inventor testimony, and expert testimony demonstrated that no sensor data was used to create data markers in those reports, as required by the claim.

## INTRODUCTION

Quest is a pioneer in the market for furnace tube inspection systems. Its inspection-display technology revolutionized the industry, enabled safe and efficient detection of potential life-threatening hazards in petroleum and petrochemical refineries across the United States, and propelled Quest to the top of the field. Quest's innovation also led to the patent at issue in this appeal. Quest's competitors, however, infringed Quest's patented inspection-display technology to capture a portion of the market for themselves. Although Quest had never before resorted to litigation to protect its patent rights, it was left with no other option in this case.

The district court granted summary judgment to Quest's competitors. The court determined that the invention need not display the "*actual* physical geometry" (Appx7) of the furnace tubes, even though the claims require displaying the physical geometry of the tubes, the invention's purpose is to display the actual physical geometry to reveal problem areas, and Quest's inventors repeatedly stated during prosecution—and amended the claims to ensure—that their invention must display "the *actual* physical geometry of the furnace" (Appx15658-15660).[1] That was error. And it caused the court to find all of Quest's claims invalid as anticipated in light of an older system that generated the Norco Reports and only displayed "strip charts" as opposed to the physical geometry of the furnace tubes. The court also believed

---

[1] All emphases added unless otherwise noted.

that Quest's older system incorporated the composite data markers and sensor-data-generated markers required by claim 30 and 40, respectively. But the only potentially relevant function in Quest's source code used "X"s to identify such markers, and, as the court recognized, it was readily "apparent" (Appx41) that the strip charts in the Norco Reports did not include any "X"s. The summary judgment of invalidity should be reversed.

## STATEMENT OF THE CASE

### A. Quest's Furnace Tube Inspection Systems

#### 1. Prior Furnace Tube Inspection Systems

Furnaces at petroleum refineries contain hundreds or thousands of feet of serpentine tubing that snakes around and above a heat source:




FIG. 1A




Appx73, Appx84 (Fig. 1A, 1:25-30); Appx37471-37473; Appx30876. Over time, those furnace tubes wear down and fail if not repaired. *See* Appx30876-30878. To prevent leaks, fire, and explosions, refineries use a furnace tube inspection system ("FTIS") to periodically inspect furnace tubes for such flaws. Quest has provided

such FTIS services since the 1980s to clients in the refining and chemical, gas, and power industries. Appx30194-30198; *see also* Quest Integrity, *Furnance Tube Inspection System FTIS*, http://www.questintegrity.com/services/inspection-services/furnace-tube-inspection/ (last visited Mar. 19, 2018) (animated overview of current FTIS); Appx37473 (discussing same); Appx30784-30786.

Early FTIS products had many problems. *See* Appx84 (1:40-48); Appx30877-30879; Appx37473-37474. External inspection of furnace tubing would not reveal damage on the interior surface of furnace tubes, so small devices, referred to as "inspection 'pigs,'" were inserted in one end of the furnace tubing system and collected ultrasonic or laser "inspection data" of tube wall thickness and radius at predetermined time intervals while traveling to the other end. Appx30786; *see* Appx84 (1:49-59); Appx14617; Appx30878; Appx37471-37474. In initial FTIS generations, that data was recorded in a numerical spreadsheet. *See* Appx30786. Because inspection pigs did not move at a constant speed, however, the reports provided no way for engineers to determine the actual physical location of any given data point identifying a flaw in the tubes. Instead, engineers had to estimate the location—and, thus, often had to replace multiple parts of tubing to be sure of locating the flawed portions. *See* Appx84 (1:65-2:32); Appx14231-14232; Appx37473-37474. And engineers would be under immense time pressure, as the whole furnace had to be shut down for inspection. *See* Appx14230-14231;

Appx30785-30786. In practice, it was "almost impossible to physically locate the correct section of tubing in the furnace tubes on a timely basis." Appx30879.

The next iteration in FTIS technology displayed inspection data from "section[s] of furnace tubing" in one "strip" that was delineated by time intervals or "sweep" numbers (scan numbers) of the pig:




Appx15264 (image truncated); *see* Appx14851-14852; Appx37473. That data was only displayed as a function of *time*, not physical geometric distance from a certain point, and did not reveal the length of tubes or the actual location of any problem area recorded by the pig. Because it would have been unwieldly to display all strip inspection data from hundreds or thousands of feet of tubing on one page, the data was displayed in dense, detailed "strip charts."

For example, Figure 3 of the ’874 patent depicts a strip chart:




FIG. 3

Appx15267 (depicting Figure 3 with annotations and additions); *see* Appx88 (9:66-10:14).

Quest's FTIS from 2001 to 2003 produced strip charts such as the following:



Each plot shows 5054 ft (1541 m) of inspection data. The piping coil begins in the bottom left corner and moves to the right, then it moves up to the next row where it starts on the left and moves to the right--it continues wrapping up in this manner. Over a mile of piping can be presented on a single plot.

Appx13849; *see* Appx14230-14232; Appx14952.

While a step forward, strip charts retained many of the same drawbacks as spreadsheets. Refinery operators needed to identify damage common to a given region due, for example, to liquid dripping down the outside of the tubes or abnormal oil flow patterns inside the tubes. *See* Appx89 (12:6-17); Appx15269. But because strip charts displayed data in time rather than physical geometric scale and did not partition inspection data at data markers or display inspection data arranged to represent the physical geometry of furnace tubes, they provided no way to identify such commons problem areas by visualizing physical geometry and spatially

correlating "one furnace tube section and another." Appx14851-14852; *see* Appx13849-13851; Appx14230-14232. Indeed, it was impossible for engineers to identify exactly where a flaw was located in the furnace from a strip chart—they "literally had no way of knowing where a detected anomaly actually was in the inside of the furnace tubes." Appx14232; *see* Appx37474.

Quest's specially trained engineers, for example, would have to look at the raw dense inspection data, "inspect the strip charts and ascertain (really, estimate) which data points could be associated with a bend in the furnace." Appx14230. Those engineers would manually insert "an annotation in the strip chart" on the visible image (i.e., "only the image on the screen was annotated," but the "inspection data was not partitioned") using a "Computer Aided Design program" (a "CAD program") to mark each "potential bend." Appx14230-14231.

To "estimate problem areas" in the furnace, the engineers would then have to laboriously use the CAD program to manually create an annotated engineered "furnace plan diagram," such as the following:




Appx14231; *see also* Appx13849-13851; Appx14230-14232; Appx18758-18763.

The "red dots" in that manually generated diagram, however, were just "estimates of where [Quest's engineers] thought [an] anomaly was in the furnace tube" based on an engineer's best guess. Appx14231. Many were "false calls" (nonexistent or incorrectly-located anomalies), each of which could cost refineries "hundreds of thousands of dollars in construction fees [for] pulling apart the relevant furnace" and result in "disappointed" clients. Appx14231-14232. Or, worst of all,

the high incidence of false calls could lead refineries to "jeopardiz[e] a massive catastrophe" by "bring[ing] the refinery back online without fixing" real issues because management assumed the "inspection on the whole was false." Appx14231-14232.

### 2. The Norco Project And Reports

In February and March 2003, Quest performed FTIS services and generated inspection reports (the Norco Reports) using its older strip-chart technology for the Norco/Orion refinery (the "Norco Sale" or "Norco Project"). *See* Appx18976; Appx18989; Appx16543-16605 (Defendants' marking added at Appx16548); Appx16607-16660 (Defendants' marking added at Appx16612, Appx16614-16615). During those inspections, Quest operated the inspection tools and ran the data analysis software; Norco was never in control or possession of Quest's system. *See* Appx18993; Appx19067. Quest did not sell any hardware or software—the customer only received the associated Norco Reports and some underlying raw data. *See* Appx18993; Appx19067.

As shown in the representative chart below, each strip chart in the Norco Reports displayed uninterrupted data starting at the bottom left corner and running left-to-right in ascending rows:




Appx19053; *see* Appx12738; Appx18757-18758. The data is delineated by sweep number, not physical distance (as shown in the label for the x-axis in the figure above), and there was no way to determine the correlation between any given data point and the physical location within the tubes. *See supra* at 4-11; *see also* Appx18990 (requiring pig to be pushed at "constant" rate during inspection). And while some charts may have included manually added tick marks that designated bends, there were no "X"s identifying the location of the bends in the inspected furnace because the software program that generated the reports did not contain any functionality to automatically place such marks. *See* Appx19052-19059; Appx19355-19358. Indeed, identifying the actual physical geometry of the

inspected furnace tubes from the software-generated strip charts required additional, post hoc, manual analysis, as shown in the following annotated version:




Appx18758; *see also* Appx12750 (unannotated version); Appx18745.

Superficially, the strip charts in the Norco Reports might resemble tubes "stacked" on top of each other. But any such appearance is coincidental and misleading. In the chart above, for example, portions of tubes 13 and 14 appear to be directly above *tube 11* (not 12). And, the middle of tube number 11 appears to be directly below the bend connecting tubes 13 and 14 when, in fact, *the center* of tube 11 is likely geometrically closest to *the center* of tube 12, which appears at the *end* of the strip of data in the chart. *See* Appx18758. Put simply, the strip charts in

the Norco Project did not identify the location of certain defects, only the "tubes" in general that were "needing repair or replacement." Appx18993.

Quest's engineers for the Norco Project also manually generated CAD program drawings to estimate potential problem areas, such as the following:




Appx18760; *see* Appx18759-18763.

Consistent with Quest's older FTIS technology, those linear schematic "stick-figures" did not display partitioned inspection data arranged to represent the physical geometry of the tubes—they were generated by a "completely different software"

program (the CAD program) based on manual operator input and design. Appx18759-18762.

### 3. Quest's Improved FTIS System

In 2004, after significant development, Quest introduced improved FTIS technology with more advanced software to process and display inspection data. *See* Appx14952-14953, Appx14958. As shown below, the new system partitioned inspection data and "generate[d] a display of the partitioned inspection data that correlates the inspection data to the physical geometry of the furnace" in order to "enable[] visual detection of problem areas within identifiable sections of the furnace tubing." Appx14852.




Appx30775-30776.

Quest's improved graphical-display FTIS technology was a significant advance in the industry and garnered high praise from customers. *See* Appx14883-14929; Appx19077; Appx30879. As one engineer from Chevron Research and Technology put it, in contrast to the old spreadsheet and strip-chart systems, Quest's new technology presented "data in a visual format that can be quickly and intuitively

interpreted by field inspection personnel" because "data points are mapped onto the *actual physical geometry* of the inspected furnace to show *exactly* which section of tubing needs to be further monitored or replaced." Appx30880 (second emphasis in original). In simple terms, users could now "directly see the location of any flaws found without having to extrapolate based on the data." Appx30880. Quest's new computerized automatic display system was "a repeatable and reliable form of inspection" that "undoubtedly saved millions of dollars and increased safety of refineries." Appx19077.

### B. The '874 Patent

Titled "2D and 3D Display System and Method for Furnace Tube Inspection," the '874 patent was filed on June 1, 2005, by inventors Phil Bondurant, Robert De Lorenzo, and Richard Roberts. Appx72.

The patent's specification includes a range of examples, from one similar to Quest's older strip-chart system to three directed more to Quest's improved graphical display system. For instance, Example 1 (depicted in Figures 3 and 4) describes a strip-chart system for displaying wall-thickness readings. Appx75-76, Appx88 (Figs. 3, 4; 9:54–10:22). The inspection data, however, is not displayed in a format that "matches the *actual physical geometry* of the furnace." Appx89 (11:42-46). A data analyst would still require an entirely separate "mechanical drawing" that shows "the physical layout of the furnace to provide hints as to where

the bends … should be located" in the charts and inspection data. Appx89 (10:46–11:5). Thus, with the system of Example 1, it was "difficult to correlate the inspection data collected from the furnace with the *physical geometry* of the furnace"—"the engineer [was] not able to readily detect worn sections of the furnace, and, [could not] determine if hot spots [were] occurring … that [were] common to a region of the furnace." Appx84 (1:65-2:32).

In contrast, Examples 2, 3, and 4 in the written description detail how inspection data can be arranged by the invention with the assistance of a computer to represent the physical geometry of stacked tube segments, which aids in rapid and easy detection of problem areas in the furnace. Example 2 (depicted in Figure 5) shows tubes arranged "in their proper orientation" so that, for instance, an operator could readily see a pattern of red blotches near the bottom left hand corner that indicates external corrosion on the tubes caused by a fixture dripping liquid:




*FIG. 5*

*See* Appx77 (Fig 5); Appx89 (11:56-63, 12:6-17);[2] Appx15269.

Similarly, Example 3 (depicted in Figure 6) shows how the arrangement of the inspection data to represent the physical geometry of stacked tube segments reveals a swirling in the middle of the furnace tubes where wall thinning has been caused by liquid flow patterns:




*FIG. 6*

*See* Appx78 (Fig. 6); Appx89 (12:42-55); Appx15269.

And Example 4 discusses how another embodiment of the FTIS could "generate a plurality of composite data markers … that identify the locations of the

---

[2] Certain Figures of the '874 patent in this brief are depicted in color and with gray curved tube sections added, as presented to the district court. *See, e.g.*, Appx15269. Those figures were filed in color with the PTO, and the specification expressly states that there are connecting tube sections that were removed from the figures. *See, e.g.*, Appx85, Appx89 (3:44-4:20, 11:61-12:5, 12:29-41); Appx14671-14677; Appx14740-14749.

furnace bends" from data such as where "wall thickness" varies, the inspection tool experiences "an acceleration," or the inspection tool experiences "de-centering." Appx89 (12:59-63, 13:5-32). The system also partitions the data at those markers and generates a display of that divided data arranged to match the actual physical geometry of the furnace to allow for rapid defect detection. Appx90-91 (14:60-66, 15:52-16:13).

The prosecution history for the '874 patent reflects how the final claimed inventions were narrowed from a broader set (that encompassed Example 1) to a narrower set that requires displaying the actual physical geometry of the stacked furnace tubes (similar to Examples 2, 3, and 4). For example, the original claims proposed by the inventors (i.e., the strip charts of Example 1) did not require displaying the actual furnace geometry. *See, e.g.*, Appx14788. Those claims were rejected several times, however, over the combination of U.S. Patent No. 6,359,434 ("Winslow"), which taught partitioning inspection data of water pipes and generating a display to enable detection of problem areas by improving upon data displayed in "strip chart form," and U.S. Patent No. 6,978,690 ("Van der Heide"), which taught inspecting furnaces. *See* Appx14772-14776; Appx14831-14838, Appx14847-14854, Appx14859-14871, Appx14878-14888, Appx14934-14966, Appx15010-15023, Appx15036-15054, Appx15059-15064; Appx50040 (Fig. 46); Appx50042-50043 (1:1-13, 1:67-2:4, 2:19-22, 4:20-22, 4:35-45, 6:4-7).

In response, the ’874 patentees amended the claims to include a limitation (the “Display Limitation”) that required the inspection data to be displayed as “arranged to represent” the “physical geometry of [a] furnace.” Appx14938. As the patentees explained, unlike the prior art (including Winslow), those amended claims required that “inspection data is *not merely correlated to particular tube segments* of the furnace” but “displayed in such a manner that the data is *arranged to represent the actual physical geometry* of the furnace, which simplifies the detection problems within a particular region of the furnace.” Appx14950-14951. Indeed, the amended claims “allow[ed] a user to visually detect and immediately ascertain any problem areas within the furnace, which may involve numerous tube segments stacked on top of one another.” Appx14950.

After an additional rejection based on, *inter alia*, Winslow and Van der Heide, the ’874 patentees amended their claims further to distinguish the prior art by requiring the inspected furnace to have “stack[ed] … tube segments” and requiring the display of the inspection data from that furnace with a “specified geometry” to represent not just the “physical geometry” of the furnace generally, but the “physical geometry” of those stacked tube segments. *See* Appx15012; Appx15019-20; Appx15042. The claims were then allowed based on that further amendment because, as the examiners agreed, Winslow did “not teach or suggest the display of

partitioned inspection data that is arranged to represent the physical geometry of plurality of tube segments of a furnace." Appx15054.

In final issued form, the asserted claims largely track claim 24 in relevant part, which reads:

> **24.** A computer-readable medium having computer-executable instructions for performing a method of displaying inspection data collected from a furnace, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:
>
> generating a plurality of data markers each of which identifies a location of a physical feature of said furnace;
>
> partitioning said inspection data at said data markers so as to correlate said inspection data to an appropriate one of said tube segments of said furnace;
>
> *generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments*; and
>
> wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

Appx92 (cl. 24) (Display Limitation emphasized).[3] Also at issue in this appeal are asserted claims 30 and 40, which require the data markers to be "composite data

---

[3] The district court ordered Quest to reduce the number of asserted claims. Appx2 n.1. Claims 1, 13, 25, 33, and 37 were asserted against Clean Harbors, and claims 12, 24, 30, 33, and 40 were asserted against Cokebusters. *See* Appx92.

marker[s]" (claim 30, which depends on claim 24) and require the "analysis of … sensor data"—rather than inspection data—to generate data markers (claim 40). Appx93 (cls. 30, 40).

### C. The Accused Products

Cokebusters and Clean Harbors traditionally offered furnace-cleaning services (also known as "de-coking"). Appx30787-30788. Several years ago, however, both started offering inspection services that used the technology protected by the '874 patent. *See* Appx30788-30789; Appx30799-30841.

Cokebusters's inspection system collects and analyzes "wall thickness [and] internal diameter" data to produce displays that, as shown below, represent the physical geometry of stacked tubes in the furnace (and indeed look strikingly like Quest's patented FTIS exemplified in Figures 5, 6, and 9 of the patent). Appx30524.




Appx30598.

Clean Harbors offers a similar furnace inspection system that uses "Smart Pig" technology to "produce[] easy-to-read reports to zero in on specific locations involving potential pipe flaws," which include displays such as the following:



Appx30566; *see* Appx30522. Again, as can be seen, Clean Harbors's system generates a display strikingly similar to Quest's.

### D. Proceedings Below

On December 15, 2014, Quest sued Cokebusters and Clean Harbors in Delaware for infringing the '874 patent. Appx30001-30010; Appx10001-10010.[4]

A few days thereafter, Quest moved for a preliminary injunction in both cases, which the district court denied after finding, *inter alia*, that the Norco Project raised

---

[4] Quest filed a third suit, against A.Hak Industrial Services US, LLC ("A.Hak"). The district court in that matter entered judgment against Quest based on the collateral estoppel effect of the decisions under review in this appeal. Order at 2, *Quest Integrity USA LLC v. A.Hak Indus. Servs. US LLC*, No. 2:14-cv-01971-RAJ, at 2-3, 11 (W.D. Wash. July 31, 2017), ECF No. 230. That judgment is the subject of the Companion Case.

a substantial question of validity. Appx30041-30042; Appx10041-10042. The court reasoned that the strip charts in the Norco Reports adequately identified the location of tube bends and the claims only required that the inspection data be "displayed in a way that suggests data markers representing the physical geometry of the furnace." Appx14629.

Following the preliminary injunction proceedings, the court construed several disputed claim terms. Relevant here, the court concluded that the Display Limitation required only "[c]reating a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments," but not any particular geometry (i.e., stacking). Appx59-66; *see* Appx6-7 (citation omitted). The court focused on the fact that Example 1 (depicted in Figures 3 and 4) of the '874 patent displays strip charts, and that a person viewing the strip chart would be able to identify pipe bends. *See* Appx60-66; Appx7-9. The court also held that strip charts were not "disclaimed" during prosecution because the '874 patentees did not use the precise term "strip chart" when amending the claims to traverse prior art. Appx66; *see* Appx8.

After claim construction, the parties cross-moved for summary judgment on both validity and infringement. The court held that all of the asserted claims (plus non-asserted claims 11, 27, and 28) were anticipated by the Norco Reports under 35

U.S.C. § 102(b)'s on-sale bar. Appx2; Appx33-44.[5] According to the court, the strip charts in the Norco Reports satisfied the Display Limitation. *See* Appx2, Appx33-44. The court stated that the claims do not require displaying the "*actual* physical geometry" of the furnace (Appx7; *see* Appx29-32) of the furnace tubes, apparently drawing a distinction between "physical geometry" and "actual physical geometry," even though Quest's inventors repeatedly stated during prosecution that their invention requires precisely that (*see, e.g.*, Appx14949-14950).

For claim 30, the court further found that there was a "composite bend indicator" function present in Quest's FTIS source code as early as 2002—even though that functionality was commented out in the source code and thus never ended up in the executable computer program. The court also determined that certain evidence submitted by Quest—declarations by inventors De Lorenzo and Bondurant—were sham affidavits. Appx39-44. And the court found that the Norco Reports anticipated claim 40 because there was supposedly "unrebutted evidence" that sensor data was used to generate data markers in the reports. Appx44; Appx52-54. Based solely on its conclusions of invalidity, the district court also granted

[5] The court denied invalidity of all claims based on obviousness because Defendants' arguments were not adequately developed, and it denied invalidity for claim 40 under § 101 because "defendants' [*Alice/Mayo*] step 1 analysis" was "insufficient to establish the most basic 'directed to' inquiry." Appx43-47.

summary judgment of noninfringement of claims 13, 25, 33, and 37 to Clean Harbors and claim 30 to Cokebusters. *See* Appx48-49; Appx54; Appx70-71.

On March 28, 2017, the district court entered final judgment in favor of Clean Harbors. Appx69. On July 12, 2017, the court entered judgment under Federal Rule of Civil Procedure 54(b) in favor of Cokebusters on infringement of claim 30 and "invalidity of claims 12, 24, 30, 33, and 40 of the '874 Patent pursuant to 35 U.S.C. § 102(b)," while "bifurcat[ing] and stay[ing]" "all other issues, including Cokebusters's counterclaim for declaratory relief" of noninfringement of claim 40. Appx70. Quest timely appealed both judgments. Appx19379; Appx37764-37765. This Court consolidated the appeals.

## SUMMARY OF THE ARGUMENT

1. The Norco Reports do not anticipate the Display Limitation. That limitation requires the display of inspection data arranged to represent the *actual physical geometry of stacked tube segments*, as confirmed by the plain language of the claims, the purpose of the invention, and the prosecution history in which the patentees expressly said so. Strip charts (such as in the Norco Reports) indisputably do not display partitioned inspection data arranged to represent the actual physical geometry of stacked tube segments in a furnace. At most, they display non-partitioned data with half of the tubes shown backwards. The Norco Reports therefore cannot anticipate the invalidated claims.

The district court's contrary conclusion was premised on the flawed assumptions that: (i) Example 1 in the specification must be included in the scope of the claimed invention, even though patentees routinely claim fewer than all embodiments; (ii) the patentees had to disclaim "strip charts" *in haec verba* to be outside the claim scope, even though the patentees' narrowing amendments determine the meaning of the claims and clearly exclude strip charts; and (iii) nothing in the claims required the representation of "actual physical geometry," even though that is precisely what the patentees said during prosecution.

2. In addition, the Norco Reports do not anticipate claim 30 because the they do not contain "composite data markers." The only potentially relevant source code included a function that identified furnace bends with "X"s. Undisputedly, however, that function was *commented out* and thus, by definition, was not part of the executable computer program that actually generated the Norco Reports. In other words, there was never a computer program capable of including composite data markers. Indeed, the Norco Reports included no software-generated marks identifying bends; instead, an inventor of the '874 patent *manually* marked the bends in those reports. Moreover, the source code that Defendants cited did not even exist for compiling at the time of the Norco Reports. Those facts were confirmed by the testimony of Quest's experts and the inventors.

Therefore, the district court should have granted summary judgment of no invalidity—or at least should have found that a genuine factual issue precluded summary judgment of invalidity. Instead, the district court erroneously dismissed Quest's arguments and evidence as lacking credibility and failed to resolve all factual disputes and inferences in Quest's favor. The district court also erroneously dismissed the inventors' declarations under the sham affidavit doctrine—there was no basis warranting that extreme sanction. And, contrary to the district court's misunderstanding, there was no testimony admitting that composite bend indicators were present in the Norco Reports.

3. Nor do the Norco Reports anticipate claim 40. No sensor data was used to create data markers in them. Defendants' experts only identified the BendDetect function as possibly using sensor data at the time of the Norco Project. But that function and its underlying data were unavailable in the source code. Sensor data functions were commented out and Quest's experts compiled and ran the BendDetect function to show how it produced "X"s at bends but, as mentioned, no such "X"s appeared in the Norco Reports. The district court's contrary conclusion was premised on several errors, including assuming the truth of *Defendants*' testimony rather than taking all factual inferences in *Quest's* favor. Reversal (or at least vacatur) is warranted.

# ARGUMENT

## I. STANDARD OF REVIEW

The district court's claim construction, which is based solely on intrinsic evidence, is reviewed de novo. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1338-39 (Fed. Cir. 2016). The grant of summary judgment is also reviewed de novo, and courts must "draw all reasonable inferences in favor of the nonmoving party" and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The patent's presumption of validity may be overcome only if all facts are "proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Anticipation under the on-sale bar is a question of fact, "includ[ing] issues of credibility and weight" that "cannot be decided adversely to the non-movant on summary judgment" where, as here, declarations supported by corroborating evidence raise a factual dispute. *See Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006).

## II. THE NORCO REPORTS DO NOT ANTICIPATE THE DISPLAY LIMITATION, AS PROPERLY CONSTRUED

Claim construction starts with the language of the claims, as read in light of the intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The prosecution history is often highly relevant. *Id.* at 1317. For example, "[a]ny explanation, elaboration, or qualification presented by the inventor

during patent examination is relevant," *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 & 1325 (Fed. Cir. 2015), and a patentee's amendments to distinguish prior art "represent[] to the public in clear and definite terms" that the invention is thereby limited, *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1123 (Fed. Cir. 2001). Likewise, the purpose of the claimed invention informs the intended claim scope. *See, e.g.*, *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368-71 (Fed. Cir. 2014).

Here, each invalidated claim of the '874 patent includes the disputed Display Limitation, which requires the "display" of "partitioned inspection data arranged to represent [the specific] physical geometry of a plurality of [stacked] tube segments." *See, e.g.*, Appx92 (cl. 24). The district court concluded that the Display Limitation includes strip charts, such as those in Example 1 (depicted in Figures 3 and 4) of the '874 patent and does not require inspection data to be displayed to represent "the actual physical geometry" of the furnace. Appx7; *see* Appx29-32; Appx60-66. Based on that construction, the district court found that the strip charts in the Norco Reports satisfied the Display Limitation. *See* Appx28-38.

The district court's construction of the Display Limitation is contrary to the plain claim language, the purpose of the invention, and the prosecution history. All of those make clear that the invention does *not* include strip charts and, instead, requires inspection data to be displayed to represent the furnace's actual physical

geometry. Indeed, the patentees amended and narrowed the claims during prosecution, adding that requirement expressly to overcome prior art (which also disclosed the prior use of strip charts). And the patentees repeatedly stated that the Display Limitation required inspection data to be "arranged to represent the *actual* physical geometry of the furnace." Appx14949-14950. Because the court erred in broadening the claim scope to include strip charts, such as those in the Norco Reports, the court's finding of anticipation for each invalidated claim should be reversed—along with the associated judgments of noninfringement for claims 13, 25, 30, 33, and 37 (which were based solely on the court's finding of invalidity).

### A. The Display Limitation Requires Representing The Actual Physical Geometry Of Stacked Tube Segments

As Quest argued below, the Display Limitation requires "inspection data" to be "depicted in the arrangement of tubes as in the *actual* furnace"—which does not include strip charts. Appx15283-15287. That construction is compelled by the claim language, the claimed invention's purpose, and the prosecution history.

#### 1. The Claim Language Compels Quest's Construction

The claim language requires representing the actual physical geometry of the tubes. First, the system obtains inspection data from a furnace with a "specified physical geometry" that includes a "plurality of tubes segments" that are connected by bends and "stack[ed]." *E.g.*, Appx92 (cl. 24). Second, it creates "data markers" to "correlate [the] inspection data to [the specific] physical geometry of [the]

furnace" (identifying, for example, the bends in the tubes). Appx92 (cl. 24); *see* Appx58-59; Appx85-86 (3:21-23; 4:37-40; 5:29-32). Third, the data is "partition[ed]" at those "data markers" into subsets of smaller size, each of which begins and ends with a data marker. *See, e.g.*, Appx92 (cl. 24); Appx57-58; Appx85 (4:34-40). Finally, those divided subsets of data are "arranged to represent [the specific] physical geometry of a plurality of [the stacked] tube segments" of the furnace and displayed (the final, Display Limitation). Appx92 (cl. 24).

In short, the data is:

(1) collected:



(2) correlated to bends with data markers:



(3) divided into subsets at those bends:




(4) and then displayed as arranged to represent the known physical geometry of stacked tube segments (which requires geometric scale and proper orientation):




*FIG. 5*

Appx15267 (images truncated); Appx15269; Appx18701 (coloring removed and

image truncated); Appx18747.

There is thus no mystery to the plain import of the ordinary language used in the claims. Partitioning inspection data at bends and then arranging that divided data to represent the *physical geometry* of stacked tubes requires placing those tube segments in stacked fashion, in proper orientation, and using a physical geometric scale (i.e., length, not time, as used in strip charts).

### 2. The Invention's Purpose Supports Quest's Construction

Displaying data to represent the stacked tubes' physical geometry undoubtedly serves the principal purpose of the Display Limitation to allow easy detection of problem areas in a furnace. *See, e.g.*, Appx14950-14951. As discussed, that ability provided a significant advantage over the prior art and was the goal of the newer FTIS technology developed (and patented) by Quest, which was designed to save customers from unnecessary expenditures and safety risks by allowing for the ready visual inspection of stacked tube segments according to their known physical geometry. *See supra* at 4-16. For example, as the specification explains, Figure 5 (above) allows an inspector to detect immediately a problem area spanning several tube segments—the red marks grouped in the lower left corner represent liquid dripping down over several tubes. Appx77-78, 89 (Figs. 5, 6; 12:6-17); Appx15269. Strip charts could not do that. Indeed, as the '874 patent expressly states, strip charts (such as those of Example 1) could not be used to locate problems

within the physical geometry of furnace tubes—another entirely separate "mechanical drawing" was necessary to determine *"the physical layout of the furnace*." Appx90 (11:2-3). The claimed invention combines that functionality in one display, which is why Quest's improved FTIS system was so successful. *See supra* at 15-16. The fundamental purpose of the claimed invention thus confirms that the physical geometry of the stacked tubes must be displayed and that the claims do not encompass mere strip charts. *See, e.g.*, *Gemalto*, 754 F.3d at 1368-71; *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008).

### 3. The Prosecution History Confirms Quest's Construction

The narrowing amendments and statements by the patentees during prosecution also unambiguously confirm that the Display Limitation requires the claimed invention to display the *actual* physical geometry of stacked tube segments and is not satisfied by strip charts.

As discussed, the original claims were rejected several times over the prior art (Winslow and Van der Heide) and only allowed after the Display Limitation was added. *Supra* at 16-22; Appx15270-15275; Appx14950-14951; Appx15037; Appx15039; Appx15053-15054; Appx15060-15064. When the patentees added the Display Limitation (originally directed to representing the geometry of the "furnace"), they repeatedly explained that this new element required "the collected inspection data [to be] displayed in such a manner that the data is arranged *to*

*represent the actual physical geometry of the furnace*" and "not merely correlated to particular tube segments of the furnace." Appx14950-14951; *see* Appx14950 ("As required by the amended independent claims …, the inspection data collected from the furnace is displayed such that the *data is arranged to represent the physical geometry of the furnace*." (emphasis in original)).

And the patentees expressly distinguished the prior art on that ground. They explained that Winslow only taught displaying "approximate location [of defects] with reference to detected pipe joints, *with no reference whatsoever to the actual physical geometry of the water pipeline*." *See* Appx14949 (emphasis in original)). And they explained that "[t]here is no disclosure whatsoever" in Van der Heide of "any display" of inspection data from a furnace "in a form representative of the physical geometry of the furnace." Appx14949.

When the claims still were not allowed, the patentees then narrowed the Display Limitation even further to its current form by requiring the display of data arranged to represent not just the physical geometry of *the furnace* generally, but the physical geometry of a plurality of *stacked tubes* in the furnace. *See* Appx15038-15054; *see, e.g.*, Appx92 (cl.11). The patentees and the examiners agreed that Winslow did "not teach or suggest the display of partitioned inspection data that is arranged to represent the physical geometry of plurality of tube segments of a furnace," and the claims were allowed specifically because of the Display

Limitation. Appx15043; *see* Appx15061-15063 (representation of stacked tube segments "makes these claims allowable over the prior art").

This Court has found the prosecution history dispositive in precisely such circumstances. For example, in *TurboCare*, the patentee distinguished prior art during prosecution by "characteriz[ing] his invention as not employing drilled holes above [a] ring" to admit steam in a shaft sealing system, so this Court held that the claimed invention must "exclude devices in which steam is admitted … through a drilled hole above [a] ring." 264 F.3d at 1122-23. And in *Fenner*, the patentee argued during prosecution that prior art was directed to a "telephone number … assigned to a particular [device]," and the claimed invention was "centered around the mobile user, not the mobile telephone." 778 F.3d at 1325 (citation omitted). This Court held the "interested public has the right to rely on" such statements, even "without attempting to decipher whether the examiner relied on them," to construe the claims as limited to a system using a "personal identification number associated with the individual and not with the device." *Id.* at 1325-26; *see also, e.g.*, *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004); *TorPharm Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003). Likewise, here, the patentees' statements during prosecution unambiguously disclose that the claims' proper scope does not include displays, such as strip charts, that do not represent the

physical geometry of the stacked furnace tubes.[6]

### B. The District Court's Contrary Construction Is Erroneous

The district court nonetheless broadened the claims' scope to include strip charts. The court reasoned that: (i) strip charts were described in the specification in Example 1; (ii) the patentees "did not disclaim strip charts as described in [E]xample 1"; and (iii) the Display Limitation only requires displaying data markers representing the physical geometry, not the "'actual physical geometry' of the furnace." Appx66; Appx7; *see* Appx27-31; Appx33-34. That reasoning is flawed.

First, the description of strip charts in Example 1 does not control the scope of the Display Limitation. Claims are not automatically construed to encompass every embodiment disclosed in the specification—patentees can, and routinely do, claim less than all disclosed embodiments, which often happens where, as here, claims are narrowed during prosecution. *See, e.g.*, *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2015); *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1375 (Fed. Cir. 2008); *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007). As discussed, here, the intrinsic record, especially the prosecution history, compels the conclusion that the Display Limitation excludes strip charts. *Supra* at 31-38.

---

[6] Quest's experts also confirmed that, from the perspective of one of ordinary skill in the art, the claims would exclude strip charts. *See, e.g.*, Appx18696-18702; Appx18756-18759; Appx14182.

Indeed, the requirement in the plain language of the claims to represent the physical geometry of the stacked furnace tubes directly links the claims to the other disclosed Examples. Examples 2 and 3, for instance, require the arrangement of the tubes in their "proper orientation"—i.e., their proper "physical geometry." *See* Appx89 (11:60-63, 12:6-17, 12:29-32); Appx92 (cl. 24). In accord with the purpose of the claimed invention, that permits "problem areas of the furnace and their source" to be "readily determined from the chart." Appx89 (12:15-17); *see* Appx89 (12:53-55).

And Example 4 specifically requires a computer to be programmed to "generate" data markers, "partition the inspection data" at those data markers to "correlate [it] to the appropriate tube segments" and the "physical geometry of the furnace," and then "generate a display of the partitioned inspection data" to enable an analyst to "visually detect problem areas within the furnace." Appx89-90 (12:59–13:4, 14:39-41). Those are the exact steps required by the claimed inventions recited nearly verbatim, and together unambiguously require "tube segments [to be] displayed in a manner that matches the actual physical geometry of the furnace." *See, e.g.*, Appx90-91 (14:65-66, 15:7-8); Appx91-93 (cls. 1, 11, 24, 30, 40) (all requiring a computer to perform each step of the patented method).

In contrast, Example 1 requires no such display of data that represents the physical geometry of stacked tubes. Instead, it requires a data analyst to *manually*

mark bends on the strip chart and then use that augmented strip chart "in conjunction with" *an entirely separate* "drawing of the physical layout of the furnace" to "provide hints as to where the bends or ends of the tube segments should be located." Appx88-89 (10:58–11:5); *see also* Appx89 (11:42-46) (recognizing that a system *other than* that recited in Example 1 could allow inspection data to be displayed in a format that "matches the actual physical geometry of the furnace").

Second, the district court's reliance on a purported failure to disclaim strip charts misses the mark. As Quest explained throughout claim construction (and as discussed above), the intrinsic record establishes that the patentee intended the plain and ordinary meaning of the claim language—as informed by "vital" prosecution history evidence—to exclude strip charts. *See* Appx15280-15287; Appx15359; *see also* Appx15354-15362 ("By completely ignoring the prosecution history, Defendants ignore the context and reason behind the addition of th[e] [Display Limitation], and its required meaning."). There was no need to "disclaim" that ordinary claim scope. *See* Appx15280-15287; *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288-89 (Fed. Cir. 2009) (prosecution history can inform and limit claim scope without "clear and unmistakable" disclaimer (citation omitted)). In any event, the patentees' statements during prosecution would have "clearly and unambiguously" disclaimed any intent (if it existed, which it did not) to include strip charts in the scope of the final claimed invention. *See, e.g.*, *Thorner v. Sony*

*Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); Appx15287; Appx18644 & n.5); *see also Athletic Alternatives, Inc. v. Prince Mfg.*, Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("narrower" of two possible constructions should control).

Third, the district court concluded that the Display Limitation does not require inspection data to be "displayed in a manner representing the 'actual physical geometry' of the furnace," such as by displaying one tube per line, in correct orientation, to scale, or scaled by a unit of measure other than time. Appx8; *see* Appx29-32. To the court, the data need only be "displayed in a way that suggests data markers representing the physical geometry of the furnace." Appx31 n.32 (quoting Appx14629-14630 ¶ 20); *see* Appx32 (quoting, without citation, Appx59-60).

That, however, is a false construct on its face. It draws a bizarre and illusory distinction between "physical geometry" and "*actual*" physical geometry. As a straightforward matter of plain English and common sense, arranging data to represent the "physical geometry" of stacked tube segments means arranging it to represent the "actual physical geometry" of those tube segments—i.e., tubes oriented properly, arranged in stacked fashion as in the actual furnace, and set to a physical *geometric* scale, not a *time-based* abstract one, as with strip charts. As discussed, that is entirely consistent with the language of the claims, which requires the

inspection data to be correlated to each tube segment, divided at bends, and then arranged to represent the physical geometry of the tube segments in their known stacked orientation. *See supra* at 31-38.

Indeed, the patentees repeatedly and expressly stated that the Display Limitation requires the inspection data to be depicted in a manner representing "*the actual physical geometry of the furnace*." *Id.*; Appx14949-14951; *see supra* at 16-22, 31-38. The Display Limitation is not concerned with how "*data markers*" could represent the furnace, as the district court implied—the Display Limitation requires *the partitioned data* (inspection data divided for each tube segment) to be arranged to represent the physical geometry of stacked tube segments. *See, e.g.*, Appx92 (cl. 24); *supra* at 31-38. If the claims only required that data markers correlate to physical features of the furnace, *any* set of data would satisfy the Display Limitation when such markers were added, regardless of how the data is otherwise arranged. The separate "correlate[d]" and "arranged to represent" terms in the claims would mean the same thing, contrary to well established law. *See, e.g.*, *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 847-48 (Fed. Cir. 2006).

In sum, contrary to the district court's conclusion, the claim language, purpose, and prosecution history make clear that the Display Limitation does not include mere strip charts and instead requires the inspection data to be displayed in a manner representing the actual physical geometry of the furnace.

### C. Strip Charts Do Not Represent The Physical Geometry Of Stacked Tube Segments

Strip charts, such as those in the Norco Reports, indisputably do not arrange partitioned inspection data to represent the physical geometry of stacked tube segments, as the Display Limitation requires. *See, e.g.*, Appx18689-18702; Appx18756-18759. No reasonable jury could conclude otherwise. *See, e.g.*, *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001) ("Summary judgment is inappropriate unless the evidence is such that a reasonable jury could not find for the non-movant.").

First, the arranged data in the Display Limitation is "partitioned inspection data," which, as the district court construed it, means data "[d]ivide[d] … into subset of smaller size, each of which begins and ends with a data maker." Appx57; *e.g.*, Appx92 (cl. 24). Strip charts, however, do not have data divided into subsets of smaller size that each begin and end with data markers—strip charts are one continuous data set artificially truncated according to randomly selected timing intervals that do not correspond with data markers.




*FIG. 3*

Appx18699 (depicting Fig. 3 of the ’874 patent with coloring added) (text boxes added). Indeed, at most, strip charts reflect the collection of inspection data and its correlation to physical features of the inspected furnace. As discussed, strip charts are nothing more than a convenient way to depict such correlated data on one page. *See supra* at 6-9; Appx15267; Appx18756-18759.

Second, even if strip-chart data were partitioned, it still would not represent the furnace tubes’ actual physical geometry. Strip charts display one continuous set of time-based data, starting from the bottom left corner and moving to the right and then continuing up in ascending rows, without regard for the actual physical layout and bends of the tubes. *See, e.g.*, Appx18698-18702. At least half of the tubes in any given strip chart are necessarily presented *backwards*, as the directional coloring indicates in the version of Figure 3 below (with blue tubes facing one direction and red tubes facing an opposite direction):




Appx18699 (truncated); *see, e.g.*, Appx18696-18702; Appx18756-18759; Appx18643-18645. The main reason for that is simple: as discussed (*supra* at 6-9), strip charts display inspection data as a function of *time*, not geometric scale or arrangement (as the claims require). Like tracking a car based on time rather than an odometer and GPS, the data in a strip chart is untethered to the actual location within the furnace. That makes determining the location of problem areas from strip charts alone nearly impossible. For example, a car could be driving in traffic around the same block for an hour and end up in the same location after several u-turns (like bends in the furnace), but a strip chart of its progress would still say that it is an hour away from where it started and none of the data collected during the trip would be spatially arranged according to actual route of the car. Thus, while strip charts may superficially appear to represent a set of stacked tubes, they actually display a maze of half-backwards half-complete overlapping tube segments of varying lengths, which do not represent the physical geometry of stacked tube segments.

Third, the written description expressly confirms that strip charts do not display the actual physical geometry of stacked tube segments. The patentees

specifically stated that "other types of displays" than strip charts could be used to display the inspection data for tube segments in a way that "matches the actual physical geometry of the furnace." Appx89-90 (11:36-48; 14:62-66). And the patentees highlighted how Fig. 9 depicted such a different example because it shows inspection data for tube segments "displayed in a manner that matches the actual physical geometry of the furnace":




FIG. 9

Appx18748; *see* Appx89-90 (11:36-48; 14:62-66). Fig. 9 is not a strip chart.

Accordingly, the strip charts in the Norco Reports do not anticipate any of the invalidated claims, each of which includes the Display Limitation. *See* Appx91-93 (cls. 1, 11, 12, 13, 24, 25, 30, 33, 37, 40). The summary judgment of invalidity (and resulting judgment of noninfringement) should be reversed.

## III. THE NORCO REPORTS DO NOT ANTICIPATE THE COMPOSITE DATA MARKER LIMITATION OF CLAIM 30

Claim 30 requires computer software that generates "composite data markers" to identify physical features of the scanned furnace tubes, such as "the locations of the furnace bends." Appx89 (12:61-63); Appx92-93 (cls. 24, 28, 30). The district court granted summary judgment that claim 30 is invalid under the § 102(b) on-sale bar because, according to the court, there was no genuine dispute that such composite data markers were used in the Norco Reports. Appx43-44. But any reasonable jury would find an absence of such computer-generated data makers in the Norco Report. The judgment of invalidity for claim 30 (along with the associated judgment of noninfringement) should be reversed or, at minimum, vacated. *See, e.g.*, *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006) (summary judgment improper absent "such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise").

### A. The Content Of The Program That Generated The Norco Reports, Not Quest's Source Code Generally, Is Dispositive

The district court directed its analysis for claim 30 to whether composite data markers "existed in [Quest]'s FTIS *source code* in August 2002" and whether that "*source code*" was "*present* during the Norco project." Appx39; Appx41. That, however, is not the proper focus for the § 102 inquiry here.

Under § 102(b)'s on-sale bar, a claimed invention is invalid if, before the critical date, the invention is the subject of a commercial offer for sale, and the invention is ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). The "product for sale," however, must be one "that embodies the claimed invention" to "place[] it in the public domain." *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 855 F.3d 1356, 1370 (Fed. Cir. 2017).

Source code is not a final executable program, such as Microsoft Word, that is used to accomplish an operation, such as word processing, and is not otherwise placed on sale. Source code is the closely-guarded underlying code from which such executable programs are compiled (i.e., built). It routinely contains features and functions that are "commented out"—including, for example, functionality that is in development for a future release, and any such lines of code are by definition never compiled into the executable program. *See, e.g.*, Appx19356-19358; Appx19067-Appx19071; Appx19212; Appx16323-16324; Appx19030-19031, Appx19037-19040; Appx19059-19063; Appx19221 (127); Appx19301-19303; Appx19354-19357. In other words, source code is merely the secret recipe for cake, not the cake itself, and any ingredient crossed out in the recipe never ends up in the mix.

Here, as any POSITA would understand, that means Quest's *source code* did not create the Norco Reports and was never itself "present during the Norco project" or potentially on-sale. Appx41. Indeed, it is even undisputed that Quest's

*executable* program compiled from that code was never actually sold in the Norco Project—Quest's engineers used the program and the customer only received its output. *See supra* at 11-15. Put simply, Quest's customer only purchased the spreadsheets and charts made by Quest's executable program, not the software program itself or its underlying source code. *See id.* The district court even recognized that Quest's source code never left a secure computer and was inaccessible except by hardcopy printout. Appx42 n.48. Thus, only the *specific* executable program *compiled from Quest's source code* was potentially responsible for generating the Norco Reports and was what potentially "embodie[d] the claimed invention" for § 102(b) purposes. *Helsinn*, 855 F.3d at 1370.

The relevant factual inquiry under § 102(b) is therefore whether the specific compiled "computer-executable instructions" in the final executable program that was actually used to generate the Norco Reports during the Norco Project practiced each and every element of the claimed inventions. Appx92-93 (cls. 24, 30). Whether such limitations could have been practiced by using Quest's underlying source code generally (or by unused portions of compiled code) is legally insufficient for anticipation under § 102(b). *See Helsinn*, 855 F.3d at 1370 ("public domain" encompasses only "product for sale"); *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010); *see also Elec. Storage*

*Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) (only actual "ordinary use" of a machine to produce a specific commercialized article is potential "public use").

### B. Reversal Is Warranted Because The Executable Program That Created The Norco Reports Did Not Contain A Function For Generating Composite Data Markers

There can be no reasonable dispute that the compiled executable program used to create the Norco Reports did not contain a software function for generating composite data markers from inspection (or sensor) data. *See* Appx18645-18647; *see also* Appx19301-19303. The actual executable program that created the Norco Reports no longer exists. *See* Appx16325 (78) (Cokebusters's counsel and Mr. De Lorenzo agreeing that "we don't have the executable code now"). So Defendants questioned Inventor De Lorenzo on two different versions of Quest's FTIS *source code*—one marked as Exhibit 127 was assembled from subscripts in a folder created on January 24, 2002 (the "January 2002 Source Code"), and another marked as Exhibit 128 was assembled from subscripts in a folder created on April 25, 2003 (the "April 2003 Source Code"). *See* Appx19211-19212. According to Defendants and the district court, there was clear and convincing evidence of invalidity because Mr. De Lorenzo supposedly admitted that a "composite data marker" could have been generated and displayed by a calculation in the "BendDetectRevA" function appearing on "line No. 42" of the April 2003 Source Code. Appx16203-16205;

Appx16325 (77); Appx16426-16427.[7] But no reasonable jury could rationally agree. *See, e.g.*, Appx19024-19047; Appx19050-19063; Appx19348-19359; Appx19361-19373.

First, the BendDetectRevA function did not even exist for compiling at the time of the Norco Project. The earliest comment date for that function is August 28, 2002. *See* Appx39-40; Appx17008. As Mr. De Lorenzo testified, that's "*not the release date of the code*," it is only the date when Mr. Bondurant began writing the function—a fact the author, Mr. Bondurant, confirmed. Appx16323 (71); *see also* Appx19212 (60); Appx19060-19063. Indeed, there is also a comment date of July 8, 2004, for the function too, indicating that it was still under development at that time and not released. *See, e.g.*, Appx17007; Appx19031-19039; Appx19060-19063. And, regardless of comment dates, it is undisputed that the April 2003 Source Code incorporating the BendDetectRevA function was only, in the words of Cokebusters's counsel, "available for the next commercial job done after April 25th, 2003"—over a month *after* the latest Norco Report. Appx19212 (58); *see* Appx14 & n.17; Appx19028; Appx19305.

---

[7] There is no relevant difference between the BendDetect function also discussed by Defendants' experts and the BendDetectRevA function relied on by the district court. *See* Appx39-40; Appx19051.

Second, the executable computer program that generated the Norco Reports never included any functionality (optional or otherwise) for generating composite data markers. The purported capability was contained in the source code's BendDetectRevA function. However, it is undisputed that the calculation on Line 42 of the BendDetectRevA function in the April 2003 Source Code was "commented out" and, thus, could never have been compiled into an executable program. *See supra* at 47-50; Appx19212 (60). Mr. De Lorenzo explained that fact without contradiction at his deposition:

> Q. [T]his is a subroutine called bend detect and it's Revision A of it; do you see that?
>
> A. Yes.
>
> ….
>
> Q. And then if you'll go down to Line No. 41, it says compute ….
>
> ….
>
> Q. … And then the next line display – DISP, does that mean display?
>
> ….
>
> Q. *Line No. 42*?
>
> A. *Yeah, it's commented out* …."

Appx16323 (70-72). That fact was repeatedly confirmed in declarations by both Mr. De Lorenzo and Mr. Bondurant. *See* Appx19029-19031, Appx19039; Appx19059-19061; Appx19305; Appx19355-19358.

The lack of such functionality is also confirmed by the lack of "X"s in the Norco Reports. The April 2003 Source Code clearly states that the BendDetect functions will place "X"s as markers to designate bend locations on any outputted strip chart displayed by the final compiled program, but no such "X"s appear in the charts for the Norco Reports. Appx16988; *see* Appx19039-19046; Appx19051-19059; Appx19306. Quest's experts even compiled and ran the BendDetect function on a sample set of data to prove that the function would have marked bends with "X"s:




Annotated result from running the function "BendDetect" (including the sub-function plot(x,y,'xk')) on a simple test data set. The black 'x' symbols are clearly seen near the sample "bend" areas.

Appx18725. In contrast, as shown below, the experts clearly explained how there are no "X"s in any of the charts in the Norco Reports, as the inventors also confirmed, and as the district court recognized was readily "apparent to the untrained eye."




**Typical strip chart from the February Norco report. No black 'x' symbols appear anywhere on this figure.**




**F52-01B Pass A 4inch Convection/Radiant**

**Typical strip chart from the March Norco Report (QUEST080580 - QUEST080633). No black 'x' symbols appear anywhere on this figure.**

Appx19053; Appx19056; *see* Appx42; Appx18722-18725.[8] Rather than "X"s, the charts in the Norco Reports include tube segment numbers that were generated from a function called "PlaceTubeNumbers" *from the January 2002 Source Code*. Appx19045-19046; Appx19058-19059; *see* Appx18710, Appx18716. Thus, there can be no legitimate dispute that the computer executable program used during the Norco Project lacked the software functionality to create composite data markers.

Third, consistent with Quest's older strip-chart technology (*see supra* at 4-11), the bends in the Norco Reports were identified and marked manually by Mr. De Lorenzo, not by any software program in use for the Project. *See* Appx19355-19358 (discussing how there were no composite data markers used in the Norco report, or ever by Quest, and that the bends were marked manually for the Norco Report). Mr. De Lorenzo's definitive testimony, which was put into the record on summary judgment by Defendants, was unequivocally clear on that point:

> Q. *Do you know how the bends were picked in the Norco report*?
>
> A. *Yes*. It was through a user interface.
>
> Q. So meaning that the data analyst … marked them?
>
> A. Yeah.

---

[8] Based on operator intuition and knowledge of the physical layout of the system (not inspection data), non-composite tick marks could be manually added post-hoc to strip charts to designate bends, just as Mr. De Lorenzo explained was done for the Norco Project. *See, e.g.*, Appx19354-19358; Appx19214; Appx19053; Appx19056.

> Q. Were you that analyst?
>
> A. *I believe I was, yes*.
>
> Q. Okay. So in this particular case, *you happened to mark the bends yourself, right*?
>
> A. *I did it via user interface, yes* ….

Appx16323 (67); Appx19214 (67); *see also* Appx19214 (68) ("Q: If the automated [BendDetect] function was used, it used the algorithm that Phil Bondurant set up to calculate bend? A. Correct."); Appx19214 (68) (Mr. De Lorenzo again confirming that bends were selected "manually through a user," not automatically). That definitively excludes the Norco Report as an anticipatory reference. *See, e.g.*, *Therasense*, 593 F.3d at 1332-33 (all limitations must be practiced to anticipate); '874 patent (cls. 24, 28, 30) (requiring computer executable program to create composite data markers); *Helsinn*, 855 F.3d at 1370; *Elec. Storage*, 307 U.S. at 20.

Thus, no reasonable jury could conclude that there was clear and convincing evidence that the underlying software program that generated the Norco Reports actually contained and used computer-executable instructions to generate any composite data markers. The district court should have granted summary judgment to Quest and reversal is warranted. *See Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) ("[T]o prevail on [a] motion for summary judgment of validity," a patentee does not even have to "have presented any factual evidence"); *see* Appx18645-18647; Appx19301-19306.

### C. At Minimum, Summary Judgment of Invalidity For Claim 30 Should Be Vacated

The district court granted summary judgment of invalidity because it believed that Quest's arguments and evidence were (i) not credible, (ii) premised on sham declarations submitted by Mr. De Lorenzo and Mr. Bondurant, and (iii) otherwise incapable of overcoming the supposed admissions concerning composite data markers in Mr. De Lorenzo's earlier deposition testimony. Appx39-44. Each of those findings is erroneous and independently warrants vacatur even if this Court declines to reverse outright.

#### 1. The District Court Erroneously Weighed The Credibility Of Quest's Arguments And Evidence

According to the district court, Quest's positions on summary judgment "lack[ed] credibility" because they were never "presented" to "defendants before [Quest's] summary judgment answering brief." Appx42-43. That was error.

First, it is blackletter law that the "credibility" of Quest's arguments and evidence was not for the court to decide. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). All factual issues and disputes had to be resolved in Quest's favor before granting summary judgment against it: "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [when] ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

Second, Quest had no ability or duty to inform Defendants of the shortcomings of their invalidity arguments prior to summary judgment. As a practical matter, it could not do so because Defendants' experts never expressly relied on the BendDetectRevA function at line 42 of the April 2003 Source Code before summary judgment. *See, e.g.*, Appx16793-16797. Regardless, parties only "waive[] arguments based on what appears in [their] brief" at summary judgment—not what comes before—and preserve arguments on summary judgment by raising them in their "principal summary judgment brief"—exactly as Quest did here. *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

### 2. The District Court Erroneously Excluded The Inventors' Declarations

The district court only granted summary judgment after dismissing the declarations by Mr. De Lorenzo and Mr. Bondurant as shams. *See* Appx40-43. The expert testimony referenced above was untouched by that ruling and is by itself sufficient to preclude summary judgment against Quest. *See, e.g.*, *In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1259 (Fed. Cir. 2007) (error to resolve factual disputes between experts on summary judgment); *see also infra* 66-67. In any event, the court fundamentally misapplied the sham-affidavit principle.

a. *The Bondurant Declaration Was Not Excludable Under The Sham-Affidavit Doctrine*

The district court found the Bondurant declaration legally irrelevant to the summary judgment inquiry under the "sham affidavit doctrine" because it "contradict[ed] DeLorenzo's deposition" testimony and a supposed "invention disclosure for FTIS" that "Bondurant sent himself" by email on August 28, 2002. Appx41-43.[9] That was error for four reasons.

First, there was no suggestion that Bondurant's declaration conflicted with "*his* … own *sworn* testimony," as is required for the sham-affidavit doctrine to apply. *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004); *see* Appx41 (recognizing that same standard). It is legally irrelevant that the declaration supposedly conflicted with *Mr. DeLorenzo*'s prior testimony or an *unsworn* statement in an email by Mr. Bondurant. Resolving those types of contradictions between witness testimony and "internal document[s]" (Appx43 n.50) requires the type of "[c]redibility determination[], the weighing of the evidence, and the drawing of legitimate inferences from the facts" that are reserved exclusively for the jury. *Anderson*, 477 U.S. at 255.

Second, there was no contradiction presented by Mr. Bondurant's declaration. In it, Mr. Bondurant explained that he only started writing the BendDetect function

[9] The district court also alluded to, but never explained, a supposed conflict with "[Quest]'s prior anticipation arguments." Appx43.

in August 2002, that the BendDetectRevA display function at line 42 of the April 2003 Source Code was commented out, and that the function was not available for use in compiled code to generate the Norco Reports. *See* Appx19059-19060; *see also* Appx16203-16204 (relying only on "line No. 42 … [in] Exhibit No. 128" to suggest the existence of composite data markers). Mr. De Lorenzo's prior testimony confirmed those facts. *See* Appx16323 (70-71) (Q. … "[Y]ou see up in the comments Phil D. Bondurant … August 28, 2002? … [D]oes that … indicate the date upon which this particular software was done? … A. … [I]t's not the release date of the code, it's when you started this comment …."); Appx16323 (72) ("Q. Line No. 42? A. Yeah, it's commented out …."); *see also* Appx19037-19039; Appx17008; Appx17007. And in his supposed "invention disclosure" of August 28, 2002, Mr. Bondurant only stated that an automatic bend detection had been "*coded* and *tested* on a variety of data sets"—not actually used on customer projects or included in any *executable* "FTIS code as of August 2002," as the district court somehow concluded, and much less in any of the Norco Reports. Appx43 (emphasis altered).

Third, the sham-affidavit doctrine would not apply even if there were a contradiction because there was a "plausible explanation" for any supposed conflict between Mr. Bondurant's declaration and Mr. De Lorenzo's supposed admission that the BendDetectRevA function was present in the FTIS executable code on

August 28, 2002. *Baer*, 392 F.3d at 624; *see* Appx39-40 (quoting Appx16325 (77)). Mr. Bondurant was the original author of the BendDetectRevA function and actually wrote the August 28, 2002 comment. *See* Appx19059-19063; Appx17008 (showing Mr. Bondurant's initials on the comment). Thus, while Mr. De Lorenzo was Quest's 30(b)(6) witness, it is entirely plausible that he simply misspoke in the statement identified by the court and that Mr. Bondurant was correct. Indeed, Mr. De Lorenzo was being shown incomplete versions of the source code during his supposed admission, and he had already expressly stated previously that the August 28, 2002 date only indicated when Mr. Bondurant started writing the script for the function, not when the function was ready for release. *See* Appx41-42 nn. 47-48; Appx16323 (70-71); Appx19029-19033; Appx19060-19062.

Fourth, even assuming a conflict, the sham-affidavit doctrine cannot apply because there is "corroborating evidence as to the substance of [Mr. Bondurant's declaration]." *Baer*, 392 F.3d at 625-26. Mr. Bondurant swore that there was no composite-data-marker functionality used by the program that generated the Norco Reports, and, along with declarations from both of Quest's experts, that fact is corroborated by the extensive evidence discussed above, including, for example, the use of tube numbers by the software rather than composite data markers, the commenting-out of the relevant function, and the designation of bends with black "X"s by that function, which do not appear in any of the Norco Reports. *See supra*

at 50-56; Appx18722-18726; Appx18763-18767; Appx19051-19063; Appx19301-19306. Indeed, the lack of X's shows definitively, and beyond any shadow of a doubt, that no composite data markers were generated, full stop.

This Court has categorically rejected the application of the sham-affidavit principle under similar circumstances in *Gemmy Industries*. There, a district court granted summary judgment of invalidity under the on-sale bar after ignoring a key witness's attempt to correct prior testimony by amending a prior affidavit concerning whether the patented product was on-sale at the relevant time. 452 F.3d at 1358-60. This Court reversed: "We agree that although a party cannot simply contradict an earlier sworn statement, here there was credible evidence supporting the contradiction," including corroborating photographs depicting the state of the product supposedly on-sale at that time. *Id.* at 1357-59 (citations omitted); *see also Baer*, 392 F.3d at 625-26 (corroborating evidence bars application of sham-affidavit principle). As the Court held, in such circumstances, the elements of the on-sale bar, "which depend on findings of material fact and include issues of credibility and weight, *cannot be decided adversely to the non-movant on summary judgment*." *Gemmy Indus.*, 452 F.3d at 1359.

The same is true here. The April 2003 Source Code (a potential "picture" of what *could* have been on-sale) indisputably shows that the BendDetectRevA function—which would use "X"s to designate composite data markers—was

commented out, and the Norco Report (an indisputable "picture" of what was supposedly on-sale) contains no "X"s, only tube numbers (per the January 2002 Source Code). *See supra* at 50-56. Thus, there was "credible evidence supporting [any] contradiction" (*Gemmy Indus.*, 452 F.3d at 1359) between Mr. Bondurant's declaration on summary judgment and any prior testimony by Mr. DeLorenzo (or, for that matter, the supposed "invention disclosure" authored by Mr. Bondurant in August 2002). *See id.* at 1357-59.

Mr. Bondurant's declaration alone clearly establishes facts that warrant outright reversal (*see supra* at 50-56), but at minimum, create a genuine dispute of material fact that the Norco Reports did not use composite data markers. *See, e.g.*, *SRAM*, 465 F.3d at 1357.

b. *The De Lorenzo Declaration Was Not Excludable Under The Sham-Affidavit Doctrine*

Beyond the fact that Mr. De Lorenzo's declaration supposedly conflicts with his own testimony, the district court excluded Mr. De Lorenzo's declaration under the sham-affidavit doctrine for the same reasons as Mr. Bondurant's declaration. *See* Appx39-43. Since the declarations—in relevant part—make identical points that are corroborated by identical objective evidence, that decision was equally erroneous for the same reasons discussed above. *See supra* at 59-63; *compare* Appx19024-19047, *with* Appx19050-19063. Indeed, Mr. De Lorenzo's similar statements regarding commented-out code for the BendDetect function and the lack of black

"X"s in the Norco Reports (*see* Appx19025-19037) are confirmed—not contradicted—by express statements in his deposition and independently corroborated by the April 2003 Source Code, the Norco Reports, Mr. Bondurant's declaration, and Quest's experts' declarations. *See supra* at 50-56, 59-63.

The additional supposedly conflicting testimony by Mr. De Lorenzo identified by the district court (*see* Appx39-40 (quoting Appx16325 (77))) does not change that straightforward conclusion. Mr. De Lorenzo never implied that an executable program compiled from Quest's source code would have included the BendDetectRevA function on August 28, 2002. *See* Appx39-40. But even if he had, Mr. De Lorenzo also clearly stated during his deposition (consistent with his declaration) that Line 42 of the function was "commented out," that August 28, 2002 was not the release date for the function, and that the function designated composite bend indicators with black "X"s, which do not appear in the Norco Reports. *See supra* at 50-56, 59-63. And, as the district court acknowledged (Appx41-42 nn.47-48), Mr. De Lorenzo made the supposedly conflicting statements when being cross-examined with incomplete and out-of-order excerpts of the April 2003 Source Code—a "plausible" (*Baer*, 392 F.3d at 625) justification for any conflict, regardless of how prepared Mr. De Lorenzo could have been for his deposition or when he chose to clarify his testimony. *See* Appx16323-16325 (70-71, 76-77); Appx19031-19035; *see also* Appx19060-19062. At most, therefore, the testimony cited by the

district court only reveals an inconsistency in Mr. De Lorenzo's deposition testimony that a jury might consider for credibility purposes—not a sham that justifies exclusion as a matter of law on summary judgment. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1306 (Fed. Cir. 2011) (jury, not district court, may "resolve conflicts in testimony").

Like Mr. Bondurant's declaration, Mr. De Lorenzo's declaration also alone warrants outright reversal (*see supra* at 50-56), but at minimum, mandates vacatur by creating a genuine dispute of material fact that the Norco Reports did not use composite data markers. *See, e.g.*, *SRAM*, 465 F.3d at 1357.

c. *Quest's Expert Testimony At Least Creates A Triable Fact Issue*

Finally, in any event, the district court itself did not exclude the declarations of Quest's experts. As discussed, that testimony unequivocally establishes that the software executable program that generated the Norco Reports did not have the capability to include composite data markers. *See supra* at 50-56. That alone establishes at least a material dispute of fact that forecloses summary judgment. *See also* Appx19305-19306 (arguing that, for claim 30, expert testimony establishes that the BendDetect functions used "X"s to designate bends, but that no such "X"s existed); *In re Gabapentin Patent Litig.*, 503 F.3d at 1259 (error to resolve factual disputes between experts on summary judgment).

### 3. The District Court Misread Mr. De Lorenzo's Deposition

Even if the district court were correct to reject Quest's arguments and evidence on summary judgment (and it was not), the district court still erred in granting summary judgment by drawing two unjustified conclusions from Mr. De Lorenzo's earlier deposition testimony.

First, the district court found that Mr. De Lorenzo "acknowledged that a 'composite bend indicator' existed in [Quest]'s FTIS source code *in August 2002*." Appx39 (citing Appx16325 (77)). But nowhere in the deposition testimony cited by the district court (Appx16325 (77)) did Mr. De Lorenzo admit that the BendDetectRevA function existed in the FTIS executable code in August 2002—Mr. De Lorenzo only agreed that, as of August 28, 2002, there was "software" that allowed for the display of "composite data markers." Appx16325 (77). That does not mean Quest's *compiled executable programs* included such functionality used in the Norco Project. Indeed, as Mr. De Lorenzo also testified, the BendDetectRevA function was merely written at that time in a script to be included in Quest's source code eventually, but it was commented out and not available for compiling until after the Norco Reports were generated. *See supra* at 47-56; Appx16323 (70-72).

Second, Mr. De Lorenzo never "acknowledged" that there was a "'composite bend indicator' … present in the software *during the Norco sale*." Appx39 (citing Appx16325 (77)). In the testimony relied upon by the district court, Mr. De Lorenzo

never even mentioned the Norco Project—and he certainly never discussed what was in the compiled executable program that generated the Norco Reports. *See* Appx39-40 (quoting Appx16325 (77)); *see* Appx16325 (77). As both counsel for Cokebusters and Mr. De Lorenzo agreed, "we don't have the executable code" that would have been generated from the April 2003 Source Code. Appx16325 (78).

At bottom, the district court drew factual inferences from the nonspecific statements in Mr. De Lorenzo's testimony to determine what it believed to be present in Quest's software used for the Norco Project. But any such "inferences from the facts" are reserved exclusively for the jury and, as matter of law, cannot be made by "a judge … [when] ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. And all such inferences must be resolved *in Quest's favor* before granting summary judgment of invalidity. *See id.* Thus, at minimum, the district court's judgment of invalidity (and noninfringement) for claim 30 should be vacated because there was no clear and convincing evidence that composite data markers were used to generate the Norco Reports. *See, e.g.*, *SRAM*, 465 F.3d at 1357.

## IV. THE NORCO REPORTS DO NOT ANTICIPATE THE SENSOR DATA MARKER LIMITATION OF CLAIM 40

The system of claim 40 requires a computer programmed to "analyze" certain "sensor data collected from [a] furnace" and "generate a plurality of data markers based upon said analysis of said sensor data" that are displayed to "identif[y] a location of a physical feature of [the] furnace." Appx93 (cl. 40). No reasonable jury

could find that a computer was programmed to perform those functions for generating the Norco Reports. Just as with claim 30, the district court's contrary conclusion ignored the overwhelming weight of record evidence, misapplied the law, and should be reversed, or, at minimum, vacated.

### A. Reversal Is Warranted Because Sensor Data Was Not Used To Create Data Markers In The Norco Reports

There can be no reasonable dispute that the compiled executable program used to generate the Norco Reports did not contain a function for generating a display of data markers for physical features of the inspected furnace based on sensor data. According to Defendants' experts, that functionality was present in the Norco Reports because the "BendDetect" function in the April 2003 Source Code (Appx16988-16989) used an assortment of sensor data to generate markers for bends in the furnace, including roll, acceleration, and axial encoding data. *See* Appx16802-16803. But as discussed previously, the April 2003 Source Code was not available for compiling when the Norco Reports were generated, the BendDetect function marks furnace bends with "X"s (but no "X"s exist in the strip charts in the Norco Reports), and Mr. De Lorenzo testified without contradiction that he, not some automated algorithm in a computer program, actually marked the bends for the Norco Report. *See supra* at 55-56; Appx18723-18726.

In addition, as with claim 30, specific key functions identified by Defendants in the April 2003 Source Code were unavailable. For example, Defendants claimed

that the BendDetect function relied on roll data ("pRoll" data) in the process of generating data markers, but the processing function for that data is commented out. *See, e.g.*, Appx18763-18765. And accelerometer data ("AccelYaw," "AccelPch," and "AccelDir" sensor data) are discarded during the operation of the BendDetect function—only radius and wall thickness data could have been used by the function. *See* Appx18722-18723; Appx18764-18765; *see also* Appx16991; Appx17044-17045; Appx18647-18648; Appx19221 (127-128).

No reasonable jury, therefore, could conclude that there is clear and convincing evidence that the Norco Reports were generated by executable code from the April 2003 Source Code that provided for data markers derived from the analysis of sensor data, as claim 40 requires. Reversal is warranted.

### B. At Minimum, The Summary Judgment Of Invalidity For Claim 40 Should Be Vacated

Despite the overwhelming evidence in the record, the district court erroneously concluded that there was "[u]nrebutted testimony from De Lorenzo and defendant's experts … that the Norco sale anticipates." Appx53. As an initial matter, the foundation for the district court's conclusion was the opinion of Defendants' experts that sensor data was part of the information used to generate the "composite data marker[s]" required by claim 30. *See* Appx52. Accordingly, if the summary judgment for claim 30 were reversed or vacated (as it should be, *see supra* at 47-67), the summary judgment for claim 40 must be too.

Regardless, the evidence and opinions identified by the district court was not "unrebutted." Appx54. To show that sensor data was used to generate data markers, Defendants' experts only pointed to the BendDetect function generally from the April 2003 Source Code, along with some data-processing functions relating to roll and accelerometer data. *See* Appx16802-16805. Quest's experts, however, explained that "sensor data is not used to create a data marker" in any of the source code identified by Defendants, including the BendDetect function. Appx18764; *see* Appx18722-18725. As discussed, they detailed how the BendDetect function would have used "only the wall-thickness and radius inspection data"—not any sensor data—"to create the bend indicators," and they proved that fact with sample data processed in a compiled version of the function that showed how the function would use "X"s as bend markers, which were not present in the strip charts for the Norco Reports. *See supra* at 68-69; Appx18722-18726; Appx18763-18765. That testimony at minimum creates a genuine dispute of fact that precludes summary judgment when resolving all disputed factual inferences in Quest's favor. *See, e.g.*, *In re Gabapentin Patent Litig.*, 503 F.3d at 1259 (error to resolve factual disputes between experts on summary judgment).

That conclusion is not altered by the factual inferences the district court drew from Mr. De Lorenzo's testimony—inferences that, regardless of substance, were improper on their face at the summary judgment stage. *See* Appx52-53; *Anderson*,

477 U.S. at 255. Contrary to the district court's suggestion, Mr. De Lorenzo never admitted that there was "an automatic bend detection algorithm in the FTIS source code used in the Norco sale" and that axial data was "critical" to it. Appx52. Far from it. *See supra* at 50-56, 68-69.[10] Mr. De Lorenzo testified explicitly that *he* marked bends manually for the Norco Project—not a computer programmed to do so based on sensor data. *See supra* at 55-56.

The court simply misreads the testimony it cites. Mr. De Lorenzo only addressed how axial data "*with the bend indice in it*" *already* from an "Excel spreadsheet" could be used generally to determine a "*relative* position" of "*minimum wall thickness*," not bends marked by a computer program. *See* Appx52-53 (quoting Appx37710). Indeed, Mr. De Lorenzo was being questioned about the earlier January 2002 Source Code (which did not include any version of the BendDetect function) and confirmed that it required an analyst to "use cross hairs and mouse button to select bend locations" manually. Appx19222 (137-139); *see* Appx37711 (133-134) (Cokebusters's counsel confirming that, for the discussion relied upon by

[10] Nor did Quest's experts "admit that the *source code used in the Norco sale* included the 'pRoll' function"—they explained the opposite was true. Appx54; *see supra* at 68-69; Appx18763-18765. And Quest never "admitted that the Norco sale anticipated limitation '[40-F]'"—that was the argument of Defendants' experts. Appx52 n.1 (citing Appx16805); *see* Appx16739; Appx16805.

the district court, they "were looking at Exhibit No 127"—the January 2002 Source Code—and attempting to "correlate[] it to some of the Norco figures").

And, although Mr. De Lorenzo discussed how axial and other sensor data may have been *collected* during the Norco project, claim 40 requires such data to be analyzed to create data markers. *See* Appx93 (cl. 40); Appx52-53; Appx18647; *see also* Appx18722-18725. The district court dismissed that fact as "not persuasive" and concluded that the relevant evidence of anticipation was "unrebutted" because claim 40 was a system claim and Quest's source code was supposedly "capable of satisfying the claim limitations" at the time of the Norco Project. Appx54 (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F. 3d 1197, 1204 (Fed. Cir. 2010)). But that principle concerning the practice of system claims for infringement purposes is inapposite here. The computer programmed to generate sensor-data-based markers had to be part of the system sold for the on-sale bar to apply to claim 40. *See Helsinn*, 855 F.3d at 1370; *see also Finjan*, 626 F.3d at 1204; *Fantasy Sports Props., Inc. v. Sportsline.com*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) (potentially inactive section of code had to be "*already present* in the underlying software" for device to infringe (emphasis in original)). As discussed, only the specific executable program compiled from Quest's source code—rather than the source code itself—was potentially in public use during the Norco Project, and there was no proof in the record that the executable program used to generate the Norco Reports actually

contained functionality to analyze sensor data to create data markers. *See supra* at 68-72.

## CONCLUSION

For the foregoing reasons, the Court should reverse or vacate the district court's judgments in these appeals.

Dated: March 20, 2018

Respectfully submitted,

*/s/ Michael A. Morin*

Michael A. Morin
Gabriel K. Bell
Robert J. Gajarsa
Abigail A. Rives
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Plaintiff-Appellant Quest Integrity USA, LLC*

# ADDENDUM

# TABLE OF CONTENTS


| Page No. | Date/Exhibit No. | Description |
|---|---|---|
| Appx1 | Mar. 28, 2017 | Memorandum Opinion<br>—No. 1:14-cv-01482 (ECF No. 247)<br>—No. 1:14-cv-01483 (ECF No. 356) |
| Appx50 | Apr. 7, 2017 | Memorandum order regarding reconsideration<br>—No. 1:14-cv-01483 (ECF No. 364) |
| Appx55 | June 28, 2016 | Memorandum order regarding claim construction<br>—No. 1:14-cv-01482 (ECF No. 137)<br>—No. 1:14-cv-01483 (ECF No. 182) |
| Appx67 | Mar. 28, 2017 | Order regarding summary judgment<br>—Nos. 1:14-cv-01482 (ECF No. 248)<br>—No. 1:14-cv-01483 (ECF No. 357) |
| Appx69 | Mar. 28, 2017 | Judgment<br>—No. 1:14-cv-01482 (ECF No. 249) |
| Appx70 | July 12, 2017 | Final judgment<br>—No. 1:14-cv-01483 (ECF No. 376) |
| Appx72 | June 2, 2009 | U.S. Patent No. 7,542,874<br>—No. 1:14-cv-01482 (ECF No. 136)<br>—No. 1:14-cv-01483 (ECF No. 181) |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUEST INTEGRITY USA, LLC<br><br>Plaintiff,<br><br>v.<br><br>CLEAN HARBORS INDUSTRIAL SERVICES, INC.<br><br>Defendant. | ) | Civ. No. 14-1482-SLR |
| QUEST INTEGRITY USA, LLC<br><br>Plaintiff,<br><br>v.<br><br>COKEBUSTERS USA INC.<br><br>Defendant. | ) | Civ. No. 14-1483-SLR |

Thomas C. Grimm, Esquire, Jeremy A. Tigan, Esquire, and Stephen J. Kraftschik, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Douglas A. Grady of Foster Pepper PLLC.

Kelly E. Farnan, Esquire and Selena E. Molina, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendant Clean Harbors Industrial Services, Inc. Of Counsel: Michael J. Turgeon, Esquire and Robert S. Rigg, Esquire of Vedder Price P.C.

David E. Moore, Esquire, Stephanie E. O'Byrne, Esquire, and Bindu A. Palapura, Esquire of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendant Cokebusters USA Inc. Of Counsel: Nick Brown, Esquire, Thomas M. Fulkerson, Esquire, and Wesley G. Lotz, Esquire of Fulkerson Lotz LLP; Michael Hudgins, Esquire and Steven Hudgins, Esquire of The Hudgins Law Firm.

**MEMORANDUM OPINION**

Dated: March 28, 2017
Wilmington, Delaware

**ROBINSON, Senior District Judge**

## I. INTRODUCTION

Quest Integrity USA, LLC ("plaintiff") initiated the above lawsuits on December 15, 2014, by filing complaints against Clean Harbors Industrial Services, Inc. ("Clean Harbors") and Cokebusters USA Inc. ("Cokebusters") (collectively, "defendants") asserting infringement of U.S. Patent No. 7,542,874 ("the '874 patent"), entitled "2D and 3D Display System and Method for Furnace Tube Inspection." (Civ. No. 14-1482, D.I. 1, ex. A) Plaintiff filed for a preliminary injunction, which the court denied on June 12, 2015. (Civ. No. 14-1482, D.I. 99) On June 28, 2016, the court issued its claim construction. (Civ. No. 14-1482, D.I. 137) Now that discovery has concluded, plaintiff has reduced the number of asserted claims to nine. Plaintiff asserts claims 1, 13, 25, 33, and 37 against defendant Clean Harbors and claims 12, 24, 30, 33, and 40 against defendant Cokebusters.[1] (Civ. No. 14-1482, D.I. 180 at 1; Civ. No. 14-1483, D.I. 286 at 1) Therefore, claims 1, 12, 13, 24, 25, 30, 33, and 40 of the '874 patent are pending.[2]

In December 2016, the parties filed various motions for summary judgment. Plaintiff moves for summary judgment of infringement and validity. (Civ. No. 14-1482, D.I. 179, D.I. 183; Civ. No. 14-1483, D.I. 285, D.I. 289) Defendants move for summary judgment of invalidity. (Civ. No. 14-1482, D.I. 184; Civ. No. 14-1483, D.I. 293) Clean Harbors moves for summary judgment of noninfringement. (Civ. No. 14-1482, D.I. 189) Cokebusters moves for summary judgment of noninfringement and no willfulness. (Civ. No. 14-1483, D.I. 290)

---

[1] The court ordered plaintiff to limit the asserted claims to "three independent and two dependent claims." (Civ. No. 14-1482, D.I. 145 at ¶ 6) Meanwhile, after the court denied reconsideration on this matter, plaintiff sees fit to complain about this requirement yet again. (Civ. No. 14-1482, D.I. 169 at ¶¶ 2-3; D.I. 180 at 1 n.1)

[2] As is discussed herein, defendants move for invalidity of independent claim 11 and dependent claims 27 and 28.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## III. DISCUSSION

### A. Claim Construction

At claim construction, neither party sought construction of claims 12 and 25.[3] (Civ. No. 14-1482, D.I. 119) Plaintiff moves for summary judgment of validity of these two claims and now proposes constructions for their limitations. (Civ. No. 14-1482, D.I. 195 at 19-21) Defendants argue that no construction is necessary but offer an alternate construction.[4] (Civ. No. 14-1482, D.I. 220 at 26-27)

#### 1. Standard

Claim construction is a matter of law. *Phillips v. AWH Corp*., 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). Claim construction focuses on intrinsic evidence - the claims, specification, and prosecution history - because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v.*

---

[3] Plaintiff averred that with respect to the "generate a display . . . arranged to represent said physical geometry" limitations, "similar phrases exist in other claims, but they should be construed consistently with Quest's proposed construction as noted in the Joint Claim Construction Statement." (Civ. No. 14-1482, D.I. 128 at 24 n.11)

[4] Defendants argue further that claim 12 is invalid under section 112 because "[c]laim 11 requires that the display be of a 'plurality' of tube segments (two or more), while the display in dependent claim 12 (which must by law practice all the elements of claim11) allows display of 'one or more' tube segments." (Civ. No. 14-1482, D.I. 220 at 28 n.28)

*Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claims must be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1313. In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, _ U.S. _, 135 S. Ct. 831, 841 (2015) (citation omitted).

Claim construction starts with the claims and remains centered on the words of the claims throughout. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the absence of an express intent to impart different meaning to claim limitations, "the words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582). "The ordinary meaning may be determined by reviewing various sources, such as the claims themselves, the specification, the prosecution history, dictionaries, and any other relevant evidence. Ultimately, '[t]he only meaning that matters in claim construction is the meaning in the context of the patent.'" *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, Civ. No. 2015-1425, _ F.3d. _, 2016 WL 3065024, at *3 (Fed. Cir. May 31, 2016). The specification is often "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

**2. Analysis**

Claim 12 recites "[t]he computerized method of claim 11, wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more of

said stacked tube segments of said furnace." ('874 patent, 17:35-38) Claim 25 recites an article of manufacture claim for performing the method of claim 12.[5] (*Id.* at 18:46-49)

The term **"wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more stacked tube segments of said furnace"**[6] means "inspection data from one or more of the stacked tube segments is displayed in two or three dimensions."[7] The "said display" of claim 12 refers to the term in claim 11 "generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments," which the court construed to mean "creating a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments."[8] (Civ. No. 14-1482, D.I. 137 at ¶ 5) The display is of the inspection data and not the tube segments: "the computer is also programmed to generate a display of the partitioned inspection data." ('874 patent, abstract) "The present invention relates generally to furnace tube inspection systems, and more particularly to a system and method for displaying inspection data in a two-dimensional and/or three-dimensional format to enable visual detection of problem areas within the furnace." (*Id.* at 1:20-24)

---

[5] The parties argue claim 25 alongside claim 12.

[6] Found in claims 12 and 25 of the '874 patent.

[7] Defendants proposed "wherein said display is comprised of one or more of said stacked tube segments visually represented in two or three dimensions." (Civ. No. 14-1482, D.I. 220 at 27) Defendants had argued that claims 12 and 25 "merely add a 2D or 3D requirement to the independent claims." (*Id.* at 26) Defendants' proposed construction did not resolve plaintiff's suggestion that (in addition to requiring 2D or 3D displays of inspection data), claims 12 and 25 add another limitation requiring the 2D or 3D display "of the stacked tubes themselves." (Civ. No. 14-1482, D.I. 195 at 20-21) For reasons to be discussed below, the 2D and 3D display embodiments relate to the display of inspection data and not representations of the furnace tubes themselves.

[8] The independent claim already addresses the physical geometry of the tubes in the so-called "Display Limitation." For reasons to be discussed below, there is nothing in the specification to suggest that applicant intended additional limitations (in claims 12 and 25) beyond 2D and 3D display of inspection data.

The specification identifies figures 3, 4, 5, and 6 as "two-dimensional color-coded" charts and figure 9 as a "three dimensional color-coded chart." (*Id.* at 3:55-4:20) In example 1, "computer 102 is programmed to generate a two-dimensional display of the wall thickness readings and/or inside radius readings collected from a furnace." (*Id.* at 9:54-56) The two-dimensional display embodiments of example 1 are disclosed with reference to figures 3 and 4. (*Id.* at 9:66-11:47) Examples 2 and 3 describe that "computer 102 is programmed to generate a two-dimensional display of the wall thickness readings" in which the "tube segments are positioned in their proper orientation." (*Id.* at 11:52-53; 12:21-22; 11:61-62; 12:31-32; *see also id.* at 12:6-7; 12:42-43 ("viewing all of the tube segments in their proper orientation")) Example 2 references figure 5, and example 3 references figures 5 and 6. (*Id.* at 11:56-12:17; 12:25-55)

Examples 1 and 4 discuss three-dimensional displays of inspection data "in a manner that matches the **actual physical geometry** of the furnace." ('874 patent, 14:65-66 (emphasis added); *see also* 11:44-46) For instance, example 1 contemplates a 3D display of the "wall thickness readings and/or inside radius readings." (*Id.* at 11:42-43) Meanwhile, example 4 recites:

> Computer 102 is also programmed to generate a display of the partitioned inspection data that may be viewed by a data analyst in order to visually detect problem areas within the furnace. This display may comprise a two-dimensional or three-dimensional representation of one or more of the tube segments of the furnace, which may be customized in accordance with customer requirements. For example, one customer may require a display that shows the wall thickness at five equally spaced positions along the length of a specific tube segment, while another customer may require a display that shows the minimum wall thickness for each tube segment of the furnace. Of course this information may also be provided to the customer in the form of a written report that accompanies the display.

(Id. at 14:45-59) Example 4 refers to figure 9. (*Id.* at 14:60-15:17)

The specification discloses several embodiments of 2D and 3D representations of inspection data, which range from 2D strip charts with no limitations on the orientation of the inspection data to 3D displays of inspection data portrayed "in a manner matching the physical geometry of the furnace." Mere reference to these embodiments does not support a construction limited to one of those embodiments. As discussed extensively in the court's claim construction order, the intrinsic record shows that applicant did not disclaim strip charts during prosecution. (Civ. No. 14-1482, D.I. 137 at ¶¶ 9-11) Nothing in the specification or the claims suggests that claims 12 and 25 should be read to exclude example 1 and figures 3 and 4. Therefore, claims 12 and 25 do not add limitations that require: (1) 2D or 3D representations of the tube segments themselves; (2) inspection data to be displayed in a manner representing the "actual physical geometry" of the furnace; or (3) an arrangement of the inspection data in a manner that places tube segments in their "proper orientation."[9]

---

[9] Plaintiff sought a construction wherein "said display is comprised of a two-dimensional depiction of one or more of the inspected tubes displayed as a stacked set of bars wherein each bar displays readings from a single tube segment of the furnace or a three-dimensional depiction where the displayed tube segments match the actual physical geometry of the furnace." (Civ. No. 14-1482, D.I. 195 at 20-21, 24) Plaintiff argues extensively that this construction is necessary to read out example 1 and figures 3 and 4 from claims 12 and 25, which applicant allegedly disclaimed during prosecution and is otherwise apparent from the specification. In support, plaintiff cited to "stacked set of bars" language from example 1 at col. 11, lines 36-46 (discussing figures 3 and 4) and argued that "[t]his language never appears in Example 1 and never appears in the discussion of the strip charts shown in figures 3 and 4." (Civ. No. 14-1482, D.I. 195 at 18) Given that plaintiff's argument contradicts the specification, the court declines to address it. Additionally, plaintiff contended that "[e]ven if strip charts are regarded . . . as being coextensive with [] independent claims . . . 11 and 24, claims 12/25 are dependent and thus narrower by definition." (Civ. No. 14-1482, D.I. 195 at 23; *see also* D.I. 187, ex. 17 at 45-46) This is an improper blurring between anticipation and claim construction. *See Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1195 n.4 (Fed. Cir. 2003). Moreover, the strip charts in the Norco sale could anticipate both independent claim 11 and dependent claim 12. *See, e.g., In re Slayter*, 276 F.2d 408, 411 (C.C.P.A. 1960). The court declines to address plaintiff's remaining, duplicative arguments.

The court has provided a construction in quotes for the claim limitations at issue. The parties are expected to present the claim construction consistently with any explanation or clarification herein provided by the court, even if such language is not included within the quotes.

**B. '874 Patent – Validity**

Defendants assert that claims 1, 11, 12, 13, 24, 25, 27, 28, 30, 33, 37 and 40 of the '874 patent are invalid as anticipated under pre-AIA 35 U.S.C. § 102(b) by plaintiff's[10] sale to Orion Norco Refining located in Norco, Louisiana ("the Norco sale"), as documented in the first of two reports (the "Norco Reports") dated February 17-23, 2003. (Civ. No. 14-1482, D.I. 185 at 11; D.I. 187, ex. 8) Defendants contend that these claims are also obvious under § 103 and invalid for claiming patent ineligible subject matter under § 101. (*Id.* at 26-27) Plaintiff, in its answering brief, argues that the Norco sale does not anticipate the claims and that the Norco sale was part of a pattern of experimental sales and product improvement, which means that the FTIS product and services were not "on sale" within the meaning of § 102(b). (Civ. No. 14-1482, D.I. 195 at 8-11) Plaintiff contends that the claims are not obvious or invalid for failing to claim eligible subject matter. (*Id.* at 26, 39) Given the late timing of this argument, defendants contend that the eleventh-hour declaration by plaintiff's experts Robert Caligiuri, PhD, PE, FASM ("Caligiuri") and Shukri J. Souri, PhD ("Souri") "should be disregarded under (1) the sham affidavit doctrine; (2) Fed. R. Civ. P. 30(e); and/or (3) Fed. R. Civ. P. 37."[11] (Civ. No. 14-1482, D.I. 220 at 4)

Plaintiff moves for summary judgment of validity with respect to dependent claims 12 and 25. (Civ. No. 14-1482, D.I. 183; Civ. No. 14-1483, D.I. 289) Plaintiff

---

[10] The sale was by plaintiff's predecessor, "Quest Integrated, Inc."

[11] Alternatively, defendants assert that the court should exclude the expert testimony from evidence by relying on the *Pennypack* factors. (Civ. No. 14-1482, D.I. 220 at 6)

contends that these claims are directed to figures 5, 6, and 9 of the '874 patent and that the court's claim construction did not address these narrow claim limitations. (Civ. No. 14-1482, D.I. 195 at 4-5) Plaintiff argues that, under the principle of claim differentiation, prior art (the Norco sale) presented at the preliminary injunction could not invalidate both the independent claims as well as the dependent claims 12 and 25. (*Id.*) Defendants respond that plaintiff's proposed construction for claim 12 is "tortured and narrow" and that there is no "one-for-one correlation between examples in the specifications and any specific claim." (Civ. No. 14-1482, D.I. 220 at 28-30) Defendants argue that the Norco sale anticipates claims 12 and 25. (*Id.* at 30-32)

**1. Standards**

**a. Anticipation**

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States."[12] The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. Id. The prior art need not be *ipsissimis verbis* (i.e., use identical words as those

[12] The '874 patent has a priority date before March 16, 2013, therefore, pre-AIA § 102 applies.

Case: 17-2423 Document: 11 Page: 95 Filed: 03/20/2018

recited in the claims) to be anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Labs Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed. Cir. 1998).

**b. Experimental use**

"[T]he on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. . . . Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). The party asserting invalidity "must [] prove the facts underlying both prongs of the *Pfaff* test by clear and convincing evidence."[13] *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002). "Whether a product was placed on sale under § 102(b) is a question of law based upon underlying factual determinations." *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993) (citations omitted).

"Nevertheless, an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye. The law has long recognized the distinction

[13] In the instant case, defendants presented arguments that the Norco sale anticipates the relevant claims before plaintiff asserted its experimental use defense. In their December 14, 2016 declaration, defendants' experts Scott Schaefer, PhD ("Schaefer") and Jerry Rau ("Rau") included a section on "Commercial nature of pre-critical date sales and readiness for patenting" (Civ. No. 14-1482 D.I. 187, ¶¶ 17-26) Schaefer and Rau noted "[w]e have included this section here out of an abundance of caution, but we believe the conclusions we reach here can also be derived from a review of the documentation without the benefit of expert testimony on the subject." (Civ. No. 14-1482 D.I. 187, ¶ 17 n.10) The court agrees.

between inventions put to experimental use and products sold commercially." *Pfaff*, 525 U.S. at 64. In order to determine whether public use or sale is experimental, the Federal Circuit has catalogued a nonexhaustive list of objective factors that include:

> (1) the necessity for public testing; (2) the amount of control over the experiment retained by the inventor; (3) the nature of the invention; (4) the length of the test period; (5) whether payment was made; (6) whether there was a secrecy obligation; (7) whether records of the experiment were kept; (8) who conducted the experiment; (9) the degree of commercial exploitation during testing; (10) whether the invention reasonably requires evaluation under actual conditions of use; (11) whether testing was systematically performed; (12) whether the inventor continually monitored the invention during testing; and (13) the nature of the contacts made with potential customers.

*Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1213 (Fed. Cir. 2005) (citations omitted). These factors "represent various kinds of evidence relevant to the question of whether pre-critical date activities involving the patented invention—either public use or sale were primarily experimental and not commercial." *Id*. "In determining the purpose of the alleged experimental use, objective evidence indicating a purpose for such testing and experiment is generally preferred. An inventor's subjective intent is generally of minimal value." *In re Smith*, 714 F.2d 1127, 1135 (Fed. Cir. 1983).

**2. Undisputed facts**

Plaintiff (and its predecessors) sells nondestructive furnace tube inspection services[14] ("FTIS") to clients in the petrochemical industry. (*See, e.g.*, Civ. No. 14-1482, D.I. 198, ex. J at 1 (February 14, 2003 quotation for Norco services)) In connection with FTIS, plaintiff obtained the '874 patent, which includes "color-coded strip chart[s]" shown in figures 3 and 4. ('874 patent, 3:55; 3:59; figure 3 (wall thickness readings); figure 4 (inside radius readings)) For example, the '874 patent describes the strip chart

[14] Plaintiff uses "FTIS" in connection with "furnace tube inspection services" as well as a "furnace tube inspection system."

in figure 3: "computer 102 is programmed to generate a strip chart 300 in which all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of horizontal strips. The wall thickness readings are plotted successively in time from left-to-right and bottom-to-top." ('874 patent, 9:66-10:4) The '874 patent also includes figure 8, which is "a colorized chart . . ., which shows the composite data markers in relation to an adaptive threshold that may be used to identify the locations of the furnace bends." ('874 patent, 4:11-14)

On August 30, 2002, one of the inventors of the '874 patent, Phil Bondurant ("Bondurant"), sent himself an e-mail containing an attached Microsoft Word document, entitled "FTISPatent.doc," that contained a disclosure about FTIS. (Civ. No. 14-1482, D.I. 186, ex. 1) This document contains text describing an invention[15] related to FTIS and includes three figures that are similar[16] to figures 3, 4, and 8 of the '874 patent. (*Id.*; *see also* '874 patent, figures 3, 4, and 8)

In a February 14, 2003 quotation for services to be delivered at a refinery in Norco, Louisiana ("first Norco quotation"), plaintiff's predecessor described its FTIS services as "fairly new to the commercial marketplace," having been developed "approximately five (5) years" before and now employing a "second generation" FTIS

---

[15] For example, the document begins with:

> This invention describes a method to analyze and display data collected from an autonomous furnace tube inspection system. In particular, the invention provides a processing and display methodology that allows a large data set of wall thickness and radius information that was collected by an autonomous inspection tool to be correlated with the physical structure of the furnace tube and to quickly determine the location of defects within the data set.

(Civ. No. 14-1482, D.I. 186, ex. 1 at 3)

[16] The court notes that, in the August 30, 2002 document, "figure 1" corresponds to "figure 3" in the '874 patent, "figure 2" corresponds to "figure 4" in the '874 patent, and "figure 3" corresponds to "figure 8." By "correspond," the court notes that the data contained in these figures is similar, employs the same units of measurement, uses the same scale on the axes, and includes the same notations identifying tube sections (e.g., "1x").

Case: 17-2423 Document: 11 Page: 98 Filed: 03/20/2018

sensor known as the "FTIS Intelligent Pig." (Civ. No. 14-1482, D.I. 198, ex. J at 1) The first Norco quotation describes the reporting to be delivered as follows:

> A "Field" Inspection Report can be supplied on site within 8 hours after the data is collected and analyzed. The inspection report will provide 2-Dimensional (2D) color graphics of all individual piping coil segments, return bends, and cross-over piping. Piping segments containing wall thinning, corrosion, broad area pitting, erosion, and bulging which exceed the client's specified threshold level will also be provided. . . .
>
> A "Final" Inspection Report will . . . be professionally bound. . . . . [and] the client will also receive an electronic copy of the report, drawings, images, and raw data on Compact Disk (CD). This data will also be archived at QUEST for use in future comparison inspections.

(*Id.* at 6-7) The first Norco quotation resulted in the first part[17] of the Norco sale, which was delivered in two parts and documented in the two separate Norco Reports dated February 17-23, 2003 and March 3-7, 2003. (Civ. No. 14-1482, D.I. 187, ex. 8 and 9; D.I. 185, ex. A at 2-3)

The first Norco Report provides an explanation of the process employed by plaintiff's then current FTIS. (Civ. No. 14-1482, D.I. 187, ex. 8) After the inspection of the furnace by the "FTIS™ Intelligent Pig" is completed and "[o]nce the ultrasonic data is processed, it is then stored for downloading to the data station at the end of the inspection." (*Id.* at 3)

> The data analysis computer is a rugged, Pentium®-based portable computer that utilizes the Windows NT®/XP® system. This computer is provided with the custom FTIS application software. The FTIS software enables the operator to configure the FTIS tool, download data from Flash RAM, and process and display collected data.
>
> . . .
>
> The FTIS software package allows operator control and configuration of the FTIS tool from within a fully menu driven graphical user interface. The FTIS software also provides

[17] The second part of the Norco sale is documented in a separate quotation dated March 6, 2003, after the first report had been completed. (Civ. No. 14-1482, D.I. 198, ex. K)

> analysis, display, and reporting capability. Displays consist of tabular, cross-sectional, and color surface plots of the data.

(*Id.* at 3-4) With respect to "2D Modeling,"

> QUEST has designed custom software, which allows 2-Dimensional (2D) viewing of the "entire" piping coil (refer to Figure 3). The color bar to the right represents a range of wall thickness in inches. The piping coil data begins in the bottom left corner and moves to the right. It then moves up one row and repeats the left to right motion throughout the length of the inspection. Over a mile of piping can be presented on a single plot.

*(Id.* at 4) In summarizing the project, plaintiff explained that "[e]ach pass was broken down into 23 sections for easy identification and tracing," e.g., sections numbered 1-9 "refer to the piping located in the Radiant portion of the pass." (*Id.* at 7) According to plaintiff, "[e]ach pipe section number was located between two return bends. Each section number has its own unique identifier for ease in locating flaws detected during the inspection . . . ." (*Id.* at 8) Figure 3 is a 2-dimensional viewing of the inspection data, organized by "Section Number" and identifying "Return Bends."




**Figure 3. FTIS 2-D Plot**

(*Id.* at 4) The second Norco Report, dated March 3-7, 2003, contained descriptions of the tubing, identified by section numbers. (Civ. No. 14-1482, D.I. 187, ex. 9 at 8) The strip charts in the second Norco Report were similar to the first report but used hash marks to identify bends in the tubes.




**Figure 3. FTIS 2-D Plot**

**Color Bar Illustrating Thickness in Inches**

(*Id.* at 4)

For these two projects, plaintiff was paid $31,160 and $40,900 respectively, for a total of $72,060. (Civ. No. 14-1482, D.I. 185, ex. A at 4) The Norco Reports include color-coded strip charts showing wall thickness data and identifying furnace tube sections. (Civ. No. 14-1482, D.I. 187, Ex 8 at 16, 20, 24, 29, 33, 37, 45, 49, 53, 57, and 61; ex. 9 at 15, 20, 25, 30, 35, 40, 46, and 51) The strip charts state that the "Wall Thickness Data [are] generated with QUEST proprietary technology," but the word "confidential" does not appear anywhere in the Norco Reports. (*Id.*) The Norco sale involved using a computer, ultrasonic sensors, and a computer readable medium. (Civ. No. 14-1482, D.I. 185, ex. A at 7-96)

On December 19, 2003, Bondurant and Robert De Lorenzo ("De Lorenzo") prepared an invention disclosure for "FTIS Post Processing and Display." (Civ. No. 14-1482, D.I. 186, ex. 2) This invention disclosure includes color images matching figures

1-3 in Bondurant's August 2002 disclosure. (*Id.*) The text of the invention disclosure contains minor edits from Bondurant's August 2002 document. (Civ. No. 14-1482, D.I. 186, ex. 5) Plaintiff filed the provisional patent application that led to the '874 patent on June 1, 2004. ('874 patent, cover) Therefore, for § 102(b) purposes, the critical date is June 1, 2003. (Civ. No. 14-1482, D.I. 185 at 3; D.I. 195 at 9)

### 3. Analysis – the Norco sale as § 102(b) prior art

#### a. Commercial sale

Plaintiff contends that the Norco sale was not a commercial sale, because "[c]ontemporaneous documents, inventor testimony, and other testimony firmly establish that [plaintiff's] Norco sale was experimental." (Civ. No. 14-1482, D.I. 195 at 8) In support of this eleventh-hour contention, plaintiff presented declarations dated December 28, 2016 from DeLorenzo and Bondurant (collectively "the inventors") (Civ. No. 14-1482, D.I. 202) and from its experts. For example, Caligiuri and Souri opined that the Norco sale was experimental, because "[w]hen companies are developing new technologies, they will often test experimental prototypes for clients and underwrite a portion of the cost while charging the client part of the cost of the experiment." (Civ. No. 14-1482, D.I. 197, ex. A at ¶ 24) Despite the significance of the § 102(b) statutory bar to the validity of the '874 patent, Caligiuri and Souri, in their November 4, 2016 rebuttal expert report on validity, expressed no opinion about the question of whether the Norco sale was "on sale" within the scope of the statute.[18] (Civ. No. 14-1482 D.I. 187, ex. 15,

[18] Defendants also point out that the inventors, during their respective depositions, had not indicated that the Norco sale was experimental. (Civ. No. 14-1482, D.I. 185 at 4-5) While these statements may not be the "smoking gun" that defendants assert them to be (primarily because they are answers to compound questions (*see, e.g.*, Civ. No. 14-1482, D.I. 220 at 3-4)), the Norco sale has been at the forefront of defendants' invalidity contentions, and plaintiff has been on notice since as early as 2015 that the Norco sale may be prior art. (*See, e.g.*, Civ. No. 14-1482, D.I. 99 at ¶¶ 16-20 (denying a preliminary injunction based upon likely invalidity of the '874 patent in light of the Norco sale))

¶ 74 ("We note that there may be some question as to whether these alleged sales were actually 'sales' in the U.S. for purposes of 102(b), but our report does not address that question.")) The conclusory, three-paragraph declaration of Caligiuri and Souri simply points to the declaration by the inventors and provides little insight into the *Electromotive* factors. (Civ. No. 14-1482, D.I. 197, ex. A at ¶¶ 23-26)

The bulk of plaintiff's *Electromotive* analysis is, therefore, based upon the inventors' declaration. Defendants do not dispute the inventors' subjective intent as evidenced by their declaration, but the declaration provides little objective evidence of experimentation. *See In re Smith*, 714 F.2d 1127, 1135 (Fed. Cir. 1983) ("An inventor's subjective intent is generally of minimal value.").

Nonetheless, in light of the undisputed facts in the record, the inventors' declaration is useful in evaluating the *Electromotive* factors. For example, the inventors state that "[a] 'sale' of the Quest product is simply a contract to perform an inspection. . . . At no point during or after an inspection does anyone other than Quest personnel have access to the FTIS product, including the tool and the software that is involved in any analysis." (Civ. No. 14-1482, D.I. 202 at ¶ 2) Defendants do not dispute this fact, and the court notes that in the Norco sale, plaintiff was in control of the product, the software, and the performance of the method steps, which is the second *Electromotive* factor "(2) the amount of control over the experiment retained by the inventor." *Electromotive*, 417 F.3d at 1213.

The inventors explain that "there was no way for us to fully test and experiment with the tool (hardware and software) other than to run it at full sized refineries," because "[a]t the time we only had a very small section of pipe, something around 50 feet at our facility in Kent [, Washington]." (Civ. No. 14-1482, D.I. 202 at ¶ 6) The first *Electromotive* factor "(1) the necessity for public testing" appears to weigh in favor of plaintiff, but every independent claim of the '874 patent refers to "displaying inspection

data." ('874 patent, 16:24; 17:16; 18:27-28; 19:19; 19:54; 20:17; 20:42) Despite the fact that the '874 patent does not claim the sensor hardware, the inventors rely on the hardware as their motivation for public testing:

> [W]e were still experimenting and had not yet produced that size tool. We did not want to produce the full size Quest FTIS tool until we knew what we were doing worked, both in hardware and in software. We knew when designing the tools that it would be too expensive for every size to have unique hardware. For that reason, we waited to produce other tools until we knew we had a fully functional model in smaller sizes. By March 2003 we still hadn't made it up to the 8" tool, as we remained focused on testing and perfecting the smaller tools at the time. We knew that if we could get the smaller tools to provide consistent data, and if that data proved useful and accurate, we could then scale up production. While we were still testing and experimenting, we did not want to spend resources on tools whose designs might be changed as a result of our trial inspections.

(Civ. No. 14-1482, D.I. 202 at ¶ 13) Public testing may have been necessary for plaintiff's hardware (i.e., sensors), but there is evidence in the record that plaintiff tested software for "displaying inspection data" on datasets collected from earlier projects.[19] The necessity of public testing does not weigh in favor of an experimental sale.

The next factor, "(3) the nature of the invention," does not weigh in favor of an experimental sale. The invention involves the display of inspection data,[20] and the August 2002 invention disclosure documents include a display of inspection data that is similar to the display of data found in the Norco Reports. A comparison of these two sets of strip charts does not suggest that plaintiff had made substantial changes of any kind to the display of inspection data between August 2002 and February 2003. (*Compare* Civ. No. 14-1482, D.I. 186, ex. 1, figure 1, *with* D.I. 187, ex. 8 at 16) Two

---

[19] The invention disclosure in Bondurant's possession in August 2002 indicates that aspects of the display software had been "coded and tested on a variety of data sets." (Civ. No. 14-1482, D.I. 186, ex. 1 at 5)

[20] If the invention claimed in the '874 patent included the sensors that required so much testing, that would swing these factors in favor of an experimental sale, but the '874 patent claims are directed to displaying the inspection data.

Case: 17-2423 Document: 11 Page: 105 Filed: 03/20/2018

related factors are "(4) the length of the test period" and "(10) whether the invention reasonably requires evaluation under actual conditions of use," and while these factors may apply to the sensors, they do not appear to apply to the "displaying inspection data" invention in the '874 patent.

There are four experimentation factors, which include "(7) whether records of the experiment were kept; (8) who conducted the experiment; . . . (11) whether testing was systematically performed; [and] (12) whether the inventor continually monitored the invention during testing." There is no evidence that the inventors kept records or even identified what they were doing as experiments. Moreover, inventor Bondurant (the primary software developer) was not present at the Norco site, nor was it his practice to be on site; even in the intervening years, he has "never been on a job." (Civ. No. 14-1482, D.I. 185, ex. C at 61:15) Inventor De Lorenzo explained how he and Bondurant worked together:

> Q.· Okay.· How would you integrate with [Bondurant] -- if you were making·a change out on the job, how would, if he was working with·the source code as well, how would you keep him updated as to·what changes you were making in the code?
>
> A.· Okay.· Again, changes I was making to the code were more·aesthetic, font changes, header changes.· Phil was·responsible -- well, he was the one writing the more core·algorithms to do the mapping to the geometry and some of the·more complex processing of the data.
>
> Q.· Are those what you in the code call "functions"?
>
> A.· They would be functions.
>
> Q.· Okay.· So Phil Bondurant was the one who would write the·functions and then you would make I would call "field·changes," changes in the field to improve the look of it or·perhaps meet a client's specific demand for information?
>
> A.· Yes.
>
> Q.· Okay.· Now, what -- was sort of the mother code kept on·Phil's computer?
>
> A.· The core algorithms were kept on Phil's computer and he would·back them up to the local server as he saw the need to do·that.· Once he had made some improvements, he would release·that of his own volition.

(Civ. No. 14-1482, D.I. 185, ex. E at 13:12-14:8) De Lorenzo, who was on site as part of FTIS, made aesthetic formatting changes to the reports, and Bondurant, who worked on the "more complex processing of the data," was not present during data collection and released software updates "of his own volition." These undisputed facts indicate that – as it relates to the invention in the '874 patent – Bondurant is the relevant inventor. Bondurant was not present to conduct regular testing or to continually monitor the invention during testing. De Lorenzo, the co-inventor, was unaware of any schedule for experimenting with the data or improving the invention (displaying inspection data) while he was on the Norco job. Based upon an undisputed record, factors seven, eight, eleven, and twelve all weigh against an experimental sale.

There are four customer-facing factors, and these are "(5) whether payment was made; (6) whether there was a secrecy obligation; . . . (9) the degree of commercial exploitation during testing; . . . and (13) the nature of the contacts made with potential customers." Plaintiff was paid for the Norco sale, and there is no evidence that plaintiff offered Norco a discount or made Norco aware of any alleged experimental nature of the FTIS service. (*See, e.g.*, Civ. No. 14-1482, D.I. 198, ex. J (Quest Quotation No. 3-03003 for Norco sale)) The inventors point out that plaintiff informed Norco that FTIS was "in [its] second generation of development," and while this may have been an accurate representation of the state of FTIS at the time, there is nothing in the record that indicates that plaintiff had communicated any experimental nature of plaintiff's activities while performing on the contract.[21] (Civ. No. 14-1482, D.I. 202 at ¶ 12; D.I. 187, ex. 10) Moreover, the record is replete with FTIS project quotations that indicate that plaintiff was actively selling FTIS services (and not communicating experimentation

[21] In fact, the inventors' declaration states otherwise: "The customers were not involved with any of our decisions to modify either the inspection pig or the code. Those choices were completely our own discretion and done privately by Quest." (Civ. No. 14-1482, D.I. 202 at ¶ 15)

or confidentiality related to the reports displaying inspection data to clients) prior to the critical date. (Civ. No. 14-1482, D.I. 187, exhibits 5, 6, 7, 11, and 14) The inventors explain that "[t]he inspection reports we did generate were given directly to the refineries. We did not make the reports publicly available, and it is our understanding that refineries [] do not share the reports either." (Civ. No. 14-1482, D.I. 202 at ¶ 17) The quotation for the Norco sale contains a boilerplate confidentiality clause that identifies "Proprietary Information" as:

> Information contained in the company's proposal and/or contract or furnished by the company in connection with either, may include information proprietary to QUEST. Neither the proposal, contract, or any information therein, nor any proprietary or trade show secret information pursuant thereto, shall be disclosed to others or used for any purpose as it may also be considered a trade secret without the prior written approval of QUEST's President.

(Civ. No. 14-1482, D.I. 187, ex. 10 at 11) This clause appears to relate to information about plaintiff and its business practices and, in light of the extensive detail found elsewhere in the quotation, the clause itself does not support plaintiff's contention that the Norco sale was experimental. Moreover, the Norco Reports that display inspection data (i.e., that relate to the invention claimed in the '874 patent) contain strip charts that state that the chart was "generated with QUEST proprietary technology," but neither the strip charts nor the reports are marked "confidential." (Civ. No. 14-1482, D.I. 187, Ex 8 at 16, 20, 24, 29, 33, 37, 45, 49, 53, 57, and 61; ex. 9 at 15, 20, 25, 30, 35, 40, 46, and 51) There is no evidence in the record that plaintiff held the Norco client to any secrecy obligation related to the display of inspection data. Therefore, all of the customer-facing factors weigh against an experimental sale.

Of the thirteen *Electromotive* factors, only one (control) weighs in favor of experimental sale, but the remainder weigh against. Several undisputed facts are notable: (1) inventor Bondurant was not on the Norco customer site during data

collection;[22] (2) Bondurant scheduled software updates "of his own volition;"[23] (3) plaintiff sold FTIS services at full price without a discount; (4) clients did not know about the experimentation;[24] (5) plaintiff did not solicit feedback from clients about the display of the inspection data; and (6) plaintiff made no attempts to keep confidential the display and presentation of the inspection data (i.e., the invention claimed in the '874 patent). For these reasons, the Norco sale was not experimental and, therefore, represents a commercial sale under § 102(b).

**b. Ready for patenting**

An invention may be ready for patenting "in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68. "A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed." *Id.* at 57 n.2 (citing *Corona Cord Tire Co. v. Dovan Chemical Corp.*, 276 U.S. 358, 383 (1928)). Plaintiff asserts claims 1, 12, 13, 24, 25, 30, 33, 37, and 40. (Civ. No. 14-1482, D.I. 180 at 1; Civ. No. 14-1483, D.I. 286 at 1)

---

[22] Nor was it his practice to be on site for FTIS jobs.

[23] His co-inventor, De Lorenzo, was not involved in the software updates, and there does not appear to have been a schedule for experimentation and software releases.

[24] The inventors state that "[f]rom job to job the customers could not necessarily tell all the work that was going on behind the scenes, but they knew we were still experimenting and developing the product." (Civ. No. 14-1482, D.I. 202 at ¶ 14) This statement supports the inventors' subjective intent to experiment, but it does not point the court to any objective evidence that clients knew about the experimentation.

**i. Machine claims**

Claims 1 and 40 are the pending machine claims. In order for machine claims to be ready for patenting, a machine must be assembled, adjusted, and used as described in the relevant claims. The first Norco Report describes the FTIS inspection tool, which includes an ultrasonic sensor, a "Position Module [that] houses two axial encoders that record the tool's axial location within the furnace coil, a roll encoder that tracks spiral rotation (roll), and two accelerometers that record the vertical orientation and unit acceleration." (Civ. No. 14-1482, D.I. 187, ex. 8 at 2-3) Ultrasonic data is collected, processed, and "it is then stored for downloading to the data station at the end of the inspection." (*Id.* at 3) The data station runs "custom software, which allows 2-Dimensional (2D) viewing of the 'entire' piping coil" in a strip chart shown in "Figure 3. FTIS 2D Plot." (*Id.* at 4) The first Norco Report documents that Norco representatives used this machine to produce a series of strip charts as found in the report. (*Id.* at 16) The first Norco Report and strip chart provide visual detection of problem areas, such as those in section 1 and section 5 as identified in Pass A. (*Id.* at 15-16) Therefore, the first Norco Report demonstrates that plaintiff assembled, adjusted, and used the FTIS machine as described in claims 1 and 40 to produce the strip charts shown. Claims 1 and 40 were reduced to practice in the FTIS machine at this point and were ready for patenting.[25]

**ii. Process claims**

The pending process (method) claims are 12, 13, 33, and 37. Claims 12 and 13 depend on claim 11. ('874 patent, 17:35-42) Claims 33 and 37 are independent. (*Id.* 19:19-20:8) The strip charts contained in the Norco Reports demonstrate that plaintiff reduced to practice the method steps associated with these claims by performing the

[25] Alternatively, Bondurant's August 2002 invention disclosure was sufficiently specific to enable a person skilled in the art to practice the invention.

methods, therefore, the methods claimed in claims 12, 13, 33, and 37 were ready for patenting at the time of the Norco sale.

**iii. Article of manufacture claims**

Claims 24, 25, and 30 recite a "computer-readable medium," which is an article of manufacture. *In re Beauregard*, 53 F.3d 1583, 1584 (Fed. Cir. 1995) Claims 24 and 25 claim the article of manufacture that performs the methods (respectively) in claims 11 and 12. ('874 patent, 17:16-38; 18:26-49) The manufacture of claims 24 and 25 was completely manufactured when plaintiff completed the software that generated the strip charts and performed the method in claims 11 and 12. Claim 30 adds the requirement of a "composite data marker," which inventor De Lorenzo acknowledged was in the FTIS software as of August 2002.[26] (Civ. No. 14-1482, D.I. 185, ex. E at 77:7-22) In the first Norco Report, the composite data marker identifies a "Return Bend." (Civ. No. 14-1482, D.I. 187, ex. 8 at 4) In the second Norco Report, the composite data marker is shown as a hash mark that "Indicates Bend Location."

[26] For reasons to be discussed below, the court disregards the later-filed declarations by DeLorenzo and Bondurant that contradict DeLorenzo's deposition testimony.




**Figure 3. FTIS 2-D Plot**

**Color Bar Illustrating Thickness in Inches**

(Civ. No. 14-1482, D.I. 187, ex. 9 at 4) Plaintiff argues that a factual dispute exists over whether the composite data markers were implemented in the FTIS software for the Norco sale.[27] (Civ. No. 14-1482, D.I. 195 at 13-15) Meanwhile, Bondurant's August 2002 invention disclosure teaches a "composite bend indicator," which combines "[a]ll six bend detection methods (three indicators for both wall and radius) . . . in a root-mean-square manner to derive a composite bend indicator." (Civ. No. 14-1482, D.I. 186, ex. 1 at 5) Bondurant's disclosure explains that:

> Figure 3[28] is a plot of the composite bend indicator and the adaptive threshold that is used to identify the bend locations within the composite signal. . . . Figures I and 2 identify each bend with an 'x' above the automatically identified bend and a tube segment number just to the left.

---

[27] This factual dispute centers on the sham affidavits to be discussed with respect to claim 30, below. *See supra* note 26.

[28] Which corresponds to figure 8 in the '874 patent.

(*Id.*) The presence of composite data markers in both Norco Reports and in Bondurant's August 2002 invention disclosure demonstrates that claim 30 was ready for patenting at the time of the Norco sale.

**c. Conclusion**

The § 102(b) statutory bar applies to the Norco sale with respect to the asserted claims of the '874 patent, because it was a commercial sale (and not experimental), and the inventions contained within the Norco Reports were ready for patenting.

**4. Anticipation by the Norco sale**

**a. The display limitation**

In the Norco sale, plaintiff produced reports containing strip charts. The parties disagree whether strip charts can anticipate a limitation common to the independent claims of the '874 patent (the "Display Limitation").[29] For example, plaintiff admits that the Norco sale anticipates five of the six limitations of claim 1, but plaintiff disputes that the Norco sale anticipates limitation "[1-E]," which is the Display Limitation. (Civ. No. 14-1482, D.I. 187, ex. 17 at 1-26) Plaintiff presents a number of arguments that the Norco sale does not anticipate the '874 patent, but (as will be discussed below) these are ultimately questions of claim construction.[30] (Civ. No. 14-1482, D.I. 195) The

[29] Claims 1, 11, 24, 33, 37, and 40 are the independent claims of the '874 patent.

[30] The court construed the Display Limitation as follows: Claims 1 and 40 are system claims that share a common Display Limitation: **"generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of said tube segments"** means "to create a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments." (Civ. No. 14-1482, D.I. 137 at ¶ 5) Claim 11 is a method claim, and claim 24 is an article of manufacture claim for performing the method of claim 11; these claims share a common Display Limitation: **"generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of said tube segments,"** which means "creating a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments." (*Id.*) The Display Limitation of method claim 33 is **"generating a two dimensional or three-dimensional representation of at least a portion of said**

common characteristic of these limitations is that plaintiff's no anticipation argument centers around the construction of the term "represent" in each Display Limitation.

**b. Claim construction**

With respect to the Display Limitation, plaintiff's experts opine that the representation of the inspection data must be to scale, represented in units of dimensional measure, and oriented in such a way so that the data is organized as the tubes would be arranged in a schematic diagram. (Civ. No. 14-1482, D.I. 197, ex. A at ¶¶ 9-22) Defendants argue that this issue was addressed at claim construction. (Civ. No. 14-1482, D.I. 185 at 13-14) Defendants contend that:

> The claims of the '874 patent expressly cover 2D Piping Coil Layout images; thus, when these images appeared in the Norco Sale, the Display Limitation was practiced and the claims were fully anticipated. Quest tried and failed to convince the Court to narrow the meaning of 'Display Limitation.' Thus, based on the uncontested facts, the logic of the preliminary injunction ruling and the Court's *Markman* opinion, the Norco Sale anticipates the '874 patent. The Display Limitation is met by the Norco Report, which was a product of the Norco Sale, because it contains 2D Piping Coil Layout Images identical to those claimed in the '874 patent.

(*Id.* at 13) Plaintiff argues that "this is an improper reading of the court's claim construction order, and, as this court well knows, it would be an error to have decided this issue in the claim construction order." (Civ. No. 14-1482, D.I. 195 at 11) Plaintiff avers that "the court simply declined to rule [at claim construction] that [plaintiff]

---

**inspection data arranged to represent a physical geometry of a plurality of said tube segments,"** which means "creating a two dimensional or three-dimensional visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments." (*Id.*) Claim 37 is a method claim that has a Display Limitation: **"generating a two-dimensional or three-dimensional representation of said inspection data collected from a plurality of said tube segments, said data arranged to represent a physical geometry of said tube segments,"** which means "creating a two dimensional or three-dimensional visual representation of the inspection data collected from a plurality of said tube segments to depict or portray the arrangement of the tube segments." (*Id.*)

disclaimed strip charts. Failing to find literal disclaimer is not the same as finding that all claims must include strip charts." (*Id.* at 11-12 (emphasis omitted)) At claim construction, the court concluded "that the applicant did not disclaim strip charts as described in example 1."[31] (Civ. No. 14-1482, D.I. 137 at ¶ 11)

Plaintiff's experts, Caligiuri and Souri, summarize their opinion:

> Strip charts do not represent the physical geometry of the furnace because the inspection data are plotted to represent the passing of time, . . . . because . . . the inspection data from a single furnace tube may be displayed over multiple horizontal strips. As such, this display of inspection data does not depict or portray the arrangement of tube segments in the furnace. These time-based strips are arranged in parallel horizontal strips, as may be the furnace tube segments, but this is only a superficial resemblance that is confusing and misleading because each strip does not represent the physical geometry of any given tube segment and is not in correct orientation to the tube segments around it. The time strips do not depict or portray any particular furnace tube segment. In fact each horizontal strip of the strip chart represents a completely arbitrary amount of time with essentially no relation to the physical geometry of the actual tubes

(Civ. No. 14-1482, D.I. 197, ex. A at ¶ 9) Caligiuri and Souri opine that, for tubing arranged as in figure 1A of the '874 patent, "the strip chart artificially split[s] the inspection data [and] . . . places the data in a different orientation." (*Id.* at ¶ 12) Caligiuri and Souri explain that time-based strip chart data leads to identified tube segments, the lengths of which are "of all different values" and are "in the wrong direction" in relation to each other. (*Id.* at ¶¶ 14-15)

Despite plaintiff's efforts to generate an issue of material fact, the court is unable to discern one. These are many of the same arguments plaintiff presented at

---

[31] In a footnote, plaintiff re-argues its contention that "strip charts were surrendered and effectively disclaimed when language was added to overcome a rejection based on strip charts in prior art." (Civ. No. 14-1482, D.I. 195 at 12 n.5) The court declines to reconsider these arguments.

preliminary injunction[32] and during claim construction. The dispute is ultimately over construction of the "represent" terms. Defendants argue that there is no need to construe this term.[33] (Civ. No. 14-1482, D.I. 185 at 13) Plaintiff (through its experts) argues that the Norco strip charts cannot anticipate the independent claims for several reasons: (1) a single tube segment cannot be displayed over multiple lines, and strip charts display tube segments over more than one line; (2) the claims require a display of the "physical geometry of any given tube segment," but strip charts only display the time a sensor is within the tubes and not geometry; (3) the claims require displayed strips to be "in correct orientation to the tube segments around it;" and (4) charts displaying inspection data must be to the scale of the physical dimensions of the tube segments.[34] (Civ. No. 14-1482, D.I. 197, ex. A at ¶¶ 9-15)

Plaintiff does not identify any support in the specification to justify reading these limitations into the claims. Moreover, plaintiff's limited argument consists primarily of citation to case law. (Civ. No. 14-1482, D.I. 195 at 11-13) Plaintiff then re-argues that applicant disclaimed strip charts, pointing to language in the specification that "the average speed and the instantaneous speed can vary significantly in view of the fact that the inspection tool does not progress through the furnace at a constant rate." ('874

[32] For example, at the preliminary injunction, "[t]he court conclude[d] that there is nothing in the specification or claims of the '874 patent that requires the inventive system to perform or look exactly like Quest's latest commercial iteration of its FTIS, so long as the inspection data can be displayed in a way that suggests data markers representing the physical geometry of the furnace." (Civ. No. 14-1482, D.I. 99 at ¶ 20)

[33] At claim construction, defendants proposed that "represent" means "to serve as a sign or symbol, to portray by pictorial art: delineate, depict." (Civ. No. 14-1482, D.I. 119, ex. A at 1) Plaintiff argued that "represent" did not need to be construed separately from the context within which it appears. (*Id.*)

[34] The court infers these limitations from Caligiuri and Souri's explanations of why the Norco strip charts cannot anticipate the independent claims. (Civ. No. 14-1482, D.I. 197, ex. A at ¶¶ 7-22; ex. B at ¶¶ 78-82)

patent, 5:3-6) However, earlier in the same paragraph, applicant explains that time-based data collection is a preferred embodiment:

> Preferably, the inspection tool collects the data at a predetermined time-based rate (although the inspection tool could alternatively collect the data using a position-based collection system in which data is collected when the inspection tool has progressed a predetermined distance). Using a time-based collection system, the data density is determined by the data collection rate and the speed at which the inspection tool progresses through the furnace.

('874 patent, 4:60-67) Souri opined that this part of the specification means that time-based strip charts are "unhelpful because it could lead to an incorrect decision as to which tube segment needs to be replaced." (Civ. No. 14-1482, D.I. 198, ex. D at 107) This is directly contradicted by the specification, which teaches that, "the data analyst will analyze strip chart 300 and/or strip chart 400 in conjunction with a mechanical drawing of the physical layout of the furnace to provide hints as to where the bends or ends of the tube segments should be located." ('874 patent, 11:1-5)

The court concludes that nothing in the specification or claims of the '874 patent limits the inventive system to specific embodiments.[35] Similarly, the '874 patent does not require the inventive system to perform or look exactly like plaintiff's latest commercial iteration of FTIS, so long as the inventive system creates "a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments" within the plain and ordinary meaning of these terms.

[35] Nor are the claims limited solely to the displays depicted in figures 5, 6, and 9 of the '874 patent.

### c. Anticipation

#### i. Claims 1, 11, 24, 33, and 37

The pending independent claims are 1, 11, 24, 33, 37, and 40. Defendants argue that independent claims 1, 11, 24, 33, and 37[36] are anticipated by the Norco sale. (Civ. No. 14-1482, D.I. 185 at 5-8) For these claims, the only dispute is over the Display Limitations. (*Id.*) Defendants have identified the strip charts produced as part of the Norco sale as anticipating the Display Limitations. The following strip chart of wall thickness data was produced as part of "Pass L" from the first Norco project:




(Civ. No. 14-1482, D.I. 187, ex. 8 at 61) This is one of twelve such charts produced in the first Norco Report.

---

[36] Plaintiff argues the remaining independent claim (40) separately.

The second Norco project produced a slightly different type of chart, as shown in figure 3 from the report:



Figure 3. FTIS 2-D Plot

(Civ. No. 14-1482, D.I. 187, ex. 9 at 4) The second Norco project produced eight strip charts labeled passes A-H.

In response to the strip charts from the Norco Reports, plaintiff contends that defendants rely on “an improper reading of the court’s claim construction order” and, under its experts’ proper reading of the claims, the Norco sale does not anticipate the “arranged to represent the physical geometry” limitations, thereby raising a genuine issue of material fact and precluding summary judgment.[37] (*Id.* at 11-13) The alleged factual disputes revolve around a straw man argument in which plaintiff contends (without citation) that “[d]efendants . . . stat[e] that distance can be inferred from time.” (*Id.* at 12)

[37] Plaintiff requests reconsideration of claim construction, in which the court determined that applicant had not disclaimed strip charts. (Civ. No. 14-1482, D.I. 195 at 11-12 & n.5)

Ultimately, plaintiff's factual dispute returns to claim construction: "Quest's experts believe that to 'depict or portray the arrangement of the tube segments' requires a reference to **physical** dimensions that are not present in strip charts."[38] (*Id.* at 13 (emphasis in original)) This is a question that the court has already addressed (above) with respect to claim construction. With the claim construction resolved, there are no genuine issues of material fact as to whether the Norco sale anticipates the "generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of said tube segments" limitations. Therefore, the court concludes that, under § 102(b), the Norco sale anticipates claims 1, 11, 24, 33 and 37 of the '874 patent.

**ii. Claim 13**

Defendants argue claim 13 with the independent claims, because plaintiff has based its no anticipation argument solely on claim 13 depending on claim 11 and plaintiff's argument that the Norco sale does not anticipate the Display Limitation in claim 11. (Civ. No. 14-1482, D.I. 185 at 12; *see also* D.I. 187, ex. 17 at 48) Plaintiff presents no arguments in response. There are no genuine issues of material fact with respect to anticipation of claim 13 by the Norco sale, therefore, claim 13 is invalid.

**iii. Claims 12 and 25**

Defendants argue that claims 12 and 25 are invalid under § 102(b) as anticipated by the Norco sale. (Civ. No. 14-1482, D.I. 185 at 21-23; D.I. 220 at 26) Plaintiff contends that the proper construction of claims 12 and 25 "narrowly require displays such as that shown in Figures 5, 6, and 9 of the '874 patent."[39] (Civ. No. 14-1482, D.I.

[38] Plaintiff's experts did not express an opinion about how a person of ordinary skill in the art would read the relevant claim language in light of the specification, nor did they identify any specific parts of the specification that support this requirement of physical dimensions. (*See* Civ. No. 14-1482, D.I. 197, ex. B at ¶¶ 79-83)

[39] The court has rejected this construction.

195 at 24 (citing Civ. No. 14-1482, D.I. 197, ex. B at ¶ 78-98; D.I. 198, ex. E)) However, plaintiff's argument is based entirely on its proposed (narrow) construction of claims 12 and 25, and the remainder of plaintiff's arguments revolve around questions of claim construction that the court has already addressed.[40] Nothing in plaintiff's brief identifies any specific factual disputes with respect to the Norco sale.[41]

The court has construed the relevant claim term "wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more stacked tube segments of said furnace" to mean "inspection data from one or more of the stacked tube segments is displayed in two or three dimensions." Defendants presented unrebutted evidence that the Norco sale anticipates claims 12 and 25 in a "one stacked tube segment"[42] configuration.[43] (Civ. No. 14-1482, D.I. 220 at 31-32) Defendants identify a two-dimensional display of segment 34, which is a 6-inch diameter tube segment in the convection section stack documented in the second Norco Report.

---

[40] For example, in the claim chart, plaintiff's experts respond to defendants' invalidity assertions with "we disagree" followed by no explanation. (Civ. No. 14-1482, D.I. 187, ex. 17 at 45-47) In the one identified dispute with respect to claim 12, plaintiff's experts opine that the claim construction requires display of physical dimensions. (*Id.* at 46-47)

[41] Plaintiff argues that "there is no genuine issue of material fact" with respect to dependent claims 12 and 25, but that there is "a dispute of fact" between the experts with respect to independent claim 11 upon which claim 12 depends. (Civ. No. 14-1482, D.I. 195 at 25-26)

[42] This is the "one" in the "one or more of said stacked tube segments of said furnace" found in claim 12. ('874 patent, 17:37-38)

[43] Defendants AutoSketch argument is not appropriate for summary judgment. The experts disagree whether the AutoSketch drawing displays inspection data. (See Civ. No. 14-1482, D.I. 220 at 31; *compare* D.I. 187 at ¶¶ 44-46, 70-81 *with* D.I. 187. ex. 15 at ¶ 85)



F52-01B Pass A 6inch Radiant Pipe Section

(Civ. No. 14-1482, D.I. 187, ex. 9 at 16; *see also* ex. 9 at 20, 26, 31, 36, 41, 47, 52) Moreover, in any of the strip charts in the Norco Reports, inspection data from one or more of the stacked tube segments is displayed in two-dimensions.[44]




Figure 3. FTIS 2-D Plot

[44] "[W]hatever would infringe if subsequent will anticipate if prior." *In re Slayter*, 276 F.2d 408, 411 (C.C.P.A. 1960).

(Civ. No. 14-1482, D.I. 187, ex. 8 at 4) Figure 3 from the first Norco Report (depicted above) includes a two-dimensional display of inspection data of 23 tube segments. Therefore, claims 12 and 25 are invalid as anticipated by the Norco sale.

**iv. Claim 27**

Plaintiff does not assert claim 27, but claim 30 (which is asserted), depends on claim 27. Defendants argue claim 27 with the independent claims, because plaintiff has based its no anticipation argument solely on claim 27 depending on claim 24 and plaintiff's argument that the Norco sale does not anticipate the Display Limitation in claim 24. (Civ. No. 14-1482, D.I. 185 at 12; *see also* D.I. 187, ex. 17 at 52) The court has found claim 24 anticipated by the Norco sale. Plaintiff presents no arguments in response. There are no genuine issues of material fact with respect to anticipation of claim 27 by the Norco sale, therefore, claim 27 is invalid.

**v. Claim 28**

Plaintiff has not asserted claim 28.[45] Claim 30 (which is asserted) depends on claim 28, which depends on claims 27 and 24. Plaintiff's experts had argued that claim 28 is not anticipated by the Norco sale, because the Norco sale does not anticipate the Display Limitation of claim 24 (upon which claim 28 depends). (Civ. No. 14-1482, D.I. 187, ex. 17 at 53) Defendants argue that the Norco sale anticipates the Display Limitation in claim 24 and that claim 28 is also anticipated by the Norco sale. (Civ. No. 14-1482, D.I. 185 at 12) The court has found claims 24 and 27 anticipated by the Norco sale. Plaintiff presents no responsive arguments in its brief. There are no genuine issues of material fact whether the Norco sale anticipates claim 28, therefore, claim 28 is invalid.

---

[45] Defendants argue invalidity of claim 28 in a footnote. Despite defendants' contention that it is necessary to resolve the validity of claim 28, the validity of (asserted) claim 30 does not hinge on the validity of claim 28.

**vi. Claim 30**

Claim 30 recites "[t]he computer-readable medium of claim 28, wherein each of said data markers comprises a composite data marker derived from a plurality of individual data markers." ('874 patent, 19:4-6) Claim 28 recites:

> The computer-readable medium of claim 27, wherein sensor data is also collected from said furnace, said sensor data comprising a plurality of sensor readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

(*Id.* at 18:59-65) Claim 27 claims "[t]he computer-readable medium of claim 24, wherein said inspection data comprises a plurality of inspection readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof." (*Id.* at 18:54-58) The claims refer to "inspection data" and "sensor data," and claim 30 is limited to articles of manufacture that collect both sets of data and that perform the method of "generating a plurality of [composite] data markers each of which identifies a location of a physical feature of said furnace." (*Id.* at 18:32-33) For example, the specification describes that "composite data markers: . . . identify the locations of the furnace bends." (*Id.* at 12:61-63) Claim 30 teaches that the composite data marker is "derived from a plurality of individual data markers." (*Id.* at 19:5-6) The specification indicates that individual data markers are "based upon the detection of various 'data clues' in the inspection data and/or sensor data." (*Id.* at 15:56-68)

Defendants deposed DeLorenzo (one of plaintiff's 30(b)(6) witnesses) who acknowledged that a "composite bend indicator" existed in plaintiff's FTIS source code in August 2002 and was present in the software during the Norco sale.

> Q.· Okay.· Now, take a look at Line No. 42 back on Page 8350 -- 550 on Exhibit No. 128.
>
> A.· Yep.

> Q.· Is this calculation that follows what you guys have referred·to as a composite data marker?
>
> A.· I believe that was the intent of that -- of what this comment·is, so yes.
>
> Q.· So if I am correct in putting your answers together, as of·roughly August 28th, 2002, your software allowed you to·utilize and give to your customers these displays that had·composite data markers in them, correct?
>
> A.· That's correct.
>
> Q.· And did you actually do so for various customers?· Were there·some of these where you utilized the automatic composite data·marker function?
>
> A.· We attempted it and we did both the automatic and the kind of auto assisted, so yes, we did use it.
>
> Q.· Okay.· All right.· And you started doing both the automatic and the data operator assisted at least as of this time, August of '02, correct?
>
> A.· Yes, that's how that graphic was generated.

(Civ. No. 14-1482, D.I. 185, ex. E at 77:2-22)

Plaintiff argues that the relevant "portions of code [defendants] rely on were commented out (and thus not used)." (Civ. No. 14-1482, D.I. 195 at 13) Plaintiff contends that the "testimony [] was elicited without giving the witness full access to the code, including vitally relevant sections of the code. . . . This resulted in confused and inaccurate testimony regarding the date and use of sections of the source code." (*Id.* at 14 (citing Civ. No. 14-1482, D.I. 200 at ¶¶ 3-19 (DeLorenzo declaration))) Relying on declarations from the inventors, plaintiff argues that "[a]nalysis of the full source code inarguably demonstrates that the Norco sale did not use composite data markers." (*Id.*) Plaintiff asserts that the source code places an "X" at the composite data marker and the Norco Reports do not contain such marks, therefore, the source code was not present at the time.[46] DeLorenzo opines that he would have given a more accurate

[46] Plaintiff presents this argument for the first time in its brief.

Case: 17-2423 Document: 11 Page: 125 Filed: 03/20/2018

answer about the availability date[47] if he had been given the full section of code. (Civ. No. 14-1482, D.I. 200 at ¶ 17-18)

Defendants respond that plaintiff selected DeLorenzo, a co-author of the source code, as its 30(b)(6) witness to discuss the "existence, functionality and use of all Quest FTIS software code from 2002 to 2004." (Civ. No. 14-1482, D.I. 220 at 17-18) Defendants assert that DeLorenzo prepared for his deposition by reviewing the code and instruction manuals and speaking with (co-author) Bondurant. (*Id.*) Defendants contends that plaintiff's counsel was provided with all the exhibits presented to DeLorenzo. (*Id.*) Defendants argue, based upon a detailed review of the record, that plaintiff's arguments as presented now are false. (*Id.* at 19-22) Finally, defendants point out that, even if the composite data markers were not used in the Norco sale (as plaintiff now contends), the source code was still present during the Norco project and that is legally sufficient to anticipate claim 30. (*Id.* at 22 (citing *Finjan v. Secure Computing Corp.*, 626 F.3d 1197, 1203-04 (Fed. Cir. 2010)))

Under the sham affidavit doctrine, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase,* 392 F.3d 609, 624 (3d Cir.2004) (citing *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991)); *see also Martin v. Merrell Dow Pharms., Inc.,* 851 F.2d 703, 706 (3d Cir.1988) (doctrine applies to contradictions of prior testimony). "When a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of

[47] Both parties agree that the FTIS source code was produced backwards and that the pages of the source code were in reverse order.

summary judgment based on the deposition." *Jiminez v. All American Rathskeller, Inc.,* 503 F.3d 247, 254 (3d Cir.2007) (citing *Hackman,* 932 F.2d at 241).

Bondurant and DeLorenzo are the source of a trio of late-breaking declarations. On December 28, 2016, the pair filed a declaration to explain that the Norco sale was, in fact, experimental use. (Civ. No. 14-1482, D.I. 202) On the same day, each filed an individual declaration contradicting DeLorenzo's deposition, explaining the reason for the contradiction, and introducing new arguments as to claim 30 and the composite data marker. (Civ. No. 14-1482, D.I. 200; D.I. 201)

Here, plaintiff produced the source code.[48] (Civ. No. 14-1482, D.I. 222, ex. 1 at 144:11-145:12) DeLorenzo was the 30(b)(6) witness on this subject, he was prepared, he had time to read the code, he took his time to answer, and he did not speculate. There is nothing in the record to suggest that DeLorenzo was not afforded all the courtesies that any deponent would expect. (*See generally* Civ. No. 14-1482, D.I. 222, ex. 1 at 144:11-145:12) Had DeLorenzo been uncertain about his testimony with respect to the August 2002 source code, he had ample opportunity to correct it, either at the deposition or afterwards. There is no evidence that DeLorenzo sought to make any corrections.

Plaintiff's new arguments related to the composite bend indicator and its absence in the Norco sale lack credibility. Plaintiff was on notice of defendants' intent to use the Norco sale as prior art, and the absence of the "X" marks in the strip charts in both Norco Reports is apparent to the untrained eye. These new arguments conveniently raise an issue of material fact with respect to anticipation and create doubt as to whether the invention of claim 30 had been reduced to practice as of the Norco sale.

---

[48] It is unclear who applied the Bates numbers in the backwards fashion. The source code contains "Secure Copy-2" in the upper right hand corner. The court infers that this was printed from a secure computer under the control of plaintiff, with the printing most likely initiated by defendants' experts.

However, there is no evidence in the record that plaintiff ever presented this argument to defendants before its summary judgment answering brief. All the evidence suggests that, before summary judgment, plaintiff was pursuing an altogether different line of argumentation with respect to no anticipation of claim 30.[49]

Meanwhile, there is evidence in the record that, on August 28, 2002, DeLorenzo's co-inventor Bondurant sent himself an invention disclosure for FTIS in which he explained that an "approach to properly associate the FTIS data with the furnace geometry is to algorithmically code [] visual clues to automatically or semi-automatically identify the bend locations in the data set" (Civ. No. 14-1482, D.I. 186, ex. 1 at 4) The disclosure identifies this as a "composite bend indicator":

> These visual clues **have been coded and tested** on a variety of data sets and have proven to be a reliable method of bend detection. All six bend detection methods (three indicators for both wall and radius) are combined in a root-mean-square manner to derive a **composite bend indicator**. The periodic peaks in the composite bend indicator identify the locations of the bends.

(*Id.* at 5 (emphasis added)) According to the invention disclosure, the composite bend indicator was in the FTIS code as of August 2002.[50]

DeLorenzo and Bondurant's declarations contradict DeLorenzo's earlier statements, Bondurant's undisputed August 28, 2002 invention disclosure, and plaintiff's prior anticipation arguments. For these reasons, the court disregards the declarations of DeLorenzo and Bondurant (Civ. No. 14-1482, D.I. 200; D.I. 201) as sham affidavits.

---

[49] In the claim charts on anticipation by the Norco sale, plaintiff's experts had opined that claim 30 required "using sensor data to create composite data markers, [and] no sensor data was used." (Civ. No. 14-1482, D.I. 187, ex. 17 at 55 (citations omitted))

[50] While this statement was not made under oath, there appears to be no deceptive intent in a contemporaneous internal document stating that a feature had been coded and tested in the software.

There is no genuine issue of material fact with respect to claim 30, therefore, claim 30 is anticipated by the Norco sale.

**vii. Claim 40**

The ‘874 patent distinguishes between inspection data and sensor data. Claim 40 is a system claim. (‘874 patent, 20:17-41) Defendants argue that claim 40 is anticipated by the Norco sale, citing statements from the Norco Reports as evidence that the system was programmed to perform the steps as outlined in the claim. (Civ. No. 14-1482, D.I. 185 at 25-26) A key limitation of claim 40 is that the computer be programmed to “analyze said sensor data and generate a plurality of data markers based upon said analysis of said sensor data” (*Id.* at 20:25-26) Plaintiff responds that by the Norco sale, it was not using sensor data to locate bends in the furnace and was instead using the ultrasonic sensors (the inspection data) to do this. (Civ. No. 14-1482, D.I. 195 at 15-16) Defendants argue that DeLorenzo “testified that axial encoder data was used to track location and to set data markers at bends.” (Civ. No. 14-1482, D.I. 220 at 23 (citing Civ. No. 14-1482, D.I. 222, ex. 1 at 109:21-110:11)) This testimony is not readily apparent from the record,[51] and defendants have not demonstrated that there is no genuine issue of material fact with respect to anticipation of claim 40. Therefore, the court denies summary judgment of anticipation of claim 40.

**5. Obviousness**

Defendants also move for summary judgment of obviousness with respect to the asserted claims. (Civ. No. 14-1482, D.I. 185 at 26-28) Defendants present no arguments directed to specific claims, let alone the remaining asserted claim 40. (*Id.*) Plaintiff moves for summary judgment of non-obviousness with respect to all asserted

[51] Defendants have cited to page 132, but the record submitted to the court is incomplete and is missing pages 129-136. Absent these missing pages, the court declines to speculate as to their content.

claims and presents argument in support.[52] (Civ. No. 14-1482, D.I. 195 at 26-38) As with defendants, plaintiff does not address its arguments to any specific claim. (*Id.*) The court finds no basis to grant summary judgment for either party.

**6. Section 101**

Defendants move for summary judgment of invalidity for failing to claim patent eligible subject matter under § 101, arguing the independent claims together under claim 1. (Civ. No. 14-1482, D.I. 185 at 28) Plaintiff responds that claim 1 is not a representative claim. (Civ. No. 14-1482, D.I. 195 at 40)

**a. Standard**

Section 101 defines patent-eligible subject matter as "any ... process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. The Supreme Court has long held that § 101 contains an important implicit exception. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, _ U.S. _, 132 S.Ct. 1289, 1293 (2012). "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Id.* (internal quotation marks, brackets, and citations omitted). The purpose of these exceptions is to protect the "basic tools of scientific and technological work." *Id.* Defendants argue that the '874 patent is directed to an abstract idea and is, therefore, patent-ineligible.

In *Alice*, the Supreme Court endorsed a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, _ U.S. _, 134 S.Ct. 2347, 2355 (2014). First, the court must determine if the claims at issue are directed to a patent-ineligible concept. *Id.* If the answer is no, that ends the matter and the defendants' motion is denied. *See, e.g., Enfish, LLC v.*

---

[52] Plaintiff manages to work in arguments about secondary considerations as well as teaching away. A true feat, given that not a single claim limitation is discussed in the twelve page discourse.

*Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (determining at step one that the claims were not directed to an abstract idea and, therefore, not discussing step two). If, however, the answer is yes, then the court must "determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 134 S.Ct. at 2355.

**b. Analysis**

The remaining valid (and asserted) independent claim is claim 40. Claim 40 recites:

> A system for displaying inspection data collected from a furnace with a specified physical geometry, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said system comprising:
>
> a storage device for storing said inspection data and sensor data collected from said furnace; and
>
> a computer programmed to:
>
> analyze said sensor data and generate a plurality of data markers based upon said analysis of said sensor data, wherein each of said data markers identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;
>
> partition said inspection data at said data markers;
>
> generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and
>
> wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

('874 patent, 20:17-41) In the claim charts on anticipation, the parties identified claim 40 as having six separate limitations numbered "40[A]-[F]." (Civ. No. 14-1482, D.I. 187, ex. 17 at 62-67)

Under step 1, defendants argue that claim 40 should be argued with claim 1, which is "directed to a system . . . for displaying inspection data." (Civ. No. 14-1482, D.I. 185 at 32) Defendants parse claim 1 (which is supposed to be the same as claim 40) into two limitations "the Partitioning Step and the Display Step." (*Id.*) Defendants do not explain how these are the sole limitations to the claim, nor do defendants reconcile these two broad limitations with the six identified limitations in claim 40. Plaintiff argues that defendants' "reductionist simplicity obscures the underlying complexity of the '874 Patent, and fails to address its innovative solution to problems arising in the field." (Civ. No. 14-1482, D.I. 195 at 39)

Defendants compare the so-called Partitioning Step and the Display Step (separately) to case law. Comparisons are necessary in this area of § 101 jurisprudence, and "both [the Federal Circuit] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. However, defendants ignore the instruction in *Enfish* that "the 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"[53] *Id.* at 1335 (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed.Cir.2015))).

Here, defendants' step 1 analysis with respect to claim 1 is insufficient to establish the most basic "directed to" inquiry under the relevant case law.[54] Despite the numerous differences between claims 1 and 40, defendants break the six limitations of claim 40 into the same two pieces as claim 1 and individually compare these two pieces to different claims in different cases. Moreover, defendants do not discuss the different

---

[53] In other words, defendants should compare the entire claim to one case at a time. The specification should factor into this analysis.

[54] Defendants do not evaluate the character of claim 1 as a whole in light of the specification. (Civ. No. 14-1482, D.I. 185 at 32-36)

Case: 17-2423 Document: 11 Page: 132 Filed: 03/20/2018

types of data collected and the sensor limitations.[55] At no point do defendants evaluate the character of claim 40 as a whole in light of the specification. Defendants have failed to provide a legally-sufficient argument as to why claim 40 is directed to an abstract idea, therefore, summary judgment under § 101 is denied.

**C. Infringement**

Plaintiff moves for summary judgment of infringement of claims 13, 25, 33, and 37 by defendant, Clean Harbors (Civ. No. 14-1482, D.I. 179), and for summary judgment of infringement of claims 12, 24, and 33 by defendant Cokebusters. (Civ. No. 14-1483, D.I. 285) Clean Harbors moves for summary judgment of noninfringement of claims 13, 25, 33, and 37. (Civ. No. 14-1482, D.I. 189) Cokebusters moves for summary judgment of noninfringement of claims 30 and 40 and for summary judgment of no willfulness. (Civ. No. 14-1483, D.I. 290)

Claim 40 is the only remaining valid claim, therefore, plaintiff's motions are denied and Clean Harbor's motion is granted. Cokebusters' motion is granted with respect to claim 30. With respect to claim 40, Cokebusters argues that plaintiff's expert admitted that Cokebusters performs the sensor steps in claim 40 manually and not automatically. (Civ. No. 14-1483, D.I. 304 at 10) Plaintiff's expert opines that Cokebusters' source code demonstrates that the accused product satisfies these automatic claim limitations. (Civ. No. 14-1483, D.I. 288 at ¶¶ 155, 172) This is a genuine issue of material fact best left to a jury. Similarly, Cokebusters moves for summary judgment of no willfulness, arguing that "even accepting this extremely convoluted chain of events as true, not a single factual allegation supports the proposition that Cokebusters (even if it knew about the patent) ever believed it may

---

[55] Claim 1 is limited to "inspection data" and claims devices for collecting that inspection data. Claim 40 recites the collection of both "sensor data" and "inspection data" and claims specific types of sensors. Under step 1, these differences could dramatically change the "directed to" analysis.

infringe the ‘874 Patent.” (Civ. No. 14-1483, D.I. 304 at 12) Given the difficulty the parties have in explaining their dispute, this “extremely convoluted chain of events” is best left to a jury. Cokebusters’ motions for summary judgment of noninfringement of claim 40 and no willfulness are denied.

## IV. CONCLUSION

For the foregoing reasons, the court grants defendants’ motion for summary judgment of invalidity of claims 1, 11, 12, 13, 24, 25, 27, 28, 30, 33, and 37 of U.S. Patent No. 7,542,874 (Civ. No. 14-1482, D.I. 184; Civ. No. 14-1483, D.I. 293), denies defendants’ motion for summary judgment of invalidity of claim 40 of U.S. Patent No. 7,542,874 (Civ. No. 14-1482, D.I. 184; Civ. No. 14-1483, D.I. 293), denies plaintiff’s motion for summary judgment of validity of claims 12 and 25 of the ‘874 patent (Civ. No. 14-1482, D.I. 183; Civ. No. 14-1483, D.I. 289), denies plaintiff’s motions for summary judgment of infringement of the ‘874 patent by defendants (Civ. No. 14-1482, D.I. 179; Civ. No. 14-1483, D.I. 285), grants Clean Harbors’ motion for summary judgment of noninfringement (Civ. No. 14-1482, D.I. 189), grants in part and denies in part Cokebusters’ motion for summary judgment of noninfringement (Civ. No. 14-1483, D.I. 290), and denies Cokebusters’ motion for summary judgment of no willfulness (Civ. No. 14-1483, D.I. 290).

An appropriate order shall issue.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUEST INTEGRITY USA, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-1483-SLR |
| | ) | |
| COKEBUSTERS USA INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 7th day of April, 2017, having reviewed defendant's limited motion for reconsideration, and the papers submitted therewith;

IT IS ORDERED that said motion (D.I. 359) is granted, for the reasons that follow:

1. **Background.** On March 28, 2017, the court granted summary judgment of invalidity of all asserted claims (1, 11, 12, 13, 24, 25, 27, 28, 30, 33, and 37) of U.S. Patent No. 7,542,874, save claim 40. With respect to claim 40, the court denied summary judgment, in part, because eight pages of deposition testimony, to which defendant cited, was missing from the record. (D.I. 356 at 43 n.51) In its limited motion for reconsideration, defendant provided the missing pages 129 through 136 of the January 12, 2016 deposition of plaintiff's 30(b)(6) witness on the FTIS source code, Robert DeLorenzo ("DeLorenzo"). (*See generally* D.I. 359, ex. A)

2. **Analysis.** Defendant seeks to correct the record for what it perceives to be "inadvertent error" by the court in identifying that defendant was "(citing Civ. No. 14-1482, D.I. 222, ex. 1 at 109:21-110:11)" as the relevant cited passage in which

DeLorenzo "testified that axial encoder data was used to track location and to set data markers at bends." (D.I. 356 at 43; D.I. 359 at 2 n.2) There is no error. Defendant argues that its brief "contained three citations for the particular quote" and the court only identified part of one. Defendant cited (without signal or explanation) to 27 pages of DeLorenzo's deposition testimony (in two separate exhibits) as well as "cell 40[C]" of the claim charts. (D.I. 328 at 23) After reviewing all of these materials (some of which referenced materials not provided to the court), the court concluded that the only passage discussing the axial encoder was the one identified. Unfortunately, absent the missing eight pages of testimony, even this passage of DeLorenzo's testimony does not provide a clear answer as to whether plaintiff used axial encoder "sweeps" or "sweeps" from another sensor to measure distance during the Norco sale. While the questioning attorney and the deponent may have understood that they were talking about the axial encoder, such a conclusion is not readily apparent from the limited record provided to the court at summary judgment. The analysis that follows reflects the additional information provided by defendant.

3. Claim 40 recites:

> A system for displaying inspection data collected from a furnace with a specified physical geometry, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said system comprising:
>
> a storage device for storing said inspection data and sensor data collected from said furnace; and
>
> a computer programmed to:
>
> analyze said sensor data and generate a plurality of data markers based upon said analysis of said sensor data, wherein each of said data markers identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;
>
> partition said inspection data at said data markers;

> generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and
>
> wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

('874 patent, 20:17-41) At summary judgment, the primary dispute between the parties was over the "analyze sensor data" limitation.[1] ('874 patent, 20:25-30; D.I. 358 at 43) Defendant deposed inventor DeLorenzo, who identified an automatic bend detection algorithm in the FTIS source code used in the Norco sale. (D.I. 294, ex. E at 66:1-5, 68:7-11, 20-24, 72:20-23, 76:3-10, and 91:4-92-9) DeLorenzo testified that the Norco data set "had 16 sensors, so a sweep of data would consist of the 16 [ultrasonic transducers] UT sensors and axial recording, another axial recording, and some other peripheral data." (*Id.* at 80:8-11) Defendant's experts explained that "data from both axial encoders and roll encoders (sensors) were used to correlate the location of data during the creation of the composite data marker." (D.I. 296 at ¶ 108) DeLorenzo corroborated the expert testimony, explaining that the data from the axial encoder was critical to establishing the location of the inspection data in relation to the bends:

> Q. What would it be based on? You put it in your words.
>
> A. Okay. So if you have an odometer on there and you run the furnace, the entire furnace you're going to have a total length.
>
> Q. Right.
>
> A. And then you look at your bend indice and you can determine where the beginning axial position is and you can substract that to find the

[1] Plaintiff admitted that the Norco sale anticipated limitation "[40-F]" which is the "wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof" limitation. (D.I. 296, ex. 17 at 67)

Case: 17-2423 Document: 41 Page: 137 Filed: 03/20/2018

> relative position, so you're using the axial array with the bend indice in it to determine where that position is.

(D.I. 359, ex. A at 129:14-25)[2] The implication of the axial data is that:

> Q. And then once you have the relative position then you just look for the sweep number where the minimum wall thickness is located, right?
>
> A. Yeah, you take that sweep number, you index into the axial position array and you do the same process. So it's relative to the index, the beginning index of the bend.

(*Id.* at 130:18-23) Claim 40 requires the use of sensor (not inspection) data to generate data markers, "wherein each of said data markers identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace." ('874 patent, 20:27-30) Unrebutted testimony from DeLorenzo and defendant's experts supports defendant's contention that the Norco sale anticipates claim 40.

4. Plaintiff's arguments in response do not create any genuine issues of material fact. Plaintiff contended that "the Norco Report[s] do[] not include any display[s] created by the use of 'sensor data' to create data markers," because the strip charts in the Norco Reports "were created purely from ultrasound data." (D.I. 306 at 15-16) Plaintiff's experts reviewed the source code and opined that "the 'Roll' sensor data array is explicitly ignored[3] by the software. . . . [and t]he 'AccelYaw,' 'AccelPch,' and 'AccelDir' sensor data array are also simply discarded by the software." (D.I. 307, ex. A at ¶ 88) Plaintiff's experts explained further in their rebuttal expert report that the "pRoll" function discards the sensor data, because it is "commented out" but otherwise present in the source code. (D.I. 307, ex. B at ¶ 95 and figure 10) None of these arguments address

---

[2] These relevant pages were absent from the record at summary judgment. Defendant has provided the missing eight pages of deposition testimony in this limited motion for reconsideration.

[3] It is not clear from the record whether "ignore" means that these sensor functions are also "commented out" as with the "pRoll" function discussed below.

DeLorenzo's deposition testimony and the axial encoding data. Moreover, plaintiff's argument that "the claim does not simply require the **collection** of sensor data: it requires **use** of sensor data to create data markers" is not persuasive. (D.I. 306 at 15 (emphasis in original)) Claim 40 recites a "system" comprising "a storage device" and "a computer programmed to" perform a series of steps. ('874 patent, 20:17-25) For system claims, "an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (citation omitted). The claims only require that the computer be programmed to analyze the sensor data to create a data marker. Defendant has provided unrebutted evidence that the axial encoder (sensor) data was used in the Norco sale to create data markers in a manner that anticipates claim 40. Moreover, plaintiff's experts admit that the source code used in the Norco sale included the "pRoll" function which employs sensor data to create a data marker, even though the "pRoll" function was "commented out." Under *Finjan*, the "pRoll" function was present in the source code used in the Norco sale and, therefore, anticipates claim 40. For these reasons, claim 40 of U.S. Patent No. 7,542,874 is invalid as anticipated by the Norco sale under § 102(b).

Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QUEST INTEGRITY USA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CLEAN HARBORS INDUSTRIAL SERVICES, INC.,<br><br>Defendant. | ) | Civ. No. 14-1482-SLR |
| QUEST INTEGRITY USA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>COKEBUSTERS USA INC.,<br><br>Defendant. | ) | Civ. No. 14-1483-SLR |

**MEMORANDUM ORDER**

At Wilmington this 28th day of June, 2016, having heard argument on, and having reviewed the papers submitted in connection with, the parties' proposed claim construction;

IT IS ORDERED that the disputed claim language of U.S. Patent No. 7,542,874 ("the '874 patent") shall be construed consistent with the tenets of claim construction set forth by the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), as follows:

1. **"Bend:"**[1] "A curved section of tubing." The specification explains that "a furnace is generally comprised of several hundred to several thousand feet of serpentine tubing that is characterized by straight tube segments . . . interconnected by angled bends . . . ." (1:26-30) Moreover, the "present invention is directed to a furnace tube inspection system for a furnace that comprises a plurality of tube segments connected by a plurality of bends, such as the furnace shown in [figures] 1A-1C." (4:27-30)




(Figure 1C) Plaintiff criticizes the construction,[2] arguing that the angle of the bend is not dictated by the specification. The adopted construction does not require a particular angle; indeed, the "bends" shown in figure 1C above may be said to be at a 90° angle or 180° angle. To the extent plaintiff seeks to capture a particular type of connection of the

---

[1] Found in claims 1, 11, 24, 33, 37, and 40.
[2] Proposed by defendants and adopted by the court.

tube ends – "mule ears" (shown below), which internally present two 90° square turns in immediate succession – the court concludes that the specification does not describe these sharp turns, characterized by a lack of roundness.



(Civ. No. 14-1483, D.I. 55 at § 48)[3]

2. **"Partition said inspection data at a plurality of data markers:"**[4] "Divide the inspection data into subsets of smaller size, each of which begins and ends with a data marker."[5] **"Partitioning said inspection data at said data markers:"**[6] "Dividing the inspection data into subsets of smaller size, each of which begins and ends with a data marker." **"Partitioning said inspection data at said bends:"**[7] "Dividing the inspection data into subsets of smaller size, each of which begins and ends with a bend." The specification explains that

> the inspection data and/or sensor data collected from the furnace may be analyzed to generate a plurality of data markers each of which identifies a physical feature of the furnace. The inspection data is then partitioned at

---

[3] **Extrinsic evidence.** "Curved" means "to have or take a turn, change, or deviation from a straight line or course or from a level surface typically with a rounded gradual effect and without sharp breaks or angularity." *Merriam-Webster Unabridged* (2016).
[4] Found in claims 1 and 11.
[5] The court adopts defendants' proposed construction. Plaintiff proposed "dividing the inspection data into subsets of smaller size at a plurality of data markers," which construction only differs as to the "plurality of data markers" language.
[6] Found in claims 24 and 40.
[7] Found in claim 33.

> the data markers so as to correlate the inspection data to the physical geometry (e.g., the appropriate tube segments) of the furnace.

(4:34-40) It follows from this explanation that each "subset" would begin and end at a data marker.[8]

3. **"Correlate said inspection data to said physical geometry of said furnace:"**[9] "To put in relation the inspection data to the arrangement of the tube segments in the furnace."[10] **"Correlate said inspection data to an appropriate one of said tube segments of said furnace:"**[11] "To put in relation the inspection data to the appropriate one of the tube segments in the furnace." The specification explains that the prior art furnace tube inspection systems were not able "to correlate the inspection data collected from the furnace with the physical geometry of the furnace," because the inspection tool did not progress through the furnace at a constant rate. This made it difficult "to identify the precise locations of the worn sections and/or hot spots of the furnace." (1:65-2:19) The current invention uses a computer "to partition the inspection data at the data markers so as to correlate the inspection data to the appropriate tube segments of the furnace." (3:21-23; 4:37-40) Any type "of physical features may . . . be used to correlate the inspection data to the physical geometry of the furnace." (4:43-57) The specification further explains that "[t]he inspection data collected by the ultrasonic transducers may also be used to identify the locations of the

---

[8] Plaintiff argued that the additional language was repetitive and potentially confusing to a jury. The court is unable to discern at this juncture why the additional language in the adopted construction would create confusion.
[9] Found in claims 1, 11, and 40.
[10] The court declines to construe "correlate" and "physical geometry" out of context as requested by the parties.
[11] Found in claims 24 and 33.

bends of the furnace and, thus, assist in correlating the inspection data to the physical geometry of the furnace." (5:29-32) The specification describes using "relational data" (such as "a plurality of time intervals") in the storage device of the system that, along with "inspection data," help in generating the data markers that identify the locations of, e.g., furnace bends. (7:16-28; figures 3, 4, and 8)[12]

4. **"A furnace with a specified physical geometry:"**[13, 14] "Arrangement of tube segments in the furnace." The specification explains that the inspection data is correlated "to the physical geometry (e.g., the appropriate tube segments) of the furnace." (4:37-40) Also, "the physical geometry of a furnace is not always consistent such that either the wall thickness or the inside radius of the furnace may change from one tube segment to another." (11:5-8)

5. **"Generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of said tube segments:"**[15] "To create a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments." **"Generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of said tube segments:"**[16] "Creating a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube

---

[12] **Extrinsic evidence.** "Correlate" is defined in the dictionary as "one of two related things viewed in terms of its relationship to the other." *Merriam-Webster Unabridged* (2016).
[13] Found in claims 1, 11, and 40.
[14] Having declined to construe "physical geometry" out of context, the court is left with this limitation, which includes the term.
[15] Found in claims 1 and 40.
[16] Found in claims 11 and 24.

segments." **"Generating a two dimensional or three-dimensional representation of at least a portion of said inspection data arranged to represent a physical geometry of a plurality of said tube segments:"**[17] "Creating a two dimensional or three-dimensional visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments." **"Generating a two-dimensional or three-dimensional representation of said inspection data collected from a plurality of said tube segments, said data arranged to represent a physical geometry of said tube segments:"**[18] "Creating a two dimensional or three-dimensional visual representation of the inspection data collected from a plurality of said tube segments to depict or portray the arrangement of the tube segments."[19]

6. The parties principally disagree on whether the limitations include "strip charts." The specification explains that the inspection data is "partitioned at the data markers so as to correlate the inspection data to the physical geometry (e.g., the appropriate tube segments) of the furnace. It will also be seen that the inspection data is displayed in a manner that enables the visual detection of problem areas within the furnace." (4:35-42) The examples provided in the specification "illustrate different approaches that may be used to correlate the inspection data to the physical geometry of the furnace and display the inspection data in a manner that enables the visual detection of problem areas within the furnace." (9:42-47)

[17] Found in claim 33.
[18] Found in claim 37.
[19] The court declines to separately construe "represent."

7. Example 1 of the specification describes certain strip charts, by reference to figures 3 and 4. Figure 3 depicts the "wall thickness readings for each of the time intervals . . . plotted vertically across the height of the horizontal strips." The "various wall thickness readings displayed on strip chart 300 are color-coded in accordance with a color legend 302," which "wall thickness readings range from 0.15 inches (shown in dark blue) to 0.35 inches (shown in dark red)." (10:8-14) In figure 4, "the inside radius readings are plotted successively in time from left-to-right and bottom-to-top, and the inside radius readings for each of the time intervals are plotted vertically across the height of the horizontal strips." The "various inside radius readings displayed on strip chart 400 are color-coded in accordance with a color legend 402," ranging "from 0.00 inches (shown in dark blue) to 5.00 inches (shown in dark red)." (10:18-26) In figures 3 and 4, each horizontal strip represents a sixty second period of time. (10:36-37) Assuming a speed of the inspection tool of 2 ft/sec, "each horizontal strip displays the readings collected from 120 feet of furnace" tubing. (10:36-40) A data analyst identifies the locations of the furnace bends by analyzing the strip chart. Specifically, the location of the bends "may be identified by visually detecting one or more 'data clues' on the strip charts," including

> an increase in the variation of the wall thickness readings and/or inside radius readings within a particular time interval (which will be depicted as different colors across the height of a horizontal strip) and/or a decrease in the number of wall thickness readings and/or inside radius readings within a particular time interval (which will be depicted as white spaces or gaps across the height of a horizontal strip).

(10:48-57) After identifying and marking the bends, the computer is programmed to generate the data markers and mark the tube segments. "The various readings are thus partitioned at the data markers to thereby correlate the readings to the appropriate

tube segments of the furnace." (10:58-67) The data analyst may also use "a mechanical drawing of the physical layout of the furnace" and "the known lengths of the various tube segments" to help identify the bends or ends of straight tube segments. (11:1-19) Using the strip charts, the analyst can determine if any tube segments are flawed and should be repaired or replaced. (11:20-35) The specification concludes "that strip charts 300 and 400 are merely examples of the types of displays that may be used to visually detect problem areas within the furnace." After "generation of the data markers, the wall thickness readings and/or inside radius readings could be displayed as a stacked set of bars wherein each bar represents one tube segment of the furnace" or "in a three-dimensional format in which the structure of the tube segments matches the actual physical geometry of the furnace." (11:36-48)

8. In example 2, the computer generates the chart shown in figure 5, "in which all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of vertical bars. Each vertical bar displays the wall thickness readings from a single tube segment." In example 3 and figure 6, "all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of vertical bars. Similar to the chart of [figure] 5, each vertical bar displays the wall thickness readings from a single tube segment." In both of these examples, "the tube segments are positioned in their proper orientation (but with the connecting bends removed)." (11:52-12:55)

9. During prosecution, the independent claim was amended in April 2008[20] to recite:

> A system for displaying inspection data collected from a furnace with a specified physical geometry, said system comprising:

---

[20] After two prior amendments.

a storage device for storing said inspection data; and

a computer programmed to:

partition said inspection data at a plurality of data markers each of which identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;

generate a display of said partitioned inspection data **arranged to represent said physical geometry of said furnace** to thereby enable visual detection of problem areas within said furnace; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

(D.I. 136 at JA268) (emphasis added) The patent office rejected such claim as obvious in view of the prior art, U.S. Patent No. 6,359,434 ("Winslow") and U.S. Patent No. 6,978,690 ("Van der Heide"). The patentee distinguished Winslow arguing that:

> Winslow is directed to approximating the location of defects in a water pipeline with respect to joints within that pipeline. The physical geometry of the water pipeline is not known and, as such, the defects are not correlated to the actual physical geometry of the pipeline. Rather the defects are merely correlated to detected pipe joints of the water pipeline in order to provide an approximate location of such defects. Indeed, because the segments of a water pipeline are not generally stacked, the location of a defect in a particular segment in relation to the location of a defect in another segment is not instructive of a global problem within the water pipeline. As such, the claimed invention would not be necessary to the detection of defects in a water pipeline. By contrast, in the furnace tube inspection system and method of the present invention, the collected inspection data is displayed such that the data is arranged to represent the known physical geometry of the furnace. The collected inspection data is not merely correlated to particular tube segments of the furnace. Rather, the collected inspection data is displayed in such a manner that the data is arranged to represent the actual physical geometry of the furnace, which simplifies the detection of problems within a particular region of the furnace.

(D.I. 136 at JA283-84) In December 2008, the patentee amended the claim to recite:

Case: 17-2423 Document: 11 Page: 148 Filed: 03/20/2018

A system for displaying inspection data collected from a furnace with a specified physical geometry, **wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments**, said system comprising:

a storage device for storing said inspection data; and

a computer programmed to:

partition said inspection data at a plurality of data markers each of which identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;

generate a display of **at least a portion of** said partitioned inspection data arranged to represent said physical geometry of **a plurality of said tube segments and** enable visual detection of a problem area **comprising one or more of said tube segments**; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer and combinations thereof.

(D.I. 136 at JA372) (emphasis added) Addressing the examiner's continued rejection of the claim as obvious in view of Winslow and Van der Heide, the patentee argued that:

In particular, attorney Carlson explained that the claimed invention was directed to a system for displaying inspection **data collected from a furnace comprising a plurality of tube segments interconnected by a plurality of bends to allow stacking of the tube segments, which physical geometry is very different from that of a water pipeline as disclosed in Winslow.** Attorney Carlson pointed out that although Winslow teaches the partitioning of inspection data, it does not teach or suggest the display of partitioned inspection data that is arranged to represent the physical geometry of plurality of tube segments of a furnace and enable visual detection of a problem area comprising one or more of the tube segments of the furnace.

(D.I. 136 at JA386-87) (emphasis added)

10. Winslow describes the prior art as using a remote field technique ("RFT") measurement device to evaluate the wall thickness of water pipes. "As the

measurement device travels along a body of tube, the detector signal's phase and amplitude are determined by the RFT instrument and are digitally recorded and/or displayed in strip chart form." Figure 2 "is an example of such strip chart data." Figure 2 shows a chart of signal amplitude vs. distance and a chart of phase vs. distance, i.e., it is representing continuous data as determined by the RFT instrument. (Winslow, 1:67-2:4) Winslow provides a method for analyzing RFT data from a data file, including "parsing the data file into pipe lengths, calculating a phase profile for the data points within each pipe length, [and] locating potential defects in the pipe length using the Phase Profiles . . . ." (Winslow, 4:36-44)

11. "A patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender certain claim scope to which he would otherwise have an exclusive right by virtue of the claim language." *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009) (citing *Purdue Pharma LP. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)). "Prosecution disclaimer does not apply to an ambiguous disavowal." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) (citations omitted). The claims of the '874 patent are each directed to a furnace. The two claim amendments presented above focus the "generating a display" step to the physical geometry of the inspected furnace. The applicant distinguishes Winslow from the patent at bar, arguing that Winslow does not teach "the display of partitioned data that is arranged to represent the physical geometry of plurality of tube segments of a furnace and enable visual detection of a problem area comprising one or more of the tube segments of the furnace." The focus of Winslow is not the "generation of a particular visual representation," but data manipulation to

approximate the location of defects. The applicant's arguments focus on the particular environment of Winslow, wherein the physical geometry of the water pipeline is not known. In contrast, the applicant points out that the claim at bar is directed to a specific environment (a furnace) with a certain physical geometry. The arguments in the prosecution history do not use the words "strip chart," nor are strip charts described.[21] Moreover, the strip charts of example 1 contain the markings made by the data analyst, effectively representing the location of the bends in the inspected furnace. The court disagrees with plaintiff's representation of the prosecution history and concludes that the applicant did not disclaim strip charts as described in example 1.

12. The court has provided a construction in quotes for the claim limitations at issue. The parties are expected to present the claim construction consistently with any explanation or clarification herein provided by the court, even if such language is not included within the quotes.

United States District Judge

[21] Plaintiff's citation to *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335 (Fed. Cir. 2005) is unhelpful. In that case, the Federal Circuit found prosecution disclaimer when "the applicant distinguished his invention from the [prior art] on the basis of the latter disclosing inner walls that are 'slightly concave'" in order to overcome an obviousness rejection. "The inescapable consequence of such an argument is that the scope of applicant's claims cannot cover inner walls that are 'slightly concave'" thus, "the scope of applicant's claims is also limited to inner walls of the base portion with no concavity." *Id.* at 1345-46.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUEST INTEGRITY USA, LLC<br><br>Plaintiff,<br><br>v.<br><br>CLEAN HARBORS INDUSTRIAL SERVICES, INC.<br><br>Defendant. | Civ. No. 14-1482-SLR |
| QUEST INTEGRITY USA, LLC<br><br>Plaintiff,<br><br>v.<br><br>COKEBUSTERS USA INC.<br><br>Defendant. | Civ. No. 14-1483-SLR |

# ORDER

At Wilmington this 28th day of March, 2017, consistent with the memorandum opinion issued this same date:

IT IS ORDERED that:

1. Defendants' joint motion for summary judgment of invalidity of claims 1, 11, 12, 13, 24, 25, 27, 28, 30, 33, 37, and 40 of the '874 patent (Civ. No. 14-1482 D.I. 184; Civ. No. 14-1483 D.I. 293) is granted as to all claims but claim 40;

2. Plaintiff's motion for summary judgment of validity of claims 12 and 25 of the '874 patent (Civ. No. 14-1482 D.I. 183; Civ. No. 14-1483 D.I. 289) is denied;

3. Plaintiff's motion for summary judgment of infringement of the '874 patent by defendant, Clean Harbors Industrial Services, Inc. (Civ. No. 14-1482 D.I. 179), is denied;

4. Defendant Clean Harbors' motion for summary judgment of noninfringement of the '874 patent (Civ. No. 14-1482 D.I. 189) is granted;

5. Plaintiff's motion for summary judgment of infringement of the '874 patent by defendant, Cokebusters USA, Inc. (Civ. No. 14-1483 D.I. 285), is denied;

6. Defendant Cokebusters' motion for summary judgment of noninfringement of the '874 patent and no willfulness (Civ. No. 14-1483 D.I. 290) is granted in part and denied in part; and

7. The Clerk of Court is directed to enter judgment in favor of defendant Clean Harbors Industrial Services, Inc. and against plaintiff Quest Integrity USA, LLC in Civ. No. 14-1482.

Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QUEST INTEGRITY USA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CLEAN HARBORS INDUSTRIAL SERVICES, INC.,<br><br>Defendant. | Civ. No. 14-1482-SLR |

**JUDGMENT IN A CIVIL CASE**

For reasons stated in the court's memorandum opinion and order of March 28, 2017;

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of defendant Clean Harbors Industrial Services, Inc. and against plaintiff Quest Integrity USA, LLC.

Sue L. Robinson
Senior United States District Judge

Dated: 3/28/2017

Nicole Nolt
(By) Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| QUEST INTEGRITY USA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 14-1483-SLR |
| v. | ) | |
| | ) | |
| COKEBUSTERS USA INC., | ) | |
| | ) | |
| Defendant. | ) | |

**[COKEBUSTERS' PROPOSED] FINAL JUDGMENT**
**PURSUANT TO FED. R. CIV. P. 54(B)**

1. The Court enters final judgment on Quest Integrity USA, LLC's ("Quest's") claim for infringement of claim 30 of U.S. Patent No. 7,542,874 ("the '874 patent"), and on Cokebusters USA's ("Cokebusters'") counterclaim for declaratory judgment of non-infringement of claim 30 the '874 Patent, in favor of Cokebusters and against Quest, as set forth in the Court's Memorandum Opinion and Order of March 28, 2017 (D.I. 356, 357) and Memorandum Order of June 30, 2017 (D.I. 373, ¶ 6).

2. The Court enters final judgment of invalidity of claims 12, 24, 30, 33 and 40 of the '874 Patent pursuant to 35 U.S.C. § 102(b) on Cokebusters' counterclaim for declaratory judgment of invalidity, in favor of Cokebusters and against Quest, as set forth in the Court's Memorandum Opinion and Order of March 28, 2017 (D.I. 356, 357) and Memorandum Order dated April 7, 2017 (D.I. 364).

3. Pursuant to the Court's May 15, 2017 Order (D.I. 368) and June 30, 2017 Memorandum Order (D.I. 373), all other issues, including Cokebusters' counterclaim for declaratory relief that claim 40 of the '874 patent is not infringed, have been bifurcated and stayed pending appeal.

4. The Court finds, for the same reasons why the Court stayed and bifurcated the remaining claims (D.I. 368, 373), that there is no just reason for delay of an appeal of the summary judgment determinations, an appeal will promote efficient judicial administration, and will not result in any unfair prejudice to the parties.

IT IS SO ORDERED this 12th day of July, 2017.

Sue L. Robinson
Senior Judge Sue L. Robinson

5262889 / 42173

US007542874B2

(12) **United States Patent**
**Bondurant et al.**

(10) **Patent No.: US 7,542,874 B2**
(45) **Date of Patent: Jun. 2, 2009**

(54) **2D AND 3D DISPLAY SYSTEM AND METHOD FOR FURNACE TUBE INSPECTION**

(75) Inventors: **Phillip D. Bondurant**, Kent, WA (US); **Robert De Lorenzo**, Seattle, WA (US); **Richard D. Roberts**, Seattle, WA (US)

(73) Assignee: **Quest Trutec, LP**, Kent, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/142,776**

(22) Filed: **Jun. 1, 2005**

(65) **Prior Publication Data**

US 2005/0267703 A1 Dec. 1, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/576,276, filed on Jun. 1, 2004.

(51) **Int. Cl.**
***G06F 15/00*** (2006.01)

(52) **U.S. Cl.** ...................................... **702/183**; 702/182

(58) **Field of Classification Search** ................. 702/183, 702/185, 33, 35, 36, 39, 40, 159, 171, 182; 128/916; 382/154; 69/29.13; 65/29.13
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,893,933 A * 1/1990 Neiheisel et al. ............ 356/608
5,125,745 A * 6/1992 Neiheisel et al. ............ 356/602
6,359,434 B1 * 3/2002 Winslow et al. ............. 324/220
6,978,690 B1 * 12/2005 Van der Heide et al. ....... 73/865
2004/0006437 A1 1/2004 Lam et al.

OTHER PUBLICATIONS

Description of Furnace Tube Inspection System (FTIS™) (attached as Exhibit A) (in public use for more than one year prior to Jun. 1, 2004, the priority date of the present application).

* cited by examiner

*Primary Examiner*—Edward R Cosimano
*Assistant Examiner*—Douglas N Washburn
(74) *Attorney, Agent, or Firm*—Stinson Morrison Hecker LLP

(57) **ABSTRACT**

A system and method for displaying inspection data collected from a furnace is disclosed. The system comprises a storage device for storing the inspection data. The system also comprises a computer programmed to partition the inspection data at a plurality of data markers so as to correlate the inspection data to the physical geometry of the furnace. Each of the data markers identifies the location of a physical feature of the furnace (such as a bend, an external raised surface, cross-over piping, a thermal well, a weld, a flange, a schedule change and/or a diameter change). Preferably, the computer is also programmed to generate a display of the partitioned inspection data, wherein the display is a two-dimensional or three-dimensional representation of the tube segments of the furnace. This display may then be used to visually detect problem areas within the furnace. Various exemplary embodiments of the system and associated method are provided.

**41 Claims, 11 Drawing Sheets**
**(7 of 11 Drawing Sheet(s) Filed in Color)**






*FIG. 1A*




*FIG. 1B*




*FIG. 1C*


106
STORAGE DEVICE
108
DATABASE
110
116a
116b
116c
116d
116e
116f
116g
116h
118a
118b
118c
118d
118e
118f
118g
118h
120a
120b
122
112
INSPECTION DATA
114
SENSOR DATA
100
102
COMPUTER
104
PROCESSOR

*FIG. 2*

QUEST084374

Express Mail Label: EV 577105995 US

3/11




*FIG. 3*

Express Mail Label: EV 577105995 US

4/11




*FIG. 4*

Express Mail Label: EV 577105995 US

5/11




*FIG. 5*



QUEST084376

Express Mail Label: EV 577105995 US

6/11




FIG. 6

U.S. Patent Jun. 2, 2009 Sheet 7 of 11 US 7,542,874 B2

Express Mail Label: EV 577105995 US

7/11




*FIG. 7*


QUEST084378

Express Mail Label: EV 577105995 US

8/11




*FIG. 8*

QUEST084380

Express Mail Label: EV 577105995 US

9/11




*FIG. 9*

Case: 17-2423 Document: 11 Page: 166 Filed: 03/20/2018






*FIG. 10A*


A
B
COMPUTER COMPARES COMPOSITE BEND MARKERS TO PREDETERMINED THRESHOLD
822
COMPUTER PARTITIONS INSPECTION DATA AT BEND MARKERS
824
DATA ANALYST INPUTS DISPLAY INFORMATION INTO COMPUTER
826
COMPUTER GENERATES DISPLAY OF INSPECTION DATA
828
DATA ANALYST ANALYZES DISPLAY TO IDENTIFY PROBLEM AREAS WITHIN FURNACE
830
END

*FIG. 10B*

# 2D AND 3D DISPLAY SYSTEM AND METHOD FOR FURNACE TUBE INSPECTION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application Ser. No. 60/576,276, filed Jun. 1, 2004, entitled "2D and 3D Display System and Method for Furnace Tube Inspection," which is incorporated herein by reference.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to furnace tube inspection systems, and more particularly to a system and method for displaying inspection data in a two-dimensional and/or three-dimensional format to enable visual detection of problem areas within the furnace.

2. Description of Related Art

As depicted in FIGS. **1A**-**1**C, a furnace is generally comprised of several hundred to several thousand feet of serpentine tubing that is characterized by straight tube segments (each of which is identified as reference numeral **10**) interconnected by angled bends (each of which is identified as reference numeral **20**). The bends allow tight stacking of the tube segments for maximum heat transfer and efficiency. Although not shown in FIGS. **1A**-**1**C, medium length sections of tubing may also be used to interconnect furnace tubing located in different regions of the furnace. These sections of tubing are not part of the furnace geometry, but are employed so that an inspection tool (described below) can be operated in one pass, if possible, and thus significantly reduce plant downtime.

If the plant maintenance personnel need to repair or replace a worn section of the furnace, it is very important to accurately identify which tube segment contains the worn section and where the identified tube segment is located within the furnace. In addition, it is important to obtain information regarding hot spots in the furnace so that the plant maintenance personnel may adjust the furnace to reduce or eliminate the hot spots and thereby prolong the life of the furnace and reduce cost and future plant downtime.

In this regard, furnace tube inspection systems have been developed in which an inspection tool (identified as reference numeral **30**) is flushed from a launcher (shown in FIG. **1**A) through the furnace (shown in FIG. **1**B) and to a receiver (shown in FIG. **1**C). Typically, the inspection tool collects inspection data at pre-determined time intervals as it progresses through the furnace (although the inspection data may alternatively be collected via a position-based collection system). The inspection data includes readings of the inside radius of the furnace, readings of the wall thickness of the furnace, and the like. The collected inspection data is then extracted from the inspection tool, whereby the various readings are converted to calibrated engineering units. Finally, the converted inspection data may be examined by an engineer in order to identify thinning, bulging and other flaws within the furnace.

One problem with the furnace tube inspection systems of the prior art is that it is difficult to correlate the inspection data collected from the furnace with the physical geometry of the furnace. This is due to the fact that the inspection tool does not progress through the furnace at a constant rate. Instead, the inspection tool will often ebb and flow through the furnace and/or may become momentarily stuck at a point in the structure. Also, the inspection tool may take longer to traverse a bend in the furnace. In addition, the furnace may change in schedule size or diameter and thus retard or promote the passing of the inspection tool. For example, the furnace could change from a schedule 40 to a schedule 80 (or vice versa) and thus change the rate of passage of the inspection tool, or, the furnace could change from a 4-inch inside diameter to a 6-inch inside diameter (or vice versa) and thus change the rate of passage of the inspection tool. All of these conditions generate a correlation (i.e., mapping or scaling) problem between the collected inspection data and the precise location of the inspection tool with respect to the physical geometry of the furnace. As a result, an engineer may not be able to identify the precise locations of the worn sections and/or hot spots of the furnace.



Another problem with the furnace tube inspection systems of the prior art is that the inspection data is not displayed in a manner that readily "announces" problem areas within the furnace. Conventionally, the inspection data has been presented in a one-dimensional tabular format, which is deficient in that an engineer must peruse each line of data to determine if a potential problem has arisen. It can be appreciated that this method of examining the inspection data is time-consuming, inefficient, and does not readily permit a comparison between one section of tubing and another. As such, the engineer is not able to readily detect worn sections of the furnace, and, cannot determine if hot spots are occurring during the operation of the furnace that are common to a region of the furnace.

Recently, data visualization tools have been developed that allow a slice of the inspection data to be graphically displayed in a two-dimensional format, wherein each slice comprises inspection data collected from a short axial section (e.g., less than a foot) of the furnace. While this graphical representation of the inspection data is an improvement over the one-dimensional tabular format described above, the engineer may only view one slice of the inspection data at a time. This is a significant problem when attempting to identify overall trends in the inspection data and then apply them to the real world operation of the plant.

## BRIEF SUMMARY OF THE INVENTION

The present invention is directed to a system and method for displaying inspection data collected from a furnace that comprises a plurality of tube segments connected by a plurality of bends. The system includes a storage device for storing inspection data collected by an inspection tool flushed through the furnace. Preferably, the inspection data comprises a plurality of inside radius and/or wall thickness readings collected by an array of ultrasonic transducers or by a single transducer with a rotating mirror. The storage device may also store sensor data collected by one or more auxiliary sensors, such as an axial encoder, an accelerometer, a roll encoder, a gyroscope and/or an inertial navigation system.

The system also includes a computer that may be programmed to generate a plurality of data markers in relation to the inspection data, wherein each of the data markers identifies a location of a physical feature of the furnace (such as a bend, an external raised surface, cross-over piping, a thermal well, a weld, a flange, a schedule change and/or a diameter change). In some applications, the data markers are generated based upon input from a data analyst who has analyzed a two-dimensional display of the inspection data in order to

identify the locations of these physical features. In other applications, the computer automatically generates the data markers based upon an analysis of the inspection data and/or sensor data collected from the furnace.

For example, the locations of the furnace bends may be identified by detecting one or more "data clues" in the inspection data and/or sensor data collected from the furnace. Examples of these "data clues" include an increase in the variation of the wall thickness readings and/or inside radius readings within a particular time interval, a decrease in the number of wall thickness readings and/or inside radius readings within a particular time interval, and/or a change in the centering of the inspection tool (all of which are more likely to occur in the bends). Other "data clues" may be detected based upon the distance traveled by the inspection tool (which may be compared with the known geometry of the furnace to locate the bends), the acceleration of the inspection tool (which is more likely to occur in the bends), and/or the roll of the inspection tool (which is likely to occur at a faster rate in the bends).

The computer is also programmed to partition the inspection data at the data markers so as to correlate the inspection data to the appropriate tube segments of the furnace. Preferably, the computer is further programmed to generate a display of the partitioned inspection data, wherein the display is a two-dimensional or three-dimensional representation of one or more of the tube segments of the furnace. The display may be used to visually detect problem areas within the furnace so that the appropriate tube segments may be repaired or replaced by the plant maintenance personnel.

The present invention has several advantages over the prior art. For example, the invention provides a processing and display methodology that allows a large amount of inspection data to be correlated with the physical geometry of the furnace. In addition, the invention provides a convenient method for displaying the inspection data on a single page for rapid assessment of problem areas within the furnace and to facilitate the observation of trends within the inspection data. Of course, other advantages of the invention will be apparent to one skilled in the art.

## BRIEF DESCRIPTION OF THE DRAWINGS

This patent application contains a plurality of drawings, some of which are executed in color. Copies of the patent application, with the color drawings, will be provided by the Patent Office upon request and payment of the necessary fee. The drawings are as follows:

FIGS. **1A-1C** are schematic diagrams of an inspection tool passing from a launcher (shown in FIG. **1A**) through a furnace (shown in FIG. **1B**) and to a receiver (shown in FIG. **1C**);

FIG. **2** is a block diagram of a computer system for displaying inspection data in accordance with the present invention;

FIG. **3** is a two-dimensional color-coded strip chart generated by the computer system of FIG. **2**, which shows all of the wall thickness readings collected from a furnace in accordance with a first example of the present invention;

FIG. **4** is a two-dimensional color-coded strip chart generated by the computer system of FIG. **2**, which shows all of the inside radius readings collected from a furnace in accordance with the first example of the present invention;

FIG. **5** is a two-dimensional color-coded chart generated by the computer system of FIG. **2**, which shows all of the wall thickness readings collected from a convection section of a furnace in accordance with a second example of the present invention;

FIG. **6** is a two-dimensional color-coded chart generated by the computer system of FIG. **2**, which shows all of the wall thickness readings collected from a convection section of a furnace in accordance with a third example of the present invention;

FIG. **7** is a colorized chart generated by the computer system of FIG. **2**, which shows the individual data markers and composite data markers that may be used to identify the locations of the furnace bends in accordance with a fourth example of the present invention;

FIG. **8** is a colorized chart generated by the computer system of FIG. **2**, which shows the composite data markers in relation to an adaptive threshold that may be used to identify the locations of the furnace bends in accordance with the fourth example of the present invention;

FIG. **9** is a three-dimensional color-coded chart generated by the computer system of FIG. **2**, which shows various tube segments of a furnace with the connecting bends removed in accordance with the fourth example of the present invention; and

FIGS. **10**A and **10**B are flow charts of a method for displaying inspection data in accordance with the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is directed to a furnace tube inspection system for a furnace that comprises a plurality of tube segments connected by a plurality of bends, such as the furnace shown in FIGS. **1A-1C**. In accordance with the invention, an inspection tool is flushed through the furnace so as to collect inspection data and/or sensor data as the inspection tool progresses through the furnace. As will be described in greater detail hereinbelow, the inspection data and/or sensor data collected from the furnace may be analyzed to generate a plurality of data markers each of which identifies a physical feature of the furnace. The inspection data is then partitioned at the data markers so as to correlate the inspection data to the physical geometry (e.g., the appropriate tube segments) of the furnace. It will also be seen that the inspection data is displayed in a manner that enables the visual detection of problem areas within the furnace.

A variety of different types of physical features may be identified to assist in correlating the inspection data to the physical geometry of the furnace. Examples of such physical features include the bends of the furnace, external raised surfaces in the convection section of the furnace (e.g., fins or studs), cross-over piping, thermal wells (e.g., Weld-O-Let welded to the pipe with a threaded hole in the middle), welds between two tube segments or between a tube segment and a bend, flanges, schedule changes between two tube segments and/or diameter changes between two tube segments. While the invention will be described in detail hereinbelow with respect to the identification of the furnace bends, it should be understood that many other types of physical features may also be used to correlate the inspection data to the physical geometry of the furnace.

The inspection tool may include a variety of different devices for collecting inspection data and/or sensor data from the furnace. Preferably, the inspection tool collects the data at a predetermined time-based rate (although the inspection tool could alternatively collect the data using a position-based collection system in which data is collected when the inspection tool has progressed a predetermined distance). Using a time-based collection system, the data density is determined by the data collection rate and the speed at which the inspection tool progresses through the furnace. In a typical applica-

tion, the data collection rate will range from 30 to 50 Hz per transducer, and the speed of the inspection tool will range from 1 to 2 ft/sec (although the average speed and the instantaneous speed can vary significantly in view of the fact that the inspection tool does not progress through the furnace at a constant rate). Of course, other data collection rates and tool speeds may also be used. Examples of the various types of devices that may be incorporated into the inspection tool will now be described.

Typically, one or more ultrasonic transducers are used to collect inspection data from the furnace (although a single transducer with a rotating mirror may also be used). Preferably, an array of 8, 16, 32, 64 or 128 transducers are positioned around the periphery of the inspection tool, although any number of transducers may be used. Each of the transducers is operable to measure the distance between the transducer and the inner wall of the furnace, whereby a plurality of "inside radius readings" are sequentially collected by the transducers as the inspection tool progresses through the furnace. Each of the transducers is also operable to measure the wall thickness of the furnace, whereby a plurality of "wall thickness readings" are sequentially collected by the transducers as the inspection tool progresses through the furnace. These readings may be used to detect inner surface anomalies of the furnace, such as pitting, corrosion, deformation and/or cracking of the furnace. It should be understood that the detection of such inner surface anomalies is indicative of problem areas within the furnace.

The inspection data collected by the ultrasonic transducers may also be used to identify the locations of the bends of the furnace and, thus, assist in correlating the inspection data to the physical geometry of the furnace. For example, a decrease in the number of inside radius readings and/or wall thickness readings within a particular time interval may provide a "data clue" as to the location of a bend. Missing data is more likely in a bend due to the fact that one or more of the transducers may not receive sufficient energy when the angle between the transducer and the inner wall of the furnace changes by more than a few degrees. Also, an increase in the variation of the inside radius readings and/or wall thickness readings within a particular time interval may provide another "data clue" as to the location of a bend. This is due to the fact that the readings from a particular transducer are more likely to vary from the readings of the other transducers as the inspection tool traverses a bend. In addition, the readings may be used to detect a change in the centering of the inspection tool to provide yet another "data clue" as to the location of a bend.

Another type of device that may be used to collect inspection data from the furnace is a laser profilometer. A laser profilometer is operable to map the inner wall of the furnace by projecting a focused beam of light onto the surface and imaging its movement onto a position sensitive photosensor. The laser profilometer rotates as the inspection tool progresses though the furnace, thus creating a helical scan of the inner wall of the furnace. The result is a digital, high resolution image of the inner wall of the furnace that provides more accurate inside radius readings (as well as a larger number of inside radius readings for a given surface area) as compared to the ultrasonic transducers described above. These readings may also be used to detect a change in the centering of the inspection tool and, thus, provide "data clues" as to the locations of the bends.

One or more auxiliary sensors may also be incorporated into the inspection tool for the purpose of collecting sensor data from the furnace. The sensor data may also provide "data clues" as to the locations of the bends and, thus, assist in correlating the inspection data to the physical geometry of the furnace. The sensor data is preferably collected simultaneously with the inspection data to assure that all of the data can be correlated in time.

One type of auxiliary sensor that may be used to collect sensor data from the furnace is an axial encoder. An axial encoder has roller wheels that contact the inner wall of the furnace and rotate as the inspection tool progresses through the furnace. Each output pulse from the axial encoder indicates that the inspection tool has moved a predetermined distance through the furnace (such as ¼ inch or ½ inch). In a time-based collection system, these output pulses are used to increment a counter that is read at each of the predetermined time intervals, whereby the counter readings are stored in the memory of the inspection tool. It should be understood that these counter readings may be converted to distance readings and then used in combination with the known geometry of the furnace to identify the locations of the bends. Preferably, two axial encoders are employed to provide redundancy in the event that one becomes stuck as the inspection tool progresses through the furnace.

One skilled in the art will understand that an axial encoder may not provide an accurate measurement of the location of the inspection tool within the furnace. Typically, an axial encoder has a position error that is 2% to 4% the length of the furnace. For example, a 10,000 foot long furnace will typically result in a position error of 200 feet to 400 feet. This position error will not be consistent, but will vary based on the frictional characteristics of different sections of the furnace. Because an axial encoder may not provide accurate "data clues" as to the locations of the bends, other types of auxiliary sensors should preferably be used in conjunction with the axial encoder to assist in identifying the locations of the bends.

Another type of auxiliary sensor that may be used to collect sensor data from the furnace is an accelerometer. An accelerometer is operable to detect an acceleration (i.e., change in speed) of the inspection tool, which is more likely to occur in the bends. In a time-based collection system, the voltage of the accelerometer is read at each of the predetermined time intervals, whereby the voltage readings are stored in the memory of the inspection tool. It should be understood that these voltage readings may be converted to acceleration readings to thereby identify the locations of the bends. Of course, if the inspection tool is designed to flow reliably through the furnace, the acceleration in the bends may not be significantly different from other accelerations that the inspection tool might encounter. In these instances, the accelerometer may not provide accurate "data clues" as to the locations of the bends and, as such, other types of auxiliary sensors should preferably be used.

It should be understood that the devices described above (namely, one or more ultrasonic transducers, a laser profilometer, an axial encoder, and an accelerometer) are merely examples of the types of devices that may be incorporated into the inspection tool. One skilled in the art will appreciate that many other types of devices could also be used, such as a roll encoder, a gyroscope or an inertial navigation system. In addition, the number of devices incorporated into the inspection tool may vary from a single device (e.g., a laser profilometer) to several devices (e.g., an array of ultrasonic transducers and several auxiliary sensors). Thus, any type and number of devices may be used to collect inspection data and/or sensor data from the furnace in accordance with the present invention.

Referring now to FIG. **2**, an exemplary embodiment of a system that may be used in accordance with the present invention is designated generally as reference numeral **100**. System

**100** comprises a computer **102** that is programmed to perform various processes (each of which will be described in detail hereinbelow). To perform these processes, computer **102** includes a processor **104** that is operable to execute computer-readable instructions stored on a computer-readable medium. The computer-readable instructions are preferably coded using the MatLab programming language, although other programming languages could also be used, such as C, C++, C # and Java. The computer-readable medium may comprise any type of computer memory, such as floppy disks, conventional hard disks, CD-ROMS, flash ROMS, nonvolatile ROM and. RAM. Examples of computers that are suitable for use with the present invention include personal computers, server computers and multiprocessor computers, although other types of computers could also be used.

Referring still to FIG. **2**, system **100** also comprises a storage device **106**, wherein computer **102** is programmed to maintain in storage device **106** a database **108** that identifies various types of relational data. In this embodiment, the relational data comprises a plurality of time intervals **110** and corresponding inspection data **112** and sensor data **114** that have been downloaded from the memory of the inspection tool during each of the time intervals (as described above). The relational data is preferably maintained in a single table within database **108**, although other database configurations could also be used. It should be understood that computer **102** may include any relational database software that is suitable for maintaining database **108** in storage device **106**.

In the exemplary embodiment of FIG. **2**, inspection data **112** comprises a plurality of inspection readings collected from the furnace by an array of eight (8) ultrasonic transducers, namely, eight (8) wall thickness readings **116***a*-**116***h* and eight (8) inside radius readings **118***a*-**118***h* for each of time intervals **110**. Sensor data **114** comprises a plurality of sensor readings collected from the furnace by a pair of axial encoders and an accelerometer, namely, two (2) position readings **120***a* and **120***b* and one (1) acceleration reading **122** for each of time intervals **110**. Thus, it can be seen that each of time intervals **110** contains a total of nineteen (19) different readings collected from the furnace during that particular time interval. Of course, it should be understood that many different types of devices could be incorporated into the inspection tool such that the width of the data set will vary between different applications.

In accordance with one approach to implementing the present invention, computer **102** is programmed to generate a display of all of inspection data **112** collected from the furnace. A data analyst may then analyze the display of inspection data **112** (preferably in conjunction with sensor data **114**) in order to identify the locations of the furnace bends. Then, based upon input from the data analyst, computer **102** is preferably programmed to generate a plurality of data markers that identify the locations of the furnace bends. Preferably, visual indicators of such data markers are shown on the display in relation to inspection data **112**. Computer **102** may also be programmed to partition inspection data **112** at the data markers so as to correlate inspection data **112** to the appropriate tube segments of the furnace. Finally, a data analyst may view the display of inspection data **112** to visually detect problem areas within the furnace so that the appropriate tube segments may be repaired or replaced by the plant maintenance personnel. Examples of this approach will be described with reference to “Example 1,” “Example 2,” and “Example 3” below.

In accordance with another approach to implementing the present invention, computer **102** is programmed to analyze inspection data **112** and/or sensor data **114** and then, based upon this analysis, automatically generate a plurality of data markers that identify the locations of the furnace bends. Computer **102** is also programmed to partition inspection data **112** at the data markers so as to correlate inspection data **112** to the appropriate tube segments of the furnace. Computer **102** is further programmed to generate a display of the partitioned inspection data **112**, wherein the display is a two-dimensional or three-dimensional representation of one or more of the tube segments of the furnace. Finally, a data analyst may view this display to visually detect problem areas within the furnace so that the appropriate tube segments may be repaired or replaced by the plant maintenance personnel. An example of this approach will be described with reference to “Example 4” below.

With both approaches, the locations of the furnace bends may be identified by detecting one or more “data clues” in inspection data **112** and/or sensor data **114** collected from the furnace. Examples of these “data clues” include an increase in the variation of wall thickness readings **116***a*-**116***h* and/or inside radius readings **118***a*-**118***h* within a particular time interval **110**, a decrease in the number of wall thickness readings **116***a*-**116***h* and/or inside radius readings **118***a*-**118***h* within a particular time interval **110**, and/or a change in the centering of the inspection tool. All of these conditions are more likely to occur in the furnace bends.

Also, position readings **120***a* and **120***b* may be used to determine the distance traveled by the inspection tool during each of time intervals **110**, which may be compared with the known geometry of the furnace to assist in identifying the locations the furnace bends. In addition, acceleration readings **122** may be used to determine the acceleration of the inspection tool during each of time intervals **110** to thereby assist in identifying the locations of the furnace bends. Of course, it should be understood that other types of “data clues” may also be used to identify the locations of the furnace bends in accordance with the present invention.

In accordance with yet another approach to implementing the present invention, the data markers are included within the data set downloaded from the inspection tool. For example, one or more of the sensors may be sufficiently reliable so as to detect the location of each physical feature, whereby a “1” in the data set indicates the detection of a physical feature and a “0” in the data set indicates no detection of a physical feature. Computer **102** is then programmed to partition inspection data **112** at the data markers so as to correlate inspection data **112** to the physical geometry of the furnace. Computer **102** is also programmed to generate a display of the partitioned inspection data **112**, wherein the display is a two-dimensional or three-dimensional representation of one or more of the tube segments of the furnace. Finally, a data analyst may view this display to visually detect problem areas within the furnace so that the appropriate tube segments may be repaired or replaced by the plant maintenance personnel.

To enhance the ability of a data analyst to visually detect problem areas within the furnace, it is preferable to remove the effects of tool de-centering from the display of the inspection data. Although the tool geometry keeps the inspection tool approximately centered in the pipe as the tool traverses the furnace, gravity often causes the inspection tool to ride below the centerline in horizontal pipes. In addition, when traversing a bend, the inspection tool has a tendency to push to one side as it enters the bend. If the inspection tool is perfectly centered in a round pipe, each ultrasonic transducer will measure the same distance to the inner wall of the pipe (assuming there is no pitting or corrosion). However, if the inspection tool is de-centered, there will be a near-sinusoidal variation in the distance readings collected by each of the

ultrasonic transducers around the circumference of the inspection tool. If the de-centering is a significant percentage of the pitting or corrosion to be measured, it is very difficult to accurately determine the pit depth or corrosion by simply looking at the displayed inspection data.

For this reason, the data set is preferably translated so that the data is displayed as if it had been collected from the centerline of the pipe. This centering process may use either the outside surface of the pipe or the inside surface of the pipe as the centering reference. If a data analyst is expecting corrosion on the inner wall of the pipe, the outside surface of the pipe is the preferred centering reference. However, if corrosion is expected on the outer wall of the pipe, the inside surface of the pipe is the preferred centering reference. In either case, the centering process is performed in order to reference the radius data (either inside radius data, or, outside radius data (i.e., inside radius plus wall thickness)) from the center of an undamaged pipe so as to visually emphasize problem areas in the furnace.

For round pipes, the centering process uses the radius data to compute a least squares fit to a circle. The radius reading that is furthest from the best fit circle is eliminated. The fitting process may then be repeated, whereby the next radius reading that is furthest from the best fit circle is eliminated. This fitting process may be further repeated until the remaining radius readings are within a preset threshold from the best fit circle. The fitting process generates the x,y location of the center of the pipe relative to the data set and a mean radius for the pipe. The original radius values are then translated to the pipe center by a vector addition of the computed x,y location of the center of the pipe with the radius readings. It should be understood that this fitting process can be performed using the inside radius data or the outside radius data.

In addition, for oval pipes or where the plant would like to compute the ovality of the pipe, the fitting process can be performed with an ellipse instead of a circle. This fitting process generates a major diameter, a minor diameter, an x,y location of the center of the pipe, and orientation. In addition, the fitting process can be extended to a cylinder where more than one slice of data is used in the fitting process.

Various examples will now be provided to further describe the furnace tube inspection system of the present invention. These examples are provided merely to illustrate different approaches that may be used to correlate the inspection data to the physical geometry of the furnace and display the inspection data in a manner that enables the visual detection of problem areas within the furnace. Of course, it should be understood that other approaches may also be used and these examples do not in any way limit the scope of the present invention.

## EXAMPLE 1

In this example, computer **102** is programmed to generate a two-dimensional display of the wall thickness readings and/or inside radius readings collected from a furnace, which may be viewed by a data analyst in order to identify the locations of the furnace bends. Then, based upon input from the data analyst, computer **102** is programmed to generate a plurality of data markers on the display to thereby correlate the various readings to the appropriate tube segments of the furnace. After generation of the data markers, the data analyst may view the display in order to visually detect problems areas within the furnace. This example will now be described in greater detail with reference to FIGS. **3** and **4**.

Referring to FIG. **3**, computer **102** is programmed to generate a strip chart **300** in which all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of horizontal strips. The wall thickness readings are plotted successively in time from left-to-right and bottom-to-top. As such, the lower left-hand corner of the chart corresponds to the time when the inspection tool leaves the launcher (see FIG. **1**A) and the upper right-hand corner of the chart corresponds to the time when the inspection tool reaches the receiver (see FIG. **1**C). The wall thickness readings for each of the time intervals are plotted vertically across the height of the horizontal strips. It can be seen that the various wall thickness readings displayed on strip chart **300** are color-coded in accordance with a color legend **302**. In this example, the wall thickness readings range from 0.15 inches (shown in dark blue) to 0.35 inches (shown in dark red).

Referring to FIG. **4**, computer **102** is also programmed to generate a strip chart **400** in which all of the inside radius readings for a plurality of time intervals are plotted across a plurality of horizontal strips. Again, the inside radius readings are plotted successively in time from left-to-right and bottom-to-top, and the inside radius readings for each of the time intervals are plotted vertically across the height of the horizontal strips. It can be seen that the various inside radius readings displayed on strip chart **400** are color-coded in accordance with a color legend **402**. In this example, the inside radius readings range from 0.00 inches (shown in dark blue) to 5.00 inches (shown in dark red).

It should be understood that color legends **302** and **402** may be customized as desired for different applications. Furthermore, as an alternative to the use of color legends **302** and **402**, the wall thickness readings and/or inside radius readings may be represented in gray scale (as opposed to color) on the strip charts. However, it can be appreciated that the use of color legends **302** and **402** is preferable to gray scale in order to readily "announce" differences between the various readings shown on the strip charts.

On strip charts **300** and **400**, each horizontal strip represents a 60 second period of time. Assuming that the speed of the inspection tool is 2 ft/sec and the data collection rate is 38 Hz per transducer, it can be calculated that each horizontal strip displays the readings collected from 120 feet of furnace (i.e., 2 ft/sec×60 seconds) over 2,280 different time intervals (i.e., 38 Hz×60 seconds). Because of the large number of readings displayed on strip charts **300** and **400**, a zoom function is provided that allows a data analyst to examine desired sections of the horizontal strips in greater detail.

In this example, a data analyst analyzes strip chart **300** and/or strip chart **400** in order to identify the locations of the furnace bends. As discussed above, the locations of the furnace bends may be identified by visually detecting one or more "data clues" on the strip charts. These "data clues" may comprise an increase in the variation of the wall thickness readings and/or inside radius readings within a particular time interval (which will be depicted as different colors across the height of a horizontal strip) and/or a decrease in the number of wall thickness readings and/or inside radius readings within a particular time interval (which will be depicted as white spaces or gaps across the height of a horizontal strip).

While analyzing strip chart **300** and/or strip chart **400**, the data analyst moves a mouse across the horizontal strips and marks the locations of the furnace bends by clicking on the appropriate positions on the strip charts. Based upon this input from the data analyst, computer **102** is programmed to generate the data markers and place a roman numeral (signifying the tube segment number) followed by an "x" above the positions marked by the data analyst. The various readings are thus partitioned at the data markers to thereby correlate the readings to the appropriate tube segments of the furnace.

Preferably, the data analyst will analyze strip chart **300** and/or strip chart **400** in conjunction with a mechanical drawing of the physical layout of the furnace to provide hints as to where the bends or ends of the tube segments should be located. As noted above, the physical geometry of a furnace is not always consistent such that either the wall thickness or the inside radius of the furnace may change from one tube segment to another. For example, it is apparent from strip chart **300** that tube segments **1** through **30** have generally one wall thickness, tube segments **31** through **37** have generally another wall thickness, and tube segments **38** through **47** have generally another wall thickness. Similarly, it is apparent from strip chart **400** that tube segments **1** through **37** have generally one inside radius, while tube segments **38** through **47** have generally another inside radius. It should be understood that the known lengths of the various tube segments may be superimposed upon strip charts **300** and **400** to provide additional guidance in identifying the locations of the bends or ends of the tube segments.

It can be seen that strip charts **300** and **400** readily "announce" problems areas within the furnace. For example, it is apparent from strip chart **300** that the wall thickness readings vary in tube segments **33** and **34** and to a lesser extent in tube segments **31**, **36** and **37** (as shown by the yellow and red variations in color along the length of these tube segments). In addition, the green-colored areas in tube segments **32** and **35** may indicate problem areas within these tube segments. These variations were immediately apparent with no more than a glance at strip chart **300**. Potential problem areas can also be seen from strip chart **400**. For example, the yellow areas along the top of tube segments **38** through **47** may be indicative of corrosion within these tube segments. Using strip charts **300** and **400**, the data analyst can determine that one or more of the tube segments are flawed and should be repaired or replaced by the plant maintenance personnel.

It should be understood that strip charts **300** and **400** are merely examples of the types of displays that may be used to visually detect problem areas within the furnace. For example, after generation of the data markers, the wall thickness readings and/or inside radius readings could be displayed as a stacked set of bars wherein each bar represents one tube segment of the furnace. Also, the wall thickness readings and/or inside radius readings could be displayed in a three-dimensional format in which the structure of the tube segments matches the actual physical geometry of the furnace. One skilled in the art will understand that other types of displays may also be used in accordance with the present invention.

## EXAMPLE 2

In this example, computer **102** is programmed to generate a two-dimensional display of the wall thickness readings collected from the convection section of a furnace, whereby the display may be viewed by a data analyst in order to visually detect problems areas within the furnace. Specifically, computer **102** is programmed to generate the chart shown in FIG. **5**, in which all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of vertical bars. Each vertical bar displays the wall thickness readings from a single tube segment. The tube segments are positioned in their proper orientation (but with the connecting bends removed).

In this example, the wall thickness readings displayed on the chart are color-coded in accordance with a color legend, wherein the readings range from 3 mm (shown in dark red) to 10 mm (shown in dark blue). It should be understood that the wall thickness readings may alternatively be represented in gray scale (as opposed to color) on the chart. However, it can be appreciated that the use of a color legend is preferable to gray scale in order to readily "announce" differences between the various readings shown on the chart.

When viewing all of the tube segments in their proper orientation, a data analyst can determine that the blue speckles on the chart are caused by the pins welded on the outside of the tube segments (which are used to increase the heat transfer area). The data analyst can also determine that the red blotches on the chart indicate areas of external corrosion on the tube segments. In this example, the spacing between the red blotches indicates that the source of the problem is a slow leaking fixture located above the tube segments that is dripping fluid onto the furnace. Thus, both the problem areas of the furnace and their source can be readily determined from the chart of FIG. **5**.

## EXAMPLE 3

In this example, computer **102** is programmed to generate a two-dimensional display of the wall thickness readings collected from the convection section of another furnace, whereby the display may be viewed by a data analyst in order to visually detect problems areas within the furnace. Specifically, computer **102** is programmed to generate the chart shown in FIG. **6**, in which all of the wall thickness readings for a plurality of time intervals are plotted across a plurality of vertical bars. Similar to the chart of FIG. **5**, each vertical bar displays the wall thickness readings from a single tube segment, wherein the tube segments are positioned in their proper orientation (but with the connecting bends removed).

In this example, the wall thickness readings displayed on the chart are color-coded in accordance with a color legend, wherein the readings range from 0.20 inches (shown in dark red) to 0.45 inches (shown in dark blue). Again, while the wall thickness readings may alternatively be represented in gray scale (as opposed to color) on the chart, the use of a color legend is preferable to gray scale in order to readily "announce" differences between the various readings shown on the chart.

When viewing all of the tube segments in their proper orientation, a data analyst can determine that the swirling patterns on the chart are indicative of general wall thinning caused by flow patterns within the furnace. It should be noted that the swirling patterns are not caused by the rotation of the inspection tool within the furnace because the inside radius readings (not shown) do not indicate such rotation. Also, the inspection tool is typically de-centered in the furnace due to gravity. Thus, if the inspection tool is rotating, the readings of the ultrasonic transducer located closest to the inner wall of the furnace would change (which is not the case here). Thus, in this example, the problem areas caused by the flow patterns within the furnace readily announce themselves on the chart of FIG. **6**.

## EXAMPLE 4

In this example, computer **102** is programmed to analyze inspection data and sensor data collected from a furnace in order to automatically generate a plurality of composite data markers (which are derived from a plurality of individual data markers) that identify the locations of the furnace bends. Computer **102** is also programmed to partition the inspection data at the composite data markers to thereby correlate the inspection data to the appropriate tube segments of the furnace. Computer **102** is further programmed to generate a

display of the partitioned inspection data that may be viewed by a data analyst in order to visually detect problem areas within the furnace. This example will now be described in greater detail with reference to FIGS. **7**, **8** and **9**.

Referring to FIG. **7**, computer **102** is programmed to generate a chart **500** in which a plurality of individual data markers are plotted on lines **502**, **504**, **506**, **508**, **510** and **512** and a plurality of composite data markers are plotted on line **514**. Computer **102** is programmed to automatically generate the individual data markers on lines **502**, **504**, **506**, **508**, **510** and **512** based upon the detection of various "data clues" in the inspection data and sensor data. Each of these lines are described below:

- Line **502** represents the individual data markers generated by detecting a decrease in the number of wall thickness readings within a particular time interval.
- Line **504** represents the individual data markers generated by detecting a decrease in the number of inside radius readings within a particular time interval.
- Line **506** represents the individual data markers generated by detecting an increase in the variation of wall thickness readings within a particular time interval.
- Line **508** represents the individual data markers generated by detecting an increase in the variation of inside radius readings within a particular time interval.
- Line **510** represents the individual data markers generated by detecting the de-centering of the inspection tool within a particular time interval.
- Line **512** represents the individual data markers generated by detecting an acceleration of the inspection tool within a particular time interval.

It can be seen that the location of each of the individual data markers is shown by a spike on lines **502**, **504**, **506**, **508**, **510** and **512**, wherein the length of the spike above the line (i.e., on the positive side of the line) is an indicator of the degree of reliability for that individual data marker. In other words, higher spikes have a higher degree of reliability than lower spikes.

Computer **102** is also programmed to automatically generate the composite data markers on line **514** by combining the individual data markers shown on lines **502**, **504**, **506**, **508**, **510** and **512**. In this example, the individual data markers are normalized so that one data marker does not dominate the other data markers within a particular time interval. As an example, for an N×M array of either wall thickness readings or inside radius readings (where N=the number of slices taken at a rate of 38 Hz and M=the number of ultrasonic transducers), each of the individual data markers may be normalized by dividing the array element by the maximum value found in the array. Then, the normalized individual data markers are combined using a root mean square calculation to generate the composite data markers (although other types of calculations or algorithms could also be used). Again, it can be seen that the location of each of the composite data markers is shown by a spike on line **514**, wherein the length of the spike above the line (i.e., on the positive side of the line) is an indicator of the degree of reliability for that composite data marker. Of course, it should be understood that the composite data markers provide a higher degree of reliability than any of the individual data markers alone.

It should be noted that chart **500** also includes line **516**, which is a plot of the position of the inspection tool as derived from the integral count from the axial encoders. Line **516** may be used to verify that the inspection tool did not become stuck at any point within the furnace. In this example, there are no flat sections along line **516** as would occur if the inspection tool had become stuck. If one or more flat sections were present, a data analyst could manually remove the redundant data collected during that particular time interval.

Referring to FIG. **8**, computer **102** is also programmed to generate a chart that depicts all of the composite data markers in relation to a predetermined threshold. Specifically, all of the composite data markers shown on line **514** of chart **500** are plotted successively in time from left-to-right and top-to-bottom to form the green line shown on the chart of FIG. **8**. By contrast, the blue line shown on this chart represents a predetermined threshold that may be used to determine if the composite data markers are "valid" indicators of the locations of the furnace bends. In other words, a composite data marker is "valid" when the peak is located above the predetermined threshold and "invalid" when the peak is located below the predetermined threshold.

As an example, the predetermined threshold may be generated by: (1) applying a 50 point running average filter in both directions through the composite data markers ($C_Data_N$) to generate a base signal ($Base_N$), wherein running the filter in both directions removes the time delay; (2) computing a running standard deviation of the composite data markers ($C_Data_N$) with a block size of 1000 to create a standard deviation array ($STDArray_N$); and (3) computing a threshold array ($Thresh_N$) by adding the base signal ($Base_N$) to 2.5 times the standard deviation array ($STDArray_N$) (i.e., $Thresh_N = Base_N + 2.5 * STDArray_N$). One skilled in the art will appreciate that a data analyst may analyze the chart of FIG. **8** in order to modify or "tweak" the algorithm used to generate the predetermined threshold.

In this example, the composite data markers shown in FIGS. **7** and **8** comprise pointers operable to "point to" the positions in the database that correspond to the locations of the furnace bends. Alternatively, the composite data markers may be directly embedded within the database, or, may comprise file names for the various inspection data. Furthermore, a data analyst may simply use the composite data markers as a guide to partition the inspection data (described below). Of course, other types of composite data markers may also be used to correlate the inspection data to the physical geometry of the furnace in accordance with the present invention.

After generation of the composite data markers, computer **102** is programmed to partition the inspection data at the composite data markers so as to correlate the inspection data to the appropriate tube segments of the furnace. Computer **102** is also programmed to generate a display of the partitioned inspection data that may be viewed by a data analyst in order to visually detect problem areas within the furnace. This display may comprise a two-dimensional or three-dimensional representation of one or more of the tube segments of the furnace, which may be customized in accordance with customer requirements. For example, one customer may require a display that shows the wall thickness at five equally spaced positions along the length of a specific tube segment, while another customer may require a display that shows the minimum wall thickness for each tube segment of the furnace. Of course, this information may also be provided to the customer in the form of a written report that accompanies the display.

An example of a display that may be customized in accordance with particular customer requirements is shown in FIG. **9**. This display comprises a three-dimensional color-coded chart **700** that depicts the inside radius readings for five different tube segments of interest (with the connecting bends removed). The tube segments are displayed in a manner that matches the actual physical geometry of the furnace, and are labeled in accordance with the customer designations for

Case: 17-2423 Document: 11 Page: 175 Filed: 03/20/2018



those tube segments (i.e., PIPE C4-1, PIPE C4-2, PIPE C4-3, PIPE C4-4 and PIPE C4-5). It can be seen that the various inside radius readings displayed on chart **700** are color-coded in accordance with a color legend **702**. In this example, the inside radius readings range from 2.86 inches (shown in dark blue) to 3.04 inches (shown in dark red).

It can be seen that chart **700** readily "announces" problems areas within the five tube segments of interest. For example, it is apparent from chart **700** that that the inside radius readings vary in the tube segments labeled PIPE C4-1, PIPE C4-2, PIPE C4-3 and PIPE C4-5 (as shown by the yellow and blue variations in color within these tube segments). These variations were immediately apparent with no more than a glance at chart **700**. Thus, using chart **700**, a data analyst can determine that one or more of these tube segments are flawed and should be repaired or replaced by the plant maintenance personnel.

Referring to the flow charts of FIGS. **10**A and **10**B, an exemplary embodiment of the method of the present invention will now be described with reference to steps **800-830**. First, in step **800**, the inspection data and/or sensor data collected from the furnace is extracted from the inspection tool. Next, in step **802**, the extracted inspection data and/or sensor data is converted to calibrated engineering units. For example, the readings collected by an ultrasonic transducer are converted from time to distance (e.g., inches), the readings collected by an axial encoder are converted from counter values to distance (e.g., inches), and the readings collected by an accelerometer are converted from voltage to acceleration (e.g., ft/sec$^2$). The conversions for other types of readings will be apparent to one skilled in the art. Then, in step **804**, the converted inspection data and/or sensor data is stored in a database. Of course, it should be understood that steps **800-804** would not be necessary for the analysis of data sets that have been previously acquired and stored in a database.

Next, a plurality of data markers are generated that identify the locations of the furnace bends in relation to the inspection data stored in the database. The data markers may be generated either "semi-automatically" in steps **806** through **812** or "automatically" in steps **814** through **822**.

Using the "semi-automatic" approach, in step **806**, a computer is used to generate a two-dimensional or three-dimensional display that depicts some or all of the inspection data stored in the database (preferably on a single page). In step **808**, a data analyst views and analyzes the display in order to visually detect "data clues" that assist in identifying the locations of the furnace bends. Then, in step **810**, the data analyst inputs information into the computer that identifies the locations of the furnace bends. Finally, in step **812**, the computer generates the data markers based upon the input from the data analyst.

Using the "automatic" approach, in step **814**, a computer is used to analyze the inspection data and/or sensor data stored in the database in order to automatically generate a plurality of data markers. As shown in steps **816** through **820**, this analysis may comprise generating a plurality of individual data markers based upon the detection of "data clues" in the inspection data and/or sensor data, normalizing the individual data markers, and then combining the individual data markers to generate a plurality of composite data markers. Then, in step **822**, the computer may compare the composite data markers against a predetermined threshold to determine if the composite data markers are "valid" indicators of the locations of the furnace bends.

Once the data markers have been generated (either "semi-automatically" in steps **806** through **812** or "automatically" in steps **814** through **822**), the inspection data is partitioned at the data markers so as to correlate the inspection data to the appropriate tube segments of the furnace in step **824**. Then, in step **826**, the data analyst inputs information relating to the display of the partitioned inspection data. This information may include customer requirements relating to the desired type of display (e.g., two-dimensional format or three-dimensional format) and the desired tube segments to be displayed (e.g., all of the tube segments or specific tube segments). In step **828**, the computer generates the display in accordance with the customer requirements. Finally, in step **830**, the data analyst views and analyzes the display in order to identify overall trends in the inspection data and/or to visually detect problem areas within the furnace.

While the present invention has been described and illustrated hereinabove with reference to exemplary embodiments, it should be understood that various modifications could be made to these embodiments without departing from the scope of the invention. Therefore, the invention is not to be limited to the exemplary embodiments described and illustrated hereinabove, except insofar as such limitations are included in the following claims.

What is claimed and desired to be secured by Letters Patent is as follows:

**1**. A system for displaying inspection data collected from a furnace with a specified physical geometry, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said system comprising:

a storage device for storing said inspection data; and

a computer programmed to:

partition said inspection data at a plurality of data markers each of which identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;

generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

**2**. The system of claim **1**, wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more of said tube segments of said furnace.

**3**. The system of claim **1**, wherein said computer is further programmed to generate said data markers based upon input from a data analyst.

**4**. The system of claim **1**, wherein said computer is further programmed to analyze said inspection data and generate said data markers based upon said analysis of said inspection data.

**5**. The system of claim **4**, wherein said inspection data comprises a plurality of readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof.

**6**. The system of claim **1**, wherein said storage device stores sensor data collected from said furnace, and wherein said computer is further programmed to analyze said sensor data and generate said data markers based upon said analysis of said sensor data.

**7**. The system of claim **6**, wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

8. The system of claim 1, wherein said computer is further programmed to generate said data markers, and wherein each of said data markers comprises a composite data marker derived from a plurality of individual data markers.

9. The system of claim 8, wherein said computer is programmed to:

generate said individual data markers;

normalize said individual data markers; and

generate said composite data marker by calculating a root mean square of said normalized individual data markers.

10. The system of claim 1, wherein each of said physical features of said furnace is selected from the following group: a bend; an external raised surface; cross-over piping; a thermal well; a weld; a flange; a schedule change; a diameter change; and combinations thereof.

11. A computerized method for displaying inspection data collected from a furnace with a specified physical geometry, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:

partitioning said inspection data at a plurality of data markers each of which identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;

generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

12. The computerized method of claim 11, wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more of said stacked tube segments of said furnace.

13. The computerized method of claim 11, further comprising receiving input from a data analyst and generating said data markers based upon said input from said data analyst.

14. The computerized method of claim 11, further comprising analyzing said inspection data and generating said data markers based upon said analysis of said inspection data.

15. The computerized method of claim 14, wherein said inspection data comprises a plurality of readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof.

16. The computerized method of claim 15, wherein said inspection data is collected at predetermined time intervals within said furnace.

17. The computerized method of claim 15, wherein said inspection data comprises a plurality of said readings within each of said time intervals.

18. The computerized method of claim 17, wherein each of said data markers is generated by detecting a data clue selected from the following group: an increase in the variation of said wall thickness readings within one of said time intervals, a decrease in the number of said wall thickness readings within one of said time intervals, an increase in the variation of said inside radius readings within one of said time intervals, a decrease in the number of said inside radius readings within one of said time intervals, a change in the centering of said inspection tool, and combinations thereof.

19. The computerized method of claim 11, further comprising analyzing sensor data collected from said furnace and generating said data markers based upon said analysis of said sensor data.

20. The computerized method of claim 19, wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

21. The computerized method of claim 11, wherein each of said data markers comprises a composite data marker derived from a plurality of individual data markers.

22. The computerized method of claim 21, further comprising:

generating said individual data markers;

normalizing said individual data markers; and

generating said composite data marker by calculating a root mean square of said normalized individual data markers.

23. The computerized method of claim 11, wherein each of said physical features of said furnace is selected from the following group: a bend; an external raised surface; cross-over piping; a thermal well; a weld; a flange; a schedule change; a diameter change; and combinations thereof.

24. A computer-readable medium having computer-executable instructions for performing a method of displaying inspection data collected from a furnace, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:

generating a plurality of data markers each of which identifies a location of a physical feature of said furnace;

partitioning said inspection data at said data markers so as to correlate said inspection data to an appropriate one of said tube segments of said furnace;

generating a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

25. The computer-readable medium of claim 24, wherein said display is comprised of a two-dimensional or three-dimensional representation of one or more of said stacked tube segments of said furnace.

26. The computer-readable medium of claim 24, wherein said method further comprises receiving input from a data analyst and generating said data markers based upon said input from said data analyst.

27. The computer-readable medium of claim 24, wherein said inspection data comprises a plurality of inspection readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof.

28. The computer-readable medium of claim 27, wherein sensor data is also collected from said furnace, said sensor data comprising a plurality of sensor readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

29. The computer-readable medium of claim 28, wherein said method further comprises analyzing said inspection data

Case: 17-2423 Document: 11 Page: 177 Filed: 03/20/2018



and said sensor data and generating said data markers based upon said analysis of said inspection data and said sensor data.

**30**. The computer-readable medium of claim **28**, wherein each of said data markers comprises a composite data marker derived from a plurality of individual data markers.

**31**. The computer-readable medium of claim **30**, wherein said method further comprises:

generating said individual data markers;

normalizing said individual data markers; and

generating said composite data marker by calculating a root mean square of said normalized individual data markers.

**32**. The computer-readable medium of claim **24**, wherein each of said physical features of said furnace is selected from the following group: a bend; an external raised surface; cross-over piping; a thermal well; a weld; a flange; a schedule change; a diameter change; and combinations thereof.

**33**. A method for displaying inspection data collected from a furnace, said furnace comprising a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:

identifying said bends of said furnace in relation to said inspection data;

partitioning said inspection data at said bends so as to correlate said inspection data to an appropriate one of said tube segments of said furnace;

generating a two-dimensional or three-dimensional representation of at least a portion of said inspection data arranged to represent a physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

**34**. The method of claim **33**, wherein said inspection data comprises a plurality of inspection readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof.

**35**. The method of claim **34**, wherein sensor data is also collected from said furnace, said sensor data comprising a plurality of sensor readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

**36**. The method of claim **35**, further comprising analyzing said inspection data and said sensor data and identifying said bends based upon said analysis of said inspection data and said sensor data.

**37**. A method for displaying inspection data collected from a furnace comprising a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said method comprising:

generating a two-dimensional or three-dimensional representation of said inspection data collected from a plurality of said tube segments of said furnace, said data arranged to represent a physical geometry of said tube segments;

analyzing said two-dimensional or three-dimensional representation and visually detecting a problem area comprising one or more of said tube segments of said furnace; and

wherein said inspection data is collected by one or more devices selected from the following group: an ultrasonic transducer, a laser profilometer, and combinations thereof.

**38**. The method of claim **37**, further comprising correlating said inspection data to an appropriate one of said tube segments of said furnace.

**39**. The method of claim **37**, wherein said inspection data comprises a plurality of inspection readings selected from the following group: wall thickness readings of said furnace, inside radius readings of said furnace, and combinations thereof.

**40**. A system for displaying inspection data collected from a furnace with a specified physical geometry, wherein said furnace comprises a plurality of tube segments interconnected by a plurality of bends so as to allow stacking of at least a portion of said tube segments, said system comprising:

a storage device for storing said inspection data and sensor data collected from said furnace; and

a computer programmed to:

analyze said sensor data and generate a plurality of data markers based upon said analysis of said sensor data, wherein each of said data markers identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace;

partition said inspection data at said data markers;

generate a display of at least a portion of said partitioned inspection data arranged to represent said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments; and

wherein said sensor data comprises a plurality of readings collected by one or more auxiliary sensors selected from the following group: an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system, and combinations thereof.

**41**. A system for displaying inspection data collected from a furnace with a specified physical geometry, said system comprising:

a storage device for storing said inspection data; and

a computer programmed to:

generate a plurality of individual data markers;

normalize said individual data markers;

generate a composite data marker by calculating a root mean square of said normalized individual data markers;

generate a plurality of data markers each of which comprises a composite data marker;

partition said inspection data at said plurality of data markers each of which identifies a location of a physical feature of said furnace so as to correlate said inspection data to said physical geometry of said furnace; and

generate a display of said partitioned inspection data to thereby enable visual detection of problem areas within said furnace.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2018, I electronically filed the foregoing Corrected Principal Brief of Appellant Quest Integrity USA, LLC with the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Michael A. Morin*
Michael A. Morin

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Fed. Cir. R. 28(a)(13) and Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitations of Fed. Cir. R. 32(a) because it contains 13,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Michael A. Morin*
Michael A. Morin