**RECORD NO. 2017-1948(L) Cons. w/2017-2423**

**IN THE**

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

CLEAN HARBORS INDUSTRIAL SERVICES, INC.,

*Defendant-Appellee*

---------------------------------------------------------------

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

COKEBUSTERS USA, INC.,

*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
Nos. 1:14-cv-01482-SLR, 1:14-cv-01483-SLR,
Judge Sue L. Robinson

## CORRECTED RESPONSE BRIEF OF APPELLEE COKEBUSTERS USA, INC.

Thomas M. Fulkerson, Esq.
FULKERSON LOTZ LLP
4511 Yoakum Boulevard
Suite 200
Houston, TX 77006
713-654-5888
tfulkerson@fulkersonlotz.com

*Counsel for Appellee*
*Cokebusters USA Inc.*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

## CERTIFICATE OF INTEREST

Counsel for Appellee certifies the following:

1. Full Name of Parties represented by me:

   Cokebusters USA Inc.

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

   N/A

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

   Cokebusters Ltd.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   **Fulkerson Lotz LLP:** Thomas M. Fulkerson, Wesley G. Lotz, Nicholas M. Brown

   **Keeling & Downes:** Byron Keeling

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this courts' decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

   *Quest Integrity USA, LLC v. A.Hak Industrial Services US, LLC*, No. 18-1002, is pending and is a companion case to the present appeal.

April 30, 2018

*/s/ Tom Fulkerson*
Thomas M. Fulkerson

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ vii

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 1

I. FTIS development as the inventors explained it to the patent office ........ 1

A. The invention correlated data to the physical geometry of the furnace made it accurate ........ 1

B. Display Improvements ........ 4

C. The inventors did not disclose their sales of 2-D Piping Coil Layout Images as prior art, so they were not discussed nor discarded during prosecution ........ 6

SUMMARY OF THE ARGUMENT ........ 22

ARGUMENT ........ 24

I. The Standard of Review ........ 24

II. The district court correctly ruled that Two-Dimensional Piping Coil Layout Images are arranged to represent the physical geometry of a plurality of tube segments ........ 25

A. Claim language supports the district court's decision below ........ 30

B. The specification supports the district court's decision ........ 32

C. The prosecution history supports the decision below....................... 35

D. The extrinsic evidence provided by the inventor – POSITAs strongly supports the district court's decisions ................................ 39

E. The objective of patenting is not controlling but was nevertheless satisfied ...................................................................... 44

III. The district court correctly ruled that Claim 30 of the '874 patent was invalidated by the Norco sale ........................................................... 45

A. Appellant conceded anticipation of Claim 30 ................................. 46

B. The district court correctly excluded Appellant's newly minted contradictory declarations................................................................ 50

C. Appellant's excuses are not plausible and would not have created a fact issue even if they had been considered ...................... 54

D. Appellant's remaining arguments lack merit ..................................... 57

IV. The Norco Sale anticipates Claim 40 ...................................................... 58

CONCLUSION ........................................................................................ 64

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*,
626 F.3d 699 (2d Cir. 2010) ........................................................................41

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................51

*Applied Companies v. United States*,
144 F.3d 1470 (Fed. Cir. 1998) ........................................................................41

*Brand Management Inc. v. Menard Inc.*,
135 F.3d 776 (Fed. Cir. 1998) ........................................................................51

*Cohesive Techs. Inc. v. Waters Corp.*,
543 F.3d 1351 (Fed. Cir. 2008) ........................................................................28

*Daubert v. NRA Grp. LLC*,
861 F.3d 382 (3d Cir. 2017) ........................................................................25, 52,53

*Del. Valley Floral Grp., Inc. v. Shaw Rose Nets LLC*,
597 F.3d 1374 (Fed. Cir. 2010) ........................................ 24-25, 50, 52, 53

*EBC, Inc. v. Clark Building System*,
618 F.3d 253 (3d Cir. 2010) ........................................................................53

*E-Pass Techs., Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) ........................................................................44

*Enzo Biochem, Inc. v. General-Probe, Inc.*,
424 F.3d 1276 (Fed. Cir. 2005) ........................................................................57

*Fenner Investments, Ltd. v. Cellco Partnership*,
778 F.3d 1320 (Fed. Cir. 2015) ........................................................................27

*Finjan Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed Cir. 2010) ........................................................................56, 63

*In re Fosamax Products Liability Litigation*,
707 F.3d 189 (2d Cir. 2013) ....................54

*France v. Lucas*,
836 F.3d 612 (6th Cir. 2016) ....................54

*GE Lighting Solutions, LLC v. AgiLight Inc.*,
750 F.3d 1304 (Fed. Cir. 2012) ....................29, 30, 32

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ....................27

*Gemmy Industrial Corp. v. Chrisha Creations Ltd.*,
452 F.3d 1353 (Fed. Cir. 2006) ....................51

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ....................31

*Honeywell International, Inc. v. ITT Industrial, Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) .................... 26-27, 32

*Irrevocable Trust of Antonious v. Nike, Inc.*,
No. 11-CV-06327 (KM), 2016 WL 3176576 (D.N.J. June 2, 2016) ....................54

*Meyers v. Pennypack Woods Home Ownership Association*,
559 F.2d 894 (3d Cir. 1977) .................... 52-53

*Microsoft Corp. v. Multi-Tech System, Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ....................28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................24, 32

*SRI International, Inc. v. Internet Sec. System, Inc.*,
511 F.3d 1186 (Fed. Cir. 2008) ....................41

*STX, LLC v. Brine, Inc.*,
211 F.3d 588 (Fed. Cir. 2000) ....................57

*Scaltech, Inc. v. Retec/Tetra, LLC*,
269 F.3d 1321 (Fed. Cir. 2001) ....................................................................57

*In re TMI Litigation*,
193 F.3d 613 (3d Cir. 1999) .........................................................................61

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ...................................................27, 29, 30, 38

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111 (Fed. Cir. 2001)..................................................28

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ....................................................................58

## STATUTES & RULES

35 U.S.C. § 102(b) ...........................................................................................58
Fed. R. Civ. P. 16 .........................................................................1, 50, 52, 53, 56

Fed. R. Civ. P. 26(a)(2)(C) ...............................................................................53
Fed. R. Civ. P.  30(b)(6)...............................................................1, 46, 50, 53, 56
Fed. R. Civ. P.  30(e).....................................................................1, 50, 52, 53, 56
Fed. R. Civ. P.  56 ...................................................................................50, 51
Fed. R. Evid. P. 703 ..........................................................................................53

## OTHER AUTHORITIES

*Merriam-Webster Dictionary* (Online Ed. 2018) (accessed April 2018)
https://www.merriam-webster.com/dictionary..........................................39, 40

*Webster's Third New Int'l* Dictionary 1926 (3d ed. 1993).....................................30

## STATEMENT OF RELATED CASES

No other appeal in or from this case was previously before this Court or another court of appeals.

A companion appeal, which concerns the collateral effect of the judgments under review here, will be directly affected by this Court's decision in these appeals. *See Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*, No. 18-1002. Counsel is unware of any other case pending in this or any other Court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

Whether the district court properly concluded that "2-D Piping Coil Layout Images" of furnaces in the pre-critical date Norco sale were arranged to represent the physical geometry of a plurality of furnace tube segments in light of the fact that they were claimed as an embodiment of the invention, were never disclosed as prior art, and were never criticized or disavowed during prosecution.

Whether the district court properly ruled that the Norco sale invalidated Claim 30 and properly precluded Quest, in response to motions for summary judgment, from offering new testimony from its corporate representative expressly contradicting former sworn testimony, especially since the new testimony violated not only the sham declaration doctrine, but the limiting provisions of Fed. R. Civ. P. 16, 30(b)(6) and 30(e).

Whether the Court properly held that Claim 40 was anticipated by the Norco sale, when Quest's corporate representative, software code and other documents all illustrated that sensor-based bend locating programming were present.

## STATEMENT OF THE CASE

### I. FTIS development as the *inventors* explained it to the patent office.

#### A. The invention correlated data to the physical geometry of the furnace made it accurate.

The inventors' application indicates that the FTIS system was developed and first went into commercial use during 1998. Appx16681. The application

consistently claimed that, prior to the invention, the prior art system (1) depicted data only from a short section of tubing; (2) made no comparison between one tube section and another; and (3) did not make it readily apparent whether problem areas were common to a particular region of the furnace. Appx14848; Appx14851; Appx14879; Appx14952.

The inventors explained that with prior art systems it was "difficult to correlate the inspection data collected from the furnace with the physical geometry of the furnace…due to the fact that the inspection tool does not progress through the furnace at a constant rate." Appx84-1:65–2:2. As a result, "an engineer may not be able to identify the precise locations of the worn sections and or hot spots of the furnace." Appx84-2:17–19.

The inventors noted that the problem with prior art displays was that "inspection data is not displayed in a manner that readily 'announces' problem areas within the furnace." Appx84-2:21–30. One-dimensional displays were deficient because "an engineer must peruse each line of data to determine if a potential problem has arisen" which was "time-consuming, inefficient, and does not readily permit a comparison between one section of tubing and another. As such, the engineer is not able to readily detect worn sections of the furnace…." Appx84-2:21–30. Recently developed graphic displays calling for "a slice of the inspection data to be graphically displayed in a two-dimensional format…[of]…

(less than a foot) of the furnace" were better, but created "a significant problem when attempting to identify overall trends in the inspection data..." Appx84-2:34–37; 40–43.

While "preferably, the inspection tool collects the data as a predetermined time-based rate…" to ensure that data was accurately affixed to the physical geometry of the furnace, the inventors suggested that data be partitioned at "data markers"—marks placed by a data analyst or the computer and tied to a known physical feature of the furnace. Appx85-4:60–Appx86-5:9; Appx84-2:59–85-3:4. Although the FTIS system was equipped with on-board axial encoders, these had error terms of 2% to 4%. Appx86-6:23–24. So, in a furnace having 10,000 linear feet of tubing, the uncorrected readings of axial encoders could produce positional error of between 200 and 400 feet. Appx86-6:25–26.

The inventors suggested using the physical geometry of the furnace to partition data into segments that correlated inspection data to known locations. Appx87-7:45–53. They taught that a data analyst may review raw inspection data for data clues like a "white strip" caused by the loss of return signal from ultrasonic sensors when they enter bends, then set a data-marker to note that bend. Appx88-10:46–57. Thus, if each tube section in the 10,000-foot-long hypothetical furnace coil is known to be 50' long, once a data marker is set at the known beginning and end of a tube segment axial error drops to 1'-2' at most, and to far

less as known locations are reached. Appx87-7:45–53. A bend or any other known physical feature of the furnace could be used to create data markers. Appx85-4:43–57.

### B. Display Improvements.

The inventors cited four examples to illustrate the two principal practices of data marker generation: Examples 1–3 of the specification covered data analyst-driven bend selection methods and Example 4 reflected computer-automated bend selection. Appx87-7:45–8:14. All four "examples [were] provided merely to illustrate different approaches that may be used to correlate the inspection data to the physical geometry of the furnace and display the inspection data in a manner that enables the visual detection of problem areas within the furnace… [and]…[did] not in any way limit the invention." Appx89-9:43–50.

To solve the display problem, the inventors suggested that any one of three general display types be used: two-dimensional strip charts (Example 1, FIGS**. 3, 4**), 2-D vertical bars with bends removed and placed in their proper orientation (Examples 2, 3, FIGS**. 5, 6**), or three-dimensional tube segments (Example 4, FIG. **9**). Appx88-9:52–89-12:55.

The specification taught that all three display types readily "announced" broad-scale problems in furnaces and allowed engineers to instantly repair or replace problem sections. Appx89-11:20–21, 33–35 ("It can be seen that strip

charts **300** and **400** readily 'announce' problems [sic] areas within the furnace…[u]sing strip charts **300** and **400**, the data analyst can determine that one or more of the tube segments are flawed and should be repaired or replaced by the plant maintenance personnel."); Appx89-12:15–18 (FIG. **5**.); Appx89-12:52–55 (FIG. **6**.); Appx91-15:7–8, 14–17 (chart **700**).

The inventors regarded each of the displays as malleable and interchangeable to meet customer needs:

> It should be understood that strip charts **300** and **400** are merely examples of the types of displays that may be used to visually detect problem areas within the furnace. For example, after generation of the data markers, the wall thickness readings and/or inside radius readings could be displayed as a stacked set of bars wherein each bar represents one tube segment of the furnace. Also, the wall thickness readings and/or inside radius readings could be displayed in a three-dimensional format in which the structure of the tube segments matches the actual physical geometry of the furnace. One skilled in the art will understand that other types of displays may also be used in accordance with the present invention.

Appx89-11:36–48, 15–19 (known tube lengths may be superimposed on strip charts to provide additional guidance); Appx89-11:67–12:5 (gray scale could be used); Appx89-12:36–41 (*Id.*); Appx90-14:60–63 (Example 4 **"**may be customized in accordance with particular customer requirements is shown in FIG. **9.**"); Appx91-16:14–19 ("[V]arious modifications could be made to these embodiments without departing from the scope of the invention.").

The difference between 2-D Piping Coil Layout Images and the remaining displays was minuscule. It was "understood" that to turn 2-dimensional color-coded strip charts into 2-dimensional stacked charts one need merely (1) remove the bends, (2) scale the inspection data to known tube lengths, and (3) flip the scaled inspection data back and forth to mimic the flow of liquids. Appx89-11:36–48.

### C. The inventors did not disclose their sales of 2-D Piping Coil Layout Images as prior art, so they were not discussed nor discarded during prosecution.

In their specification, the inventors referred to Figure **3** as "a two-dimensional color-coded strip chart generated by the computer system of Figure **2** which shows all of the wall thickness readings collected from a furnace in accordance with a first example of the present invention" and to Figure **4** as "a two-dimensional color-coded strip chart generated by the computer system of Figure **2**, which shows all of the inside radius readings collected from a furnace in accordance with the first example of the present invention[.]" Appx85-3:55–62.

At no point during the prosecution of the '874 patent did the inventors disclose that 2-D color-coded strip chart displays were prior art. Appx14690–15082. At no point during the prosecution of the '874 patent did the inventors criticize two-dimensional color-coded strip charts by name or otherwise.

Appx14690–15082. At no point did the inventors declare that 2-D color-coded strip charts were not part of the invention. Appx14690–15082.

During prosecution, the examiner located and cited a *Winslow* reference, using it to reject the '874 claims as obvious. Appx14772; Appx63. *Winslow* employed remote field technique ("RFT") sensors to determine circumferential and non-circumferential wall loss in water pipelines. Appx50042-1:1–13; Appx64–65.

The inventors consistently contrasted *Winslow* to the "present invention" as a whole, without differentiating between the four displays in the specification. Appx14949–14964; Appx15053–15054. At every discussion of *Winslow* and of claim amendments, the inventors clarified their invention but relinquished none of it:

> Thus, in view of the teachings of *Winslow*, the amendments to independent claims 1, 12, 26, 36, 41 and 45 (***clarifying*** that the displayed data is arranged to represent the physical geometry of the furnace), and the unique problem solved by the present invention, it is respectfully submitted that the claims of the present application are not obvious over *Winslow* (or *Van der Heide*) and should be allowed.

Appx14951 (emphasis added). On seven occasions in the prosecution history, both before and after claim amendment, the inventors equated ***correlating*** data to physical geometry in a display with ***arranging*** that data to represent furnace components – no separate step being required. Appx90-14:48–62; Appx14848; Appx14852; Appx14879–14880; Appx14883-14884; Appx14952; Appx14958; Appx14963–14964. ("The [Improved System of the application] ***also generates a***

***display*** of the partitioned inspection data ***that correlates the inspection data to the physical geometry of the furnace***.") (emphasis added). On four occasions inventor Roberts made this characterization under oath. Appx14851–14852; Appx14887; Appx14957–14958; Appx14965.

The inventors did not consistently use the phrase "actual physical geometry" to describe the imagery imagined by the invention. Appx14949–1495. In the office action of April 30, 2008, the inventors and their agent used the phrase "actual physical geometry" eight times, and "physical geometry" nine times to describe what is to be imaged. Appx14949–Appx14962.

The Examiners' notes discussing allowance omit the words "actual furnace geometry" entirely: "*Applicant contrasted invention to prior art cited and, although Winslow et al teaches partitioning inspection data, **does not display representation of piping geometry**. Examiners agreed with that analysis and will withdraw rejection pending further search and review*." Appx15037 (emphasis added).

In their final amendment, the inventors eliminated any requirement that "said furnace" be depicted at all. On April 30, 2008, the inventors amended each of the independent claims to require that the displays be "arranged to represent ***said*** physical geometry ***of said furnace***." Appx14935–14947 (emphasis added). But on December 1, 2008, the inventors further amended the display limitation to

require only that: (1) inspection data was to be "arranged to represent the physical geometry of "***said tube segments***" and (2) enable visual inspection to detect ***a*** problem area ***comprising one or more tube segments***. Appx15039–15052. The '874 patent issued on the understanding that the inventors limited their invention to the inspection of serpentine furnace coils. Appx15061–15063.

## II. Appellant sold the claimed invention for almost two years before the critical date.

From September 1, 2001, to May 31, 2003, Appellant offered to sell software, and both offered to sell and did sell FTIS reports, using a system embodying each asserted claim. Appx1–49; Appx17169–17248.

On September 30, 2001, Appellant offered to "[d]esign…a MATLAB based three-dimensional FTIS data visualization application…[to] enable visualization of three basic data types in the geometric perspective of the furnace under inspection" and sell it to Aramco for $30,000. Appx16469. The software would create a 3-D display of the furnace in accurate cartesian coordinates reporting minimum wall thickness, average wall thickness per sweep and ovality, scaled to the furnace, showing the X, Y and Z positions of the data. Appx16470; Appx16472.

On January 11, 2002, Quest, through inventors Roberts and DeLorenzo, provided a report to Saudi Aramco expressing the FTIS results via "Two-Dimensional (2D) Piping Coil Layout Image." Appx16492.




Appx17145 (2-D Piping Coil Layout Image).

These reports allowed "easy identification and tracing [sic] [of] the piping/coil system" and simple "visualizing [of] the damage patterns" caused by "exterior gas flow causing elevated temperatures…". Appx16487; Appx16489–16490. Appellant collected $71,062.68 for the job. Appx16684.

The inventors understood they had one year from the January 11, 2002, Aramco sale to apply for a patent. Appx16310-267:24–268:13; Appx17093 (Bondurant, January 10, 2002: "I left the [original]…of the invention disclosure at the copying machine."); Appx17095 (emphasis added) (January 30, 2002: Quest CEO Altenberg seeks copy of "FTIS Patent***.doc***"); Appx17101–17113 (May 20, June 4, June 7, July 2, July 3, July 22, August 5 and August 6, FTIS patent

document visited and upgraded); Appx17117–17119 (July 20, 2002 Bondurant to seek cost estimates from patent counsel Haywood Verdun for patenting).

On August 30, 2002, inventor Phil Bondurant completed an invention disclosure, dubbed the "FTISPatent.doc," which was duplicated on December 19, 2003 and used to spawn the '874 application. *Compare*: Appx16345–16351 *with* Appx16341–16381. Per Bondurant, 2-dimensional color-coded strip charts solved both the inaccurate data positioning and weak presentation problems of the prior art. Appx16356. He created a six-figure algorithm to automate a composite bend indicator and "determined [that] the *best* way to visualize the data is to display it in strips as shown in Figures 1 and 2 with the information of interest (radius or wall thickness) color coded." Appx16348; Appx16327-93:6–17; Appx16921.

Figure 1 of the August 30, 2002 invention disclosure ***is*** Figure 3 of the '874 patent.




Appx16922.




Appx75.

He concluded that "[T]he color-coded strip-chart style display allows the large data set to be easily viewed and interpreted to determine overall trends in the piping." Appx16348.

Throughout 2002, Appellant marketed the Improved System and 2-DPCLI as:




to difficulties presented by prior art systems. Appx16688. Appellant told customers in 2002 that its display software:

> ***…[A]utomatically creates a 2D view of the entire furnace piping network that identifies and assigns identification numbers to return bends, individual piping segments, and cross-over piping.*** This allows you to see the entire piping coil system overlaid with the inspection data results on a single-color plot. The software also categorizes the flaws detected within each section based on user-definable limits. ***These capabilities enable you to clearly identify patterns of damage occurring over a specific region of the fired heater's piping coil system***.

Appx16689 (emphasis added). Appellant labeled the 2002 2-D Piping Coil Layout Images as "patent pending," though none was. Appx16690. Appellant assured buyers they would receive "[a]ccurate axial positioning of flaw locations within each pipe segment" and "2D color layout views of the entire furnace piping coil with inspection data overlaid immediately after completion of inspection" that

detected interior wall thinning, exterior wall thinning, bulging, swelling, broad area corrosion, broad area erosion, and pipe ovality problems. Appx16691.

On February 14, 2003, Quest contracted to provide a report with "2-Dimensional (2D) color graphics of all individual piping coil segments, return bends, and cross-over piping [and]…[p]iping segments containing wall thinning, corrosion, broad area pitting, erosion, and bulging which exceed the client's specified threshold level" to the Orion Norco Refinery in New Orleans, Louisiana. Appx16666; Appx16662 (the "Norco sale" and "Norco Report"). Appellant completed these jobs on February 23, and March 7, 2003, through inventor Robert DeLorenzo, who produced two inspection reports. Appx16543–16605; Appx16607–16660.

To complete the Norco Report, Messrs. Roberts and DeLorenzo first obtained data about the known attributes of the tubing in the two furnaces to be inspected. Appx16549; Appx16613. Appellant then ran the FTIS device and created a 2-D "model" of each of the two furnaces. Appx16548; Appx16612.

**2D Modeling**

QUEST has designed custom software, which allows 2-Dimensional (2-D) viewing of the "entire" piping coil (refer to Figure 3). The color bar to the right represents a range of wall thickness in inches. The piping coil data begins in the bottom left corner and moves to the right.




Figure 3. FTIS 2-D Plot

It then moves up one row and repeats the left to right motion throughout the length of the inspection. Over a mile of piping can be presented on a single plot.

Appx16548 (comments in original, red blocking added); *see also*, Appx16612.

The report arranged inspection data to reflect each component of the physical geometry of tube segments in several ways. First, "QUEST utilized the furnace pipe/coil layout numbering system that the Orion Norco facility had provided for this examination" and "[a]ll positioning references in this report use this axial positioning system…." Appx16550; Appx16614. By reporting all tube segments as they were labeled by the customer and separated by bend indicators,

the customer could easily identify the part of the furnace being reported on and any problem areas. Appx16489; Appx16552; Appx16616.

In addition, the report displayed every furnace tube in a generally ascending structure similar to the one appearing in the furnace: “[t]he piping coil data begins in the bottom left corner and moves to the right. It then moves up one row and repeats the left to right motion throughout the length of the inspection.” Appx16548; Appx16612. The displays were not expressed as a single linear strip of data as Quest does now. *Compare* Appx16543–16605 and Appx16607–16660 *with* APB7.




This very roughly mimics the way a customer sees the furnace on a daily basis. Appx16403–16404.

The Norco Report correlated data to its proper location by (1) time counts tied to sweep intervals of the UT sensors, (2) recording accelerometer and axial encoder data and correlating it to those sweeps, and (3) partitioning the data to known tube lengths tied to bends. Appx16547–16548; Appx16611–16612.[1] Flaw detection was thus permitted and reported to an accuracy of within 1' axial foot. Appx16559. Appellant warranted that its "evaluation accurately describes the condition of the furnace piping at the time of inspection…." Appx16546.

Appellant stated: "[T]he Wall Thickness 2D Plot presents the data in a two-dimensional format which shows the pipe segments in a rolled-out format, much like a flat plate." Appx16523. A demonstrative graphic representing this process, appears below.

[1] Appellant conceded below that Norco Sale inspection data was partitioned to known bend locations and thus known tube lengths, but now appears to dispute that this element of the claim was met by the Norco sale. *Compare:* Appx16402; Appx16932 (Cell 1(D)) *with* APB30–31. It is unclear why Appellant has changed its position, but it has clearly waived the argument, and is wrong regardless. *In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004); Appx16933–36.




The color-bar to the right of each 2-D Piping Coil Layout Image in the Norco Report expressed both nominal (expected) and transient (actual) thickness of every inch of every tube segment in the furnace. Appx16548; Appx16612. The first Norco Report reported schedule 40 piping having a "0.263" nominal width, which explains why most of the graph above is in the yellow color range. Appx16549; *see also*, Appx16548.

The text and images of the Norco Report show how the 2-D Piping Coil Layout Images revealed problem areas:


PASS D

- DAMAGE OR DETERIORATION: A minimum wall thickness of 0.183" was detected 4' from the bottom of Section #4. This area is suspected to be a different material or schedule. A minimum wall thickness of 0.192" was detected 3' from the bottom in Section #7. This area is suspected to be a different material or schedule. A minimum wall thickness of 0.229" was detected throughout the bottom segment of Section #5 due to corrosion/erosion. A general wall loss of no more than (~35%) was identified throughout the entire 23 sections of this pass (refer to Appendix D for more information).



Appx16553–16554; Appx16573.

The reports contain a second type of graphic image, called Piping Coil Layout Drawings, that also display at least a portion of the inspection data arranged to represent the physical geometry of a plurality of tube segments.




Appx16416; *see also*, Appx16842; Appx16573.

These 2-D Piping Coil Drawings reflect the physical geometry of the furnace tubing under inspection. Appx16550; Appx16334-197:1–3 ("Right, whereas in Figure 5, actually, this is a scaled drawing of—that represents the physical

geometry of the furnace tube.”). Each red dot or green slash represents “data collected from a furnace inspection.” Appx16415, ¶76. The red dots represent “Minimum Wall Thickness <0.230” and green slashes represent “Suspect Tube Segments” in which inferior piping was substituted for original schedule 40 piping. Appx16415, ¶76; *see also*, above image. The notations were affixed to the 2-D Piping Coil Drawings after data was partitioned to ensure accurate flaw positioning. Appx16325-77:19–22; Appx16236–16237.

The manual application of data, or even of data markers themselves, was permitted by the inventors. Appx87-7:48–53; Appx89-11:58–62; Appx89-12:59–67; Appx90-14:1–3. The claims do not require that all programming be contained in a single program. Appx16236–16237; Appx83–FIG. 10A, step 826; Appx91-16:31, 49, 51–53, 60–62; Appx92-17:1, 6; Appx93-20:24, 46–48. The frequency and position of the red dots or green slashes permitted engineers to visualize problem areas within a region of the furnace. Appx16314-223:22–224:9.

The second Norco Report[2] changed color coding, noted bends with a black slash data marker and presented a computer-generated “thinnest point” of each tube segment with an asterisk.

[2] Both reports were prepared pursuant to a single sale order and are therefore a single prior art reference. Compare Appx16543 *with* Appx16607.

***2D Modeling***

QUEST has designed custom software, which allows 2-Dimensional (2-D) viewing of the "entire" piping coil (refer to Figure 3). The color bar to the right represents a range of wall thickness in inches. The piping coil data begins in the bottom left corner and moves to the right.




**Figure 3. FTIS 2-D Plot**

**Color Bar Illustrating Thickness in Inches**

It then moves up one row and repeats the left to right motion throughout the length of the inspection. Over a mile of piping can be presented on a single plot.

Appx16612 (red border blocking added); Appx16416–16417. Appellant was paid $77,713 for the Norco sale. Appx16684.

## SUMMARY OF THE ARGUMENT

Quest argues at length that it developed its Furnace Tube Inspection System ("FTIS") displays in three intervals, but in their submissions to the patent office however, the *inventors* explained that the displays were developed in only two

intervals. In the prior art phase, the system produced spreadsheets and two-dimensional displays of 1' pipe segments. In the second phase, which the inventors characterized as the "Improved System" or the "Present Invention," the system produced (1) 2-D strip charts[3], (2) 2-D stacked charts, and (3) 3-D pipe images, all of which were claimed and regarded as malleable and interchangeable.

Representations to the patent office notwithstanding, 2-D strip charts were actually prior art. Quest sold services using the Improved System to produce "Two-Dimensional (2D) Piping Coil Layout Images" that the inventors later claimed as an embodiment of the invention from September 2001 through March of 2003, all before the critical date. The system both correlated inspection data to the physical geometry of furnace tubes and arranged it to represent a plurality of furnace tube segments so that customers could (1) detect flaws accurately, (2) identify broad problem areas, and (3) take instant corrective action. The inventors prepared to claim this invention throughout 2002 but did not file their non-provisional application until June 1, 2004. Appx14690.

The district court correctly concluded that all three display types generated by the Improved System are arranged to represent a plurality of tube segments from an actual furnace, but they depict their results differently. None of the three are pictorially accurate displays of the physical geometry of either tube segments

[3] The phrases "2-D strip charts" and "2-D Piping Coil Layout Images" or "2-DPCLI" are used interchangeably throughout this brief.

or of a furnace. In fact, Appellants current FTIS displays are not found amongst the patented images.

The district court correctly construed the claims of the ’874 patent broadly—just as the inventors did—to find that the 2-D Piping Coil Layout Images anticipate all independent claims. Its decision is supported by a plain reading of the claims, the specification, the prosecution history and extrinsic admissions of the inventors. Because the inventors withheld the fact that 2-D Piping Coil Layout Images (2-D strip charts) were prior art, these displays were never discussed as prior art, criticized, or disclaimed during prosecution of the ’874 patent.

It also rightly rejected Appellant’s many last-second attempts to change the sworn admissions of the inventors proving that the FTIS computer used in the Norco sale contained programming that anticipated all remaining claims-in-suit. The district court’s decision should be affirmed.

## ARGUMENT

### I. The Standard of Review.

This Court reviews a district court’s claim construction rulings *de novo*. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

The Court reviews a district court’s use of the sham declaration doctrine, and any other decision concerning the admission or exclusion of evidence, under an abuse of discretion standard. *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets LLC*,

597 F.3d 1374, 1379–80 (Fed. Cir. 2010) ("We review a district court's decision to exclude evidence for abuse of discretion."); *Daubert v. NRA Grp. LLC*, 861 F.3d 382, 389 (3d Cir. 2017) ("[W]e review a district court's decision to exclude materials under the sham-affidavit doctrine for abuse of discretion.").

"In applying [the sham - affidavit doctrine], we adhere to a 'flexible approach'…giving due regard to the surrounding circumstances." *Daubert*, 861 F.3d at 391. These circumstances include whether the witness was operating under a physical or mental disability, or was confused, or whether there is independent evidence in the record to bolster an otherwise questionable affidavit. *Daubert*, 861 F.3d at 392. If it is "clear [that] the affidavit was offered 'solely' to defeat summary judgment" exclusion is automatically warranted. *Id.*

## II. The district court correctly ruled that Two-Dimensional Piping Coil Layout Images are arranged to represent the physical geometry of a plurality of tube segments.

Appellant's proposed definition of the display limitation is born of desperation, conveniently being just wide enough to capture Cokebusters' images but narrow enough to exclude Appellant's long-sold displays. Appellant's claim that after the specification was written 2-DPCLI were disclaimed would indeed be remarkable since 2-DPCLI were never disclosed to be prior art, much less abandoned. Appx14690–15082. Instead, they were always characterized as part of the present invention. *Supra* at 6-9; *Infra* at 39-49.

The district court correctly ruled that to meet the display limitations, FTIS displays should "create a visual representation of at least a portion of the inspection data to depict or portray the arrangement of the tube segments" rather than "create a display of at least a portion of the partitioned inspection data that displays data depicted in the arrangement of tubes as in the actual furnace." Appx59; Appx14664. The Court also correctly ruled that 2-DPCLI anticipated the display limitation of all contested claims because (1) the claims cover them, (2) the specification calls them an embodiment of the invention, (3) the prosecution history could not have and does not disavow them, and (4) the inventors/POSITAs repeatedly declared that they anticipate. *Infra* at 30-45. Since the display limitation was the only dispute concerning claims 1, 11, 12, 24, 33 and 37 a finding of anticipation led to invalidation of those claims.

Appellant has conceded that the Norco Report meets all elements of contested claims 1, 11, 12, 24, 33 and 37, except the display limitation. Appx16739–Appx16805. It has also agreed that the Norco displays are essentially identical to Figure 3 of the written description of the '874 patent, which was done "in accordance with a first example of the invention." APB7; Appx85-3:55–58; Appx16932–16956; Appx16739–16805. If the inventors' statement that Figure 3 was created "in accordance with a first example of the present invention" is fully credited, as it should be, anticipation is established *ipso facto*. *See Honeywell Int'l*,

*Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) ("On at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'…. The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter.").[4]

In this unique case, the Court could stop its analysis of Appellant's disavowal claim without a blow-by-blow analysis of prosecution history, because Appellant, having failed to even disclose the appropriate prior art reference, cannot meet "[t]he [exacting] standard for disavowal of a claim scope." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language" and loses it only by "including…specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.").

Every disavowal case cited by Appellant references prior art that was openly identified and whose properties were carefully discussed and discounted by the inventors in comparison to the claimed invention. *See, e.g., Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325–26 (Fed. Cir. 2015) (U.S. Patent No. 5,210,787 distinguished); *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368 (Fed.

[4] While a specification may contain references broader than the claimed invention, when language describing embodiments as "the present invention" or "the invention" is present, it is controlling. *Honeywell*, 452 F.3d. at 1316-1319.

Cir. 2014) (U.S. Patent 5,923,884 distinguished); *Cohesive Techs. Inc. v. Waters Corp.*, 543 F.3d 1351, 1360–61 (Fed. Cir. 2008) (U.S. Patent No. 5,019,270 distinguished); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 n.5 (Fed. Cir. 2004) (*Lewen* reference distinguished); *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1123 (Fed. Cir. 2001) (*Warth* reference distinguished).

Here the inventors ***never mentioned*** 2-DPCLI as prior art, much less openly disavowed or distinguished them. Appellant cites no authority suggesting that an inventor may withhold prior art, actually claim it as an embodiment of his invention, then argue that a discussion of a wholly separate prior art reference having none of the characteristics of the undisclosed prior art can substitute for it. Since no comparison of the graphics of the disclosed *Winslow* reference and 2-DPCLI or, more importantly, between 2-DPCLI as prior art and "stacked" images ever occurred, it is impossible to claim disavowal under the applicable high standard. The district court correctly rejected Appellant's jerry-rigged approach.

Even if this Court allows Appellant to use the *Winslow* reference to stand in for 2-DPCLI, which it should not, it would do Appellant no good. Appellant argues that:

- On April 30, 2008, it amended each claim of the '874 patent to add the required display of inspection data "arranged to represent [said] physical geometry of said furnace." APB20.

- This was done to distinguish the invention from *Winslow*, which used an RFT tool testing water pipe. APB19.
- The inventors criticized *Winslow* for failing to reflect the "actual physical geometry" of the water pipes it inspected and contrasted it with the "present invention" which produced displays showing the "actual physical geometry" of the furnace. APB36.
- Since the words "as in the actual furnace" are also used in the specification to describe Figure 9, the inventors must have meant to limit their invention to the embodiment connected to these words. APB31; APB41.
- Since Figures 5, 6 and 9 are drawn to scale with tube segments in their correct orientation, the inventors must have also meant to import these limitations into the claims. APB17–19.

Even if every inference suggested by Appellant were taken as true, and few are, its argument still fails. At most, Appellant's argument shows that displays like Figures 5, 6 and 9 are ***included*** in the amended claims, not that displays covered by Figures 3 and 4 are ***excluded***.

Disavowal is never permitted under these circumstances because "the specification [or prosecution history] [must] make [] clear that the invention ***does not*** include a particular feature." *GE Lighting Solutions, LLC v. AgiLight Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2012) (emphasis added). "Simply referring to two terms as alternatives or disclosing embodiments that all use the term the same way is not sufficient to redefine a claim term." *Thorner*, 669 F.3d at 1368. Even if exchanges with the patent office had left Figures 5, 6, and 9 as the only

embodiments of the invention (which they did not), reading their limitations into the claims would still be improper. *GE Lighting Solutions*, 750 F.3d at 1309.

A more detailed analysis shows that claims 1, 11, 12, 24, 33, 37 and the display limitations of claims 30 and 40 are anticipated by 2-DPCLI because (1) the claims include them, (2) the specification names them as an embodiment of the invention, (3) the prosecution history could not have disavowed them and does not disavow them, and (4) the inventors repeatedly declared that they anticipate. *Infra* at 30-45.

**A. Claim language supports the district court's decision below.**

The applicants' claim requires no particular image, rather only that it be "*arranged to represent* said physical geometry of a plurality of said tube segments and enable visual detection of a problem area comprising one or more of said tube segments." Appx92-18:38–41; Appx19:29–34, 20:32–36. The plain meaning of the word "represent" negates the Appellant's position. If an object "[r]epresent[s]" another it "serve[s] as a sign or symbol, [or] portray[s] by pictorial art: delineate, depict. To serve as the counterpart or image of; typify." *Webster's Third New Int'l* Dictionary 1926 (3d ed. 1993). By using the broader "represent," the inventors rejected the requirement of a photographic quality replication of furnace. *See Thorner*, 669 F.3d at 1366–67 (each word used in a claim has meaning).

None of the words that Appellant claims trigger the requirement of "stacked" imagery–such as "in the actual furnace," "to scale," or "in their correct orientation"–appear in the claims. "If [Appellant] had intended to use these terms to describe the [FTIS output], it should have." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). The words "the actual physical geometry of the furnace" were used in the discussion of Figure 9 of the specification from day one, so if the inventors wanted to limit their display claims to Figures 5, 6 and 9, they knew exactly how to do it. Appx89-11:45; Appx90-14:66. But they chose not to. In fact, by requiring only that "at least a portion of said partitioned inspection data" be used, the inventors made clear that the entire furnace need never be displayed. Appx91-16:36–40; Appx92-17:26–30; Appx92-18:37–38. Final claim amendments removed the requirement that the display represent "said furnace" and only substituted the requirement that they represent the physical geometry of "a plurality of said tube segments," clearly moving away from any requirement of a pictorial ***furnace*** presentation. Appx15039; Appx15042; Appx15045; Appx15048.

The inventors' addition of language that "said furnace comprises a plurality of tube segments connected by a plurality of bends so as to allow stacking of at least a portion of said tube segments" to the claim does not alter this outcome. These serpentine furnace coils were always the subject of the invention. Appx73

(Fig. 1A). The preamble of each claim describes ***what*** was being displayed, but the display limitation covers ***how*** it is to be displayed. *Compare*, Appx73 (Fig. 1A) *with* Appx91-16:24–29, 36–39. The inventors limited their invention to the unique setting of problem recognition within a serpentine furnace coil so it would not allow it to conflict with the field already held by *Winslow*, and the patent office perceived it that way. Appx15053–15054.

**B. The specification supports the district court's decision.**

The specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a dispute term." *Phillips*, 415 F.3d at 1315. Here the specification says 2-DPCLI or "2-D color coded strip charts" are "in accord with the present invention." Appx85-3:55–4:5. When a group of claim elements are explicitly adopted as the invention, the language is generally regarded as dispositive. *GE Lighting Solutions*, 750 F.3d at 1309; *Honeywell Int'l Inc.*, 452 F.3d at 1318.

The Court's analysis of the specification could end here. But all other parts of the specification support the district court's decision. The examples were meant to highlight differences in bend detection methods, not limit the displays to the examples accompanying them. Examples 1–3 described manual bend detection methods, and Example 4 described automated bend detection. Appx87-7:45–8:14. The four examples "are provided merely to illustrate different approaches that may

be used to correlate the inspection data to the physical geometry of the furnace and display the inspection data in a manner that enables the visual detection of problem areas within the furnace and…do not in any way limit the scope of the present invention." Appx88-9:43–50.

Each example also treats the resulting displays of inspection data as interchangeable and malleable depending on customer requirements. *Supra* at 4-6. Any aspect of the physical geometry of a furnace may be used to anchor data position consistent with the invention and in some cases physical geometry consists solely of changes in tube thickness. Appx85-4:43–57; Appx85-3:14–20; Appx89-11:5–19. Scaling 2-DPCLI tube segments for length was always optional, never required: "[i]t should be understood that the known lengths of the various tube segments ***may be*** superimposed upon strip charts **300** and **400** to provide additional guidance in identifying the locations of the bends…". Appx89-11:15–19 (emphasis added). Finally, the inventors repeatedly stressed that each example expressed the minimum, not the maximum, scope of the claims. Appx88-9:41–50; Appx89-11:36–48; Appx91-16:4–8.

None of the examples in the specification are pictorially accurate displays of the actual physical geometry of a furnace. For example, Figures 5, 6 and 9 are of a tube segments in a convection section of a furnace only, not the entire furnace. Appx85-3:63–4:5, 4:16–20; Appx77–78; Appx81. All three figures have all return

bends removed. While tube **lengths** are drawn to scale in Figures 5 and 6, tube **widths** are not.[5] Furnace tube segments have an internal diameter of 4 to 8 inches. Appx84-2:6–13; Appx16549; Appx16613. The demonstrative figures below show the inventors widened the flattened view of the tube segments from two to three times their normal size to enhance viewability:



FIG. 5

Appx77.

[5] Using the pixel length and known tube length from Figure 5, width projects as one meter in circumference (3.28’). The tube diameter is thus 1.18ft (3.28’/3.141592654).

Figure 5, to Scale



FIG. 5

Actual pipe circumference = 12.56”

Actual pipe diameter = 4”

*See* Appx77.

### C. The prosecution history supports the decision below.

Not only were 2-DPCLI not disclosed, criticized or disclaimed during prosecution, no other prosecution history supports disavowal.

The inventors knew exactly how to definitively disclaim claim scope when they wanted. In their first amendment, the inventors attempted to distance their claims from *Winslow’s* remote field technique sensors by requiring that inspection data be “collected by one or more devices selected from the following group: an

ultrasonic transducer, a laser profilometer, and combinations thereof." Appx14785–14798; Appx91-16:41–44. This language definitively disavowed all other sensors. It is in stark contrast to the display limitation in which all images *arranged to represent* a plurality of tube segments are claimed with no requirement that they be arranged with any specific characteristic.

Even if one were to engage in the fatuous supposition that *Winslow* could substitute for full disclosure of 2-DPCLI, disavowal simply did not happen. It is unclear what image from *Winslow* was differentiated during prosecution. Evidently Appellant believes that because the words "strip chart" are used in Fig. 19 of *Winslow* (below) it was the subject of discussion, but there is no support for this assumption in the file history itself.




*Fig.19.*

Appx50020. Clearly, *Winslow* makes no attempt, as all four displays in the specification do, to map partitioned inspection data to return bends, to state the data circumferentially, to color-code it to nominal and actual pipe thickness, to show the thickness of inferior replacement pipe, to correlate pipe segments to known furnace geometry, or to provide a means to identify broad problem areas in a serpentine furnace. *Supra* at 6-9. There was no need by the inventors to leave 2-DPCLI behind because *Winslow* had none of the characteristics of ***any*** of the displays in Examples 1–4 of the specification.

Nor did the inventors make a distinction between embodiments when distinguishing *Winslow*. Instead, *Winslow* was always compared to “the furnace tube inspection system of the ***present invention***” without any differentiation between its embodiments. Appx14949–14964. The only place the phrase “the present invention” is defined is the specification–which explicitly includes 2-DPCLI. When the inventors discussed commercial success during prosecution, the entire “present invention” was the solution, not Figures 5, 6 or 9. Appx14951–14959; Appx14852; Appx14887.

***None*** of Appellant’s fourteen pages of recently-generated criticisms of 2-DPCLI appear anywhere in the prosecution history. *Compare* APB 6-15, 32-35 and - *with* Appx14668–15082. Instead, when the inventors filed amendments, they recited that they were just ***clarifying*** what they always taught, namely that “[t]he

[improved system of the application] ***also generates a display of the partitioned inspection data that correlates the inspection data to the physical geometry of the furnace.***" *Supra* at 7. This is exactly what Appellant's experts testified to under oath during the preliminary injunction phase before reversing field. Appx14182. It is also how the inventors consistently described the invention throughout all amendments. Appx90-14:48–62; Appx14848; Appx14852; Appx14880; Appx14883; Appx14952; Appx14958; Appx14963–14964.

The inventors never consistently used the phrases "actual physical geometry" or "actual furnace" so as to permit one to infer that the words were code meant to limit their claims to Figures 5, 6, or 9. Instead, "actual physical geometry" was used eight times to describe images while the more generic "physical geometry" was used nine times. Appx14949–14964. Even if the inventors' fitful use of the phrases "actual furnace" and "actual physical geometry" could be treated as coded references to specification language describing only Figures 5, 6 and 9, the result merely begs the Court to commit the cardinal sin of claim construction—to import a claim limitation from the specification into the claims. *Thorner*, 669 F.3d at 1366.

Finally, contrasting the last two changes to claim language strongly supports the district court's decision. *Supra at 30-32.* Because the final amendment no longer required that the display be arranged to represent "said furnace" but only "a

plurality of said tube segments," Appellant cannot now reclaim the "as in the ***actual furnace***" language to save itself from its on-sale activities. The addition of words describing the serpentine furnace coil during prosecution does not alter this result. *Supra* at 30-32.

### D. The extrinsic evidence provided by the inventor – POSITAs strongly supports the district court's decisions.

All claims, written descriptions, and the file history are considered from the eyes of a person of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. The extrinsic evidence shows that the inventors/POSITAs felt 2-DPCLI were arranged to represent the physical geometry of a plurality of tube segments.

The Norco contract promised delivery of "2-Dimensional (2D) color graphics of all individual piping coil segments, return bends, and cross-over piping…containing wall thinning, corrosion, broad area pitting, erosion, and bulging which exceed the client's specified threshold level…." Appx16677 (emphasis added). Had Quest failed to deliver this result, it would have violated its warranty. Appx16546. ("[O]ur evaluation accurately describes the condition of the furnace piping at the time of inspection….").

The Norco Report called its displays "2-D Piping Coil ***Layout***[6]***Images"*** 22 times and 'layout" is a plain word meaning "the design or arrangement" of a thing.

[6] "**Layout**. 1: the plan or design or arrangement of something laid out…" *Layout.* Merriam-Webster Dictionary (Online Ed. 2018) (accessed April 2018), *available at* https://www.merriam-webster.com/dictionary/layout.

Appx16543–16605; Appx16607–16660. The inventors further referred to the process of creating 2-DPCLI as ***2-D Modeling***, another plain word which means to create "a representation, generally in miniature, to show the construction or appearance of something."[7] Appx16548; Appx16612, *Supra* at 13-14.

Appellant uses the very same phrase now ("3-D ***Modeling***")—to describe its most evolved FTIS images, strongly suggesting that both are representations of the physical geometry of a furnace. Appx17240–17246. Inventor Roberts even testified that when the word modeling was used, it meant the patented displays: "[y]es, [the patented 2-D model] it's how we—how we present the coil." Appx17243–17244.

Marketing materials that Roberts created for Quest are even more explicit: "the software…***automatically creates a 2D view of the entire furnace piping network that identifies and assigns identification numbers to return bends, individual pipe segments, and cross-over piping.*** This allows you to see the entire piping coil system overlaid with the inspection data results on a single color plot." Appx16689 (emphasis added). These marketing materials were done years before

[7] "**Model**. 4. A usually miniature representation of something * a plastic model of the human heart; *also:* a pattern of something to be made." *Model*. Merriam-Webster Dictionary (Online Ed. 2018) (accessed April 2018), *available at* https://www.merriam-webster.com/dictionary/model.

this litigation and are incontrovertible proof that the inventors knew 2-DPCLI were arranged to represent the physical geometry of an entire furnace.

The district court concluded, and this Court may as well, that no reasonable jury could disagree. Appellant's self-serving testimony to the contrary is insufficient to create a genuine issue of material fact. *See, e.g., Applied Companies v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998) ("In light of the strong documentary evidence . . . Mr. Fortin's affidavit alone is insufficient to create a genuine issue of material fact."); *SRI Int'l., Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) ("Dr. Kesidis's testimony is not sufficient to overcome the weight of evidence" from the printed publications).[8]

Appellant tries to seduce acceptance of its self-serving testimony through a false dichotomy: displays are either (i) "stacked" and "scaled" and thus show the "actual physical geometry" of a furnace or (ii) are defined as the district court has and do not. Both 2-DPCLI and stacked images ***represent*** the arrangement of tube segments of an actual serpentine furnace coil but do it in different ways.

---

[8] *See also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 735 (2d Cir. 2010) (affirming summary judgment because "the plaintiffs have repeatedly represented, in both the transaction documents and in tax and regulatory filings, that the natural gas contained in the Storage Facility constitutes 'personal property'…The plaintiffs [and their experts] cannot now seriously claim that the Storage Facility contains only 'real property.'").




FIG. 3




FIG. 5

Appx75; Appx77, *Supra* at 19-21. In the 2-DPCLI on the top, data is arranged to represent the physical geometry of tube segments by (1) displaying every tube segment, (2) numbering them in the order they appear in the actual furnace, (3) placing them end-to-end as in the furnace, (4) identifying every bend, (5) displaying data flattened in accord to its circumferential position in each tube, (6) identifying and staking the inspection data to known tube lengths, and (7) using a color scale to compare nominal wall thickness to actual thickness so that operators can see thinning, corrosion or other risks to the tubing. *Supra* at 11-14. The display below removes the bends, scales the drawing to the actual length of tubes but not their width, and flips the tube segments into their correct orientation. *Id.*

Appellant cannot validly suggest that data must be arranged to reflect ***every*** aspect of physical geometry of tube segments: even anticipating displays Figures 5, 6 and 9 do not. "A variety of different types of physical features may be identified to assist in correlating the inspection data to the physical geometry of the furnace." Appx85-4:43–45. Instead, each embodiment, including 2-DPCLI maps inspection data to the known physical geometry of a plurality of tube segments to allow the customer to determine "in an instant" problems across several tube segments.

### E. The objective of patenting is not controlling but was nevertheless satisfied.

Appellant argues that unless 2-DPCLI are excluded from the claims the "fundamental purpose" of the '874 patent will not be served. This claim is both legally and factually wrong.

> The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution.

*E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003). Appellant's approach intrinsically invites error because "[a]n invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them." *Id.*

The argument is also wrong because inventors consistently characterized 2-DPCLI as tools that solved prior art deficiencies by allowing broad problem recognition and immediate corrective action. *Supra* at 11-14.

It is neither surprising nor relevant to the anticipation question that Figures 5, 6 and 9, or their later more sophisticated progeny, might reveal different problems or even do so more efficiently than 2-DPCLI. The claims merely require that the display enable detection of ***a*** problem area in one or more tube segments, not ***every*** problem. Appx92-18:38–41; Appx93-19:29–34, 20:32–36.

The district court correctly rejected Appellants multiple inference approach to disavowal and ruled that 2-DPCLI or "2-dimensional color-coded strip charts" anticipate the display limitation of all contested claims because (1) the claims cover them, (2) the specification makes them an embodiment of the invention, (3) the prosecution history does not disavow them, and (4) the inventors/POSITAs repeatedly declared that they anticipate. Since the display limitation was the only dispute concerning claims 1, 11, 12, 24, 33 and 37, a finding of anticipation of the display limitation by the Norco reports properly led to invalidation of those claims.

## III. The district court correctly ruled that Claim 30 of the '874 patent was invalidated by the Norco sale.

In Claim 30, the inventors describe an FTIS system having "[a] computer-readable medium having computer-executable instructions for performing a method of displaying inspection data…wherein each of said data markers comprises a composite data marker…." Appx92-18:26–28; Appx93-19:4–6 (hereafter "CDM"). The district court correctly found that Appellant's corporate representative, inventor Robert DeLorenzo, repeatedly admitted that the computer used during the Norco job had computer readable medium programmed to produce CDM and excluded several newly minted declarations offered to contradict DeLorenzo's admissions.

### A. Appellant conceded anticipation of Claim 30.

Robert DeLorenzo appeared on January 12, 2016, as Appellant's corporate representative under Fed. R. Civ. P. 30(b)(6) to testify to the existence, production, and functionality of FTIS software from 2002–2004. Appx19208–19209. DeLorenzo had an intimate knowledge of the FTIS software and graphic interface, and personally conducted the Norco examination. Appx19210-51:14–17; Appx19214-67:9–10. He co-authored the software code and authored Appellant's FTIS instruction manuals. Appx16320-11:22–12:16; Appx16321-13:12-20; Appx19210-52:8–25; Appx19222-140:16–19. Before his deposition, he studied the code, separately reviewed it for step changes and discussed it with his co-author, Phil Bondurant. Appx19208-7:17–8:1; Appx19209-9:5–19, 9:22–10:13. He was offered clarification of any question, frequent breaks, and the opportunity to change any answer during the deposition if needed to clarify his testimony. Appx19229-8:16–Appx19230-9:20. DeLorenzo was well shielded from inadvertent error: in his two depositions Appellant's counsel raised ***two hundred*** objections, but virtually none in the passages that are relied upon here. Appx19208–19225; Appx19229–19230.

DeLorenzo conceded anticipation of Claim 30 ***nine times*** in his deposition. Here is the first:

Q: Okay. Now, take a look at line no 42 back on page 8350–550 on Exhibit No. 128.
A: Yep.
Q: Is this calculation that follows what you guys have referred to as a composite data marker?
A: I believe that was the intent of that -- of what this comment is, so yes.
Q: So if I am correct in putting your answers together, ***as of roughly August 28th, 2002, your software allowed you to utilize and give your customers these displays that had composite data markers in them, correct?***
A: ***That's correct.***

Appx16325-77:2–13 (emphasis added).

Appellant focuses on the fact that this single line of questioning used the July 8, 2004 BendDetectRevA.m program instead of its earlier August 28, 2002, vintage BendDetect.m counterpart, ignoring that the CDM function was initially present in both, but was not commented until a year after the Norco job. Appx19190–19192.

DeLorenzo referred to Bondurant's six-factor CDM algorithm as "automatic" bend detection or "auto-assisted" bend detection. Appx16322-66–67; Appx16322-68:20–23 (DeLorenzo: "Q: …If the automated function was used, it used the algorithm that Phil Bondurant set up to calculate bend? A: Correct."). The testimony recited above is alone sufficient, but DeLorenzo testified ***eight more***

***times*** that this automatic/CDM programming was available and used during the Norco job:

- "…[D]id you have the option of the Norco Report to either hand select…[bends] or have them automatically selected? A: Yes." Appx16322-66:1–5 (emphasis added);

- "You could call… [how the bends were picked in the Norco Report] auto assisted, but yeah, I picked it—yes, I picked it through the interface." Appx16322-67:2–3, 16–17 (emphasis added);

- "…And that's what you're saying could have been manually or automatically selected, that software permitted you to do both at that point? A: Right, manually through a user—yeah, through a user interface, yes.") Appx16322-68:7–11;

- "…[W]ould that be a black mark that was, if you were using an automated section it would automatically appear at a bend? A: That's the intent, yes." Appx16323-72:20–23;

- "…So, the computer is going through and calculating these locations through some algorithm. We also automated it through a user interface. So…we've built a user interface to kind of auto assist you to pick those locations. So, it can quickly—with the mouse and that graphic, so now it's a type of automation. It's, I would call it more automated, you can go through and click those very quickly." Appx16324-73:21–74:15;

- "So, I guess there was two methods we were using and one is through finding this algorithm that Phil Bondurant wrote and also using this kind of auto assisted method where you have a cross hair that can quickly visually identify…[bends]." Appx16324-74:11–15 (emphasis added);

- DeLorenzo hit the prompt for automatic bend selection, bends appeared as black marks or X's, then he looked at them to do a reality check and marked them manually). Appx16324-76:3–Appx16325-77:1.

- Q: And ***did you actually do so for various customers?*** Were there some of these where you utilized automatic composite data marker function?
  A: ***We attempted it and we did both the automatic and the kind of auto assisted, so yes, we did use it.***
  Appx16325-77:18 (emphasis added).

DeLorenzo also described in detail from memory that the automated system "wasn't that reliable" which was why bends had to be manually marked. Appx16322-66:18–19.

DeLorenzo never changed his deposition testimony under Fed. R. Civ. P. 30(e). Appx19152. Appellant defended against Norco's anticipation of Claim 30 only by offering the incorrect and now-abandoned position that the FTIS system did not collect sensor data. Appx42–43 n.49. But on December 28, 2016, nearly a year after the 30(b)(6) deposition, and after the defendants had filed summary judgment motions in reliance on DeLorenzo's testimony, DeLorenzo, Bondurant and Appellant's experts testified for the first time that CDM (1) could not have existed in the code until after July 8, 2004 and (2) CDM would have produced an "X" at return bends had it been used. Appx19024–19049; Appx19050–19065; Appx19066–19073; Appx19074–19087. Appellant originally claimed that the defendants had misled DeLorenzo, but that claim was exposed below and has now been abandoned. Appx19152–19154; APB64–65. The district court acted well within its discretion in excluding the new testimony of all four witnesses as a

sham, but it would have been justified in excluding all four declarations under Fed. R. Civ. P. 16, 30(e), or 30(b)(6).

Appellant argues (1) the district court violated Rule 56 by making credibility determinations; (2) Defendants haven't proven that the executable code required by the claim existed; (3) their testimonial reversals had "plausible" explanations; and (4) the Norco sale wasn't really a sale. APB59–62. None of these arguments are valid.

**B. The district court correctly excluded Appellant's newly minted contradictory declarations.**

The district court assessed the credibility of *arguments* that had never before been raised, not of witnesses under Rule 56. Appx42–43, n.49. In *Delaware Valley Floral*, this Court affirmed a district court should do exactly what the district court did here under remarkably similar facts:

- Each deponent made false claims of confusion. 597 F.3d at 1378; cf. *Supra* at 49;
- Each repeatedly testified to anticipating commercial activity only to retract it. 597 F.3d at 1381 (eighteen times); cf. *Supra* at 46-50 (nine times);
- Neither witness equivocated in his original deposition. 597 F.3d at 1378; cf. *Supra* at 46-50;
- No timely change of deposition testimony occurred under Fed. R. Civ. P. 30(e). 597 F.3d at 1378 (changes made 57 days after the deposition); cf. *Supra* at 49-50 (no changes);

- Testimonial changes were offered for the first time after dispositive motions were filed citing the original testimony. 597 F.3d at 1381, cf. *Supra* at 49-50.

These factors alone show that the district court acted well within its authority and discretion.

Appellant argues that if a court must conduct a credibility assessment concerning the circumstances around testimonial reversal, it automatically makes an improper credibility determination under Fed. R. Civ. P. 56. APB29, citing *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006). This is not the test—a district court can and must consider all circumstances surrounding testimonial reversal. *Del. Valley Floral*, 597 F.3d at 1379–80. Were this not the rule, every opponent could defeat summary judgment solely by creating a "plausible" basis for a change of testimony, regardless how definitive the original testimony was, how false the late-filed testimony is or how strong the other evidence is. Appellant must first demonstrate predicate facts showing confusion or deceptive questioning before the substance of the conflicting declarations can be considered at all. *Brand Mgmt. Inc. v. Menard Inc.*, 135 F.3d 776, at *10 n.6 (Fed. Cir. 1998). Appellant tried meeting this acknowledged burden below but could not do so and has now abandoned the effort. *Supra* at 49. Further, even if a "dispute" could be created by such techniques, it must rise to a dispute of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

254 (1986). No reasonable jury could ignore nine clear admissions in favor of a tenth newly-minted contrary position.

Several additional factors beyond those identified in *Del. Valley Floral*, 597 F.3d at 1381-82 are present here to support exclusion. DeLorenzo was a 30(b)(6) representative, a witness expected to prepare and know the answers. *Daubert*, 861 F.3d at 392–93. Further, this was Appellant's ***third*** set of sham declarations. All three inventors declared that the Norco sale was not experimental, then filed declarations claiming it was. Appx19137–19139. These claims have now been abandoned. *Compare* Appx19137–19139 *with* APB11-12. After both Appellant's experts and their counsel confirmed that 1999-vintage software applicable to Claim 40 was present in Norco-FTIS software, they now try to retract that position as well. *Infra* at 58-64. Appellant busily generated "fact issues" at any cost and the district court acted well within its discretion in disregarding Appellant's sham declarations.

The district court could also have disregarded all four new declarations under Fed. R. Civ. P. 16 or 30(e). The new declarations required specialized training, background and skill to read and interpret code and offer opinions about it, none of which were produced in accordance with the district court's scheduling order. Appx60001; Appx19185; Appx16792–97. Appellee's extensive analysis of factors favoring exclusion of these untimely expert opinions under *Meyers v.*

*Pennypack Woods Home Ownership Assn.*, 559 F.2d 894 (3d Cir. 1977) went unchallenged below and here.

Further, Appellant did not make deposition changes within 30 days as required by FRCP 30(e), so exclusion under that rule alone would have been proper as well. Appx19139–40; *see Del. Valley Floral*, 597 F.3d at 1381; *EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, 265 (3d Cir. 2010) ("The procedural requirements of Rule 30(e) are clear and mandatory.").

Appellant's claim that it can contradict DeLorenzo with testimony from others is also wrong. First, all four declarations were excludable under Fed. R. Civ. P. 16. *See* Fed. R. Civ. P. 26(a)(2)(C) (employee experts giving Fed. R. Evid. 703 opinions must designate subject matter and summary of their Rule 703 opinions).

Second, Rule 30(b)(6) is designed to create testimony that is binding on the corporation so unless valid excuse under the sham declaration doctrine is present, the testimony cannot be contradicted by ***anyone***. *E.g.*, *Daubert*, 861 F.3d at 392 ("The District Court, we hold, acted well within its discretion to disregard Sarver's affidavit. Her sworn written statement flatly contradicted Schaar's earlier 30(b)(6) testimony.").

Thirdly, most courts have held that when the sham declaration doctrine is invoked, neither the witness, nor others, may contradict their sworn deposition

testimony. *E.g.*, *In re Fosamax Products Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (Although we have typically applied the sham issue of fact doctrine where a party submits an affidavit that contradicts the party's own prior statements, it may also apply when a party attempts to use evidence from an expert witness to defeat summary judgment.”); *Irrevocable Trust of Antonious v. Nike, Inc.*, No. 11-CV-06327 (KM), 2016 WL 3176576, at *4 n.3 (D.N.J. June 2, 2016) (doctrine extended to encompass a person testifying as a paid expert.”); *see also France v. Lucas*, 836 F.3d 612, 622–23 (6th Cir. 2016) (sham affidavit doctrine usually applied against a party but is not limited to that situation).

### C. Appellant’s excuses are not plausible and would not have created a fact issue even if they had been considered.

The analysis above, standing alone, supports the district court’s decision. But a careful analysis of the timeline presented by the source code and related documents shows why Appellant’s contentions would not generate a genuine dispute even if they were considered.

- Programmer notes reflect that a six-function CDM algorithm was written into the Matlab code by “pdb” (Phil Bondurant) beginning on August 28, 2002 in a “BendDetect.m” file to: “Build the composite bend indicator[.]” Appx16988.

```
C:\Users\FPGuest\Desktop\Early Matlab Scripts 4-25-2003\Early Matlab Scripts 4-25-2003\BendDetect.m

% pdb - 8.28.2002

% Compute RMS and sum value of all bend indicators
disp('Build the composite bend indicator')
rmsValue = RMSArrayRad.^2 + RMSArrayWall.^2 + NaNCtRad.^2 + NaNCtWall.^2 + AvgRad.^2 + AvgWall.^2;
sumValue = RMSArrayRad + RMSArrayWall + NaNCtRad + NaNCtWall + AvgRad + AvgWall;
```

- By August 30, 2002, the CDM algorithm had been "***coded*** and tested…and [was] proven…." Appx16348 (emphasis added).

- Though the "Early Matlab Scripts" show a date of April 25, 2003, 30 code changes before that date, and 37 afterwards are recorded in it. Appx16988–17030. *See, e.g.* Appx16991-L:8–9; Appx16993-L:18–19; Appx17002-L:24-26.

- Unless it had bugs, new software code was used on the next available. Appx19212-57:1–58:11.

- CDM bearing "BendDetect.m" file was present in the FTIS code on February 14, 2003, three days before the first Norco job began. Appx19185–19186, ¶¶15–16.

- Had it been changed between February 14, 2003, and March 7, 2003 when the Norco job was completed, those changes would have been automatically reflected in the index file. Appx19185, ¶15.

- Appellees relied upon the August 28, 2002 "BendDetect.m," along with DeLorenzo's testimony, to show anticipation of Claim 30, not the July 8, 2004 "BendDetectRevA.m" code. Appx19190–19192; Appx16792–16797 (second column).

- When DeLorenzo used the automated CDM data-marker code, it produced spurious results and missed some bends, so he used it as an "auto-assist" to suggest bends, which he then manually reviewed and marked, producing black tick marks, rather than X's on the Norco Report. *Supra* at 46-49.

- On July 8, 2004, a "BendDetectRevA.m" file was "ADDED," commenting out CDM code from BendDetect.M file to "Do it a Different Way." Appx19190–19192; Appx17007-L:73, 78.

These facts are straightforward and completely consistent with DeLorenzo's 30(b)(6) testimony that CDM-bearing code was present at Norco and used in an auto-assist fashion but ignored in favor of quick manual selection.

The argument that CDM software was not ***used*** to create the Norco Report is both irrelevant to anticipation and wrong. Claim 30 is a computer readable medium claim, requiring a computer "having computer-executable instructions for performing a method of displaying inspection data collected from a furnace...wherein each of said data markers comprises a composite data marker." Appx92–93. To anticipate such claims, appropriate programming need only be present in programming, not used or even accessible. *See Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed Cir. 2010) ("Claim 65 of the '194 patent recites a 'computer-readable storage medium storing program code for causing a server that serves as a gateway to a client to perform the steps of receiving…; comparing…; and preventing execution.' This language does not require that the program code be 'active'.")

But even if use were required to show anticipation (and it is not), DeLorenzo testified that during the Norco job he used Bondurant's algorithm to suggest bends, then manually confirmed and marked them because the CDM program was flawed. *Supra* at 57-58.

Thus, even if Appellant's binding testimony were ambiguous (which it isn't), even if Appellant had shown illness or confusion by the witness (which they haven't), even if their violations of Fed. R. Civ. P. 16, 30(b)(6) and 30(e) are ignored (and they shouldn't be), the resulting evidence provides no plausible

excuse for a new testimonial epiphany and does not create a fact issue that the Norco FTIS system failed to anticipate.

**D. Appellant's remaining arguments lack merit.**

Appellant mentions two final arguments in passing. First, Appellant argues it retained possession of the source code during its service offering and therefore no sale occurred. "The overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term." *STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000). The law does not require that a specific form of commercialization occur, but merely that the patented invention be the "subject matter" of the sale. *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1283–84 (Fed. Cir. 2005). It does not matter where the invention resides or whether the details of the invention are disclosed to the customer. *See Id.*; *see also Scaltech, Inc. v. Retec/Tetra*, LLC, 269 F.3d 1321, 1328 (Fed. Cir. 2001) ("[T]he fact that the process itself was not offered for sale but only offered to be used by the patentee to process waste does not take it outside the on sale bar rule."). Here, the "subject matter" of the invention—an Improved FTIS system designed to produce customer reports with improved graphics—was repeatedly offered and used for commercial gain for nearly two years before the critical date.

Second, Appellant argues that Appellees lack proof that "executable" code existed. APB48–49. According to Appellant, since the executable version of that

code has been destroyed for years: "*voila,*" Appellant wins. First, Appellant simply did not raise the argument at all below–not in its expert reports, not in the testimony of its fact or 30(b)(6) witness, and not in its response brief or declaration. It has been waived. *See In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004). Second, Appellant represented that the source code it produced, whether of the 1999, 2002 or 2004 vintage, ***was*** the Norco job code. Appx19157. Third, Matlab *is* intrinscially executable, just like Microsoft Outlook or Word. It cannot be used in any other way. The source code used as exhibits here simply shows how that execution occurs. Fourth, DeLorenzo testified nine times that the code was not only executable during the Norco sale, but ***was executed*** through the graphic user interface. *Supra* at 46-49.

The district court's exclusion of Appellant's last-second epiphanies was justified on several grounds. Even if it hadn't been, the evidence overwhelmingly demonstrates that CDM were present in executable code during the Norco job, and, though it is unnecessary for Appellees to prove it, were actually used during the Norco job in an auto-assist mode. The district court correctly concluded that Claim 30 was anticipated by the Norco sale and is invalid under 35 U.S.C. § 102(b).

## IV. The Norco Sale anticipates Claim 40

The district court correctly concluded that the system involved in the Norco sale anticipated Claim 40 of the '874 Patent. Appx50–54; *see also*, Appx16800–

16805; Appx19178–19200. Though the district court relied upon the Rule 30(b)(6) testimony of Appellant's corporate representative and uncontradicted expert testimony directed to the 2002 software code, it could also have relied upon additional 1999 FTIS software code or Appellants' numerous admissions to support its conclusions. Appx16800–16805; Appx19186–19197.

Claim 40 reflects a system for displaying inspection data collected from a furnace having a computer programmed to record and analyze sensor data (data from one or more auxiliary sensors selected from an axial encoder, an accelerometer, a roll encoder, a gyroscope, an inertial navigation system and combinations thereof) to generate a display of partitioned inspection data mapped to the physical geometry of tube segments and to generate a display representing the physical geometry of a plurality of tube segments. Appx51–52; Appx93-20:17–41; Appx16800–16805.

It is uncontested that two axial encoders existed on the unit used in the Norco sale. Appx16547 ("The Position Module includes axial, pitch and roll sensors that continuously monitor the telemetry and orientation of the tool during an inspection. This information is essential to properly identify the positioning of the collected data."); *see, also,* Appx16801 (Cell 40(B)).

DeLorenzo repeatedly testified that Quest's computers used data from the axial encoders to generate location data at every sweep of the ultrasonic sensors.

Appx51–53. In addition to the testimony relied upon by the district court, he also testified:

> Q: … When you have the bend indicators, as you said let's say you have a thousand sweeps in this particular array, and on Pipe No. 6 … you determine, I think you said 88 was the number you used as your start point. That's where your sweep is for the pig as it's coming into Tube No. 6.
>
> A: Right.
>
> Q: And then you take a look at your exit sweep number … ***That gives you a starting and stop point for that tube segment, correct?***
>
> *A.* ***Yeah, it gives you an index of that array***, right.
>
> Q: Now, the customer has also given you the length of that tube, right?
>
> A: Via drawing, yes.
>
> Q: And you've recorded that in your information going into the job, correct?
>
> A: Not necessarily.
>
> Q: Okay.
>
> A: You're probably ***relying on an axial encoder*** at that point.
>
> Q: Okay. So, at this point the ***axial encoder is going through the system and it tells you how many feet*** from Sweep No. 88 you are. So, let's say that you use the numbers I have, 88 and 120. You've got 32 sweeps within that particular section, Section No. 6, right? … and the pipe is 40 feet long. If the axial recorder gives you a certain sweep number, say Sweep No. 100, then you do the – ***it does the correlation to say it's at 22 feet, right?***
>
> A: ***From the axial data, right.***

Appx37710-131:7–132:12 (emphasis added). The computer automatically used this data to note precisely where data markers were placed to partition furnace tube segments into known lengths to improve the positional certainty of inspection data. Appx37710-132:13–25. Since all other elements of the claim are met, this testimony alone establishes the anticipation of Claim 40, just as the equivalent

testimony by Appellant's corporate representative establishes anticipation of Claim 30.

The district court could also have premised the anticipation finding on the uncontested testimony of the experts. As Appellant's experts conceded, Quest used data from two sensors in the 2002-vintage Norco code and automatic bend selection using sensor data in the 1999 code. *Compare*, Appx16802–16805 (Cell 40(C)), column 2 "Rebuttal" and column 4 "Reply." Appellant's experts only countered that in the 2002 Norco code, data from the roll encoder and accelerometers went unused but made no response about either the 1999 code or the use of axial encoders in the 2002 code. Appx16802–16805 (Cell 40(C)), column 2 "Rebuttal." Later, they claimed that the 1999 code was not *used* to create the Norco displays, not that it was absent from FTIS computer. Appx16802–16805 (Cell 40(C)). *See In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) ("If, even given the proffered expert testimony, the proponent 'still has failed to present sufficient evidence to get to the jury, summary judgment is appropriate."').

Claim 40 requires only that data from "one or more auxiliary sensors" be used, so the use of data from the two axial encoders more than satisfies this claim element, regardless of how inputs from other sensors were treated. Appx51–53; Appx93-20:17–41; Appx16800–805. Appellant's experts did not respond to the

claim that the 1999 code, which Appellant's experts conceded in deposition testimony was present in the FTIS computer during the Norco job, had its own automated bend selection process using accelerometer data. *Compare*, Appx16800–16805 (Cell 40(c)), column 2 "Rebuttal" and column 4 "Reply"; Appx19190–19192. The 1999 code used "pitch" data from the X/Y accelerometers to show the system was entering a bend and set data markers, a demonstration of which appears below:




Image source: American Petroleum Institute (2013)

Per the inventors: "[t]he [1999] software ***automatically identifies straight sections of tubing based on the accelerometer data…***" Appx17059 (emphasis added); Appx16802–16805 (Cell 40[C]).

The testimony of Appellant's experts that neither the 1999 or 2002 code employing axial encoders were *used* to create the Norco Report is not relevant. To

establish anticipation, the FTIS system needed only to contain a "computer programmed" to perform claimed functions. *Finjan*, 626 F.3d at 1204. Thus, a second unrebutted data point, supported *either* by the 1999 or 2002 code, illustrates a Norco vintage computer contained programming in which the computer analyzed and created data markers using sensor data. Appx53–54.

Should any further proof be needed, and it is not, no reasonable juror could ignore the explicit language of the Norco Reports, Quest's operating manuals or its marketing materials, all of which indicate that data from *several* sensor devices was continuously used by the computer to locate the tool and corresponding data throughout the Norco job. Appx16547 ("The Position Module includes axial, pitch and roll sensors ***that continuously monitor the telemetry and orientation of the tool during an inspection. This information is essential to properly identify the positioning of the collected data."***); Appx16689 ("Two independent axial position encoders determine axial locations, and three accelerometers determine spiral rotation or roll, front end positioning, and unit acceleration."); Appx31624 and Appx17055 ("The positioning module provides the system with continuous axial, pitch, and roll orientation during inspection. This information is essential for proper positioning of the collected data. The positioning module houses two axial position encoders to determine axial location and three accelerometers for

determining spiral rotation or roll, front end up or down positioning and unit acceleration.”).

Unambiguous documentary evidence renders Appellant’s self-serving testimony insufficient to raise a genuine issue of material fact. *See*, authorities *Supra* at 41.

## CONCLUSION

For each of the foregoing reasons, summary judgment of invalidity by the district court are correct and should be affirmed.

April 30, 2018

Respectfully submitted,

*/s/ Tom Fulkerson*

Thomas M. Fulkerson
Wesley G. Lotz
Nicholas M. Brown
FULKERSON LOTZ LLP
4511 Yoakum Blvd., Suite 200
Houston, Texas 77006
(713) 654-5800

*Counsel for Defendant-Appellee*
*Cokebusters USA Inc.*

# ADDENDUM

# TABLE OF CONTENTS


| Page No. | Date | Description |
|---|---|---|
| APPX60001 | September 19, 2016 | Stipulation and Order<br>—No. 1:14-cv-01482 (ECF No. 150)<br>—No. 1:14-cv-01483 (ECF No. 219) |

Case: 17-2423 Document: 12 Page: 75 Filed: 05/03/2018

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

QUEST INTEGRITY USA, LLC,
Plaintiff,
v.
CLEAN HARBORS INDUSTRIAL SERVICES, INC.,
Defendant.

C.A. No. 14-1482 (SLR)

QUEST INTEGRITY USA, LLC,
Plaintiff,
v.
COKEBUSTERS USA INC.,
Defendant.

C.A. No. 14-1483 (SLR)

**STIPULATION AND ORDER**

IT IS HEREBY STIPULATED by the parties, subject to the approval of the Court, that the case schedule is amended as shown in the table below:

| Event | Current Deadline | Amended Deadline |
| --- | --- | --- |
| Rebuttal Expert Reports | Nov. 7, 2016 | Nov. 4, 2016 |
| Reply Expert Reports | Nov. 16, 2016 | Nov. 11, 2016 |
| Close of Expert Discovery | Nov. 30, 2016 | Dec. 2, 2016 |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*

Thomas C. Grimm (#1098)
Jeremy A. Tigan (#5239)
Stephen J. Kraftschik (#5623)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: (302) 658-9200
tgrimm@mnat.com
jtigan@mnat.com
skraftschik@mnat.com

*Attorneys for Quest Integrity USA, LLC*

OF COUNSEL:

Douglas A. Grady
John R. Nelson
Richard T. Black
Emily R. Kelly
Benjamin Hodges
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, WA 98101
(206) 447-4400

RICHARDS, LAYTON & FINGER, PA

*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)
Selena E. Molina (#5936)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7705
farnan@rlf.com
molina@rlf.com

*Attorneys for Clean Harbors Industrial Services, Inc.*

OF COUNSEL:

Michael J. Turgeon
Robert S. Rigg
VEDDER PRICE, PC
222 North LaSalle Street
Suite 2500
Chicago, IL 60601
(312) 609-7500

POTTER ANDERSON & CORROON LLP

*/s/ Stephanie E. O'Bryne*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Cokebusters USA Inc.*

OF COUNSEL:

Thomas M. Fulkerson
Wesley G. Lotz
Gavin Uttecht
FULKERSON LOTZ LLP
700 Louisiana St., Ste. 5200
Houston, TX 77002-2773
(713) 654-5800

Michael Hudgins
Steven Hudgins
THE HUDGINS LAW FIRM
24 Greenway Plaza, Suite 2000
Houston, TX 77046
(713) 623-2550

September 12, 2016

SO ORDERED this ________ day of September 2016.

____________________________________________
J.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that this brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(3) because this brief consists of 13,797 words, inclusive of 1,496 words in the figures on pages 10, 12, 13, 15, 16, 18-20, 22, 34-36, 42, 54, 62, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

April 30, 2018

*/s/ Tom Fulkerson*
Thomas M. Fulkerson

## CERTIFICATE OF SERVICE

I hereby certify that I have this April 30, 2018, filed the foregoing Brief of Appellee using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Tom Fulkerson*
Thomas M. Fulkerson