Nos. 2017-1948, -2423

# United States Court of Appeals for the Federal Circuit

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

CLEAN HARBORS INDUSTRIAL SERVICES, INC.,

*Defendant-Appellee*

QUEST INTEGRITY USA, LLC,

*Plaintiff-Appellant*

v.

COKEBUSTERS USA INC.,

*Defendant-Appellee*

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:14-cv-01482-SLR, 1:14-cv-01483-SLR, Judge Sue L. Robinson

## REPLY BRIEF FOR APPELLANT QUEST INTEGRITY USA, LLC

Michael A. Morin
Gabriel K. Bell
Robert J. Gajarsa
Abigail A. Rives
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Plaintiff-Appellant Quest Integrity USA, LLC*

June 13, 2018

# CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

1. Full Name of Parties represented by me:

   Quest Integrity USA, LLC

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

   N/A

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

   Quest Integrity USA, LLC states that it is a wholly-owned subsidiary of Quest Integrity Group, LLC, which is a wholly-owned subsidiary of TQ Acquisition, Inc., which is 100% owned by Team, Inc. Team, Inc. is publicly traded on the New York Stock Exchange under the symbol "TISI".

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   **Morris, Nichols, Arsht & Tunnell LLP**: Thomas C. Grimm, Jeremy A. Tigan, Stephen J. Kraftschik

   **Foster Pepper PLLC**: Douglas A. Grady, John R. Nelson, Richard T. Black, Emily R. Kelly, and Benjamin Hodges, Cristofer I. Leffler, Madeline D. Hepler

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

   *Quest Integrity USA, LLC v. A.Hak Industrial Services US, LLC*, No. 18-1002, is pending and is a companion case to the present appeal.

June 13, 2018 — Date

*/s/ Michael A. Morin* — Michael A. Morin

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..... i

TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. THE DISPLAY LIMITATION EXCLUDES STRIP CHARTS ..... 3

A. The Plain Claim Language Excludes Strip Charts ..... 3

B. The Specification Confirms That The Claims Exclude Strip Charts ..... 5

1. The Claimed Invention Tracks Non-Strip-Chart Examples ..... 5

2. The Key Purpose Of The Claims Excludes Strip Charts ..... 6

3. Cokebusters's Reliance On The Specification Is Misplaced ..... 7

C. The Prosecution History Leaves No Doubt That The Claims Do Not Cover Strip Charts ..... 8

1. Winslow Discloses Strip Charts Like In The '874 Patent ..... 9

2. The Prosecution History Need Not Address "Strip Charts" *In Haec Verba* ..... 12

3. The "Exacting" Disavowal Standard Does Not Help Cokebusters ..... 13

4. Cokebusters's Other Prosecution History Arguments Fail ..... 15

**Page**

D. Cokebusters's Reliance On "Extrinsic Evidence" Is Meritless ........ 16

II. THE NORCO REPORTS DO NOT ANTICIPATE CLAIM 30'S COMPOSITE DATA MARKER LIMITATION ........ 21

A. Cokebusters Concedes That The Key Testimony The District Court Cited Was About Software That *Post-Dated* The Norco Reports ........ 21

B. Only The Program Used To Generate The Norco Reports Is Relevant To Anticipation ........ 23

C. The Undisputed Absence Of "X"s In The Norco Strip Charts Warrants Reversal ........ 24

D. Cokebusters Fails To Justify Exclusion Of The Inventor Declarations ........ 26

E. Cokebusters's New Factual Allegations Cannot Support Affirmance ........ 30

III. THE NORCO REPORTS DO NOT ANTICIPATE CLAIM 40'S SENSOR DATA LIMITATION ........ 31

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................29

*Baer v. Chase*,
392 F.3d 609 (3d Cir. 2004) ........................................................28, 29

*Brand Management, Inc. v. Menard Inc.*,
135 F.3d 776 (Fed. Cir. 1998) ...............................................27, 28, 29

*Camfield Tires, Inc. v. Michelin Tire Corp.*,
719 F.2d 1361 (8th Cir. 1983) ...........................................................29

*Daubert v. NRA Group LLC*,
861 F.3d 382 (3d Cir. 2017) ........................................................28, 30

*Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*,
597 F.3d 1374, 1378 Fed. Cir. 2010).............................................27, 30

*E-Pass Technologies, Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) .............................................................6

*EBC, Inc. v. Clark Building Systems, Inc.*,
618 F.3d 253 (3d Cir. 2010) ..............................................................29

*Electric Storage Battery Co. v. Shimadzu*,
307 U.S. 5 (1939)................................................................................24

*Fantasy Sports Properties, Inc. v. Sportsline.com*,
287 F.3d 1108 (Fed. Cir. 2002) ...........................................................23

*Fenner Investments, Ltd. v. Cellco Partnership*,
778 F.3d 1320 (Fed. Cir. 2015) .....................................................13, 14

*Finjan, Inc. v. Secure Computing Corp.*,
626 F. 3d 1197 (Fed. Cir. 2010) ..........................................................23

*Galvin v. Eli Lilly & Co.*,
488 F.3d 1026 (D.C. Cir. 2007)...........................................................29

**Page(s)**

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ....................6

*Gemmy Industries Corp. v. Chrisha Creations Ltd.*,
452 F.3d 1353 (Fed. Cir. 2006) ....................27, 28, 29

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966) ....................14

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*,
855 F.3d 1356 (Fed. Cir. 2017) ....................23, 33

*Inpro II Licensing, S.A.R.L. v. T–Mobile USA Inc.*,
450 F.3d 1350 (Fed. Cir. 2006) ....................7

*International Visual Corp. v. Crown Manufacturing Metal Co.*,
991 F.2d 768 (Fed. Cir. 1993) ....................17

*Jiminez v. All American Rathskeller, Inc.*,
503 F.3d 247 (3d Cir. 2007) ....................29

*Konstantopoulos v. Westvaco Corp.*,
112 F.3d 710 (3d Cir. 1997) ....................29

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998) ....................29

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ....................14

*Pacing Technologies, LLC v. Garmin International, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015) ....................5

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ....................13

*TorPharm Inc. v. Ranbaxy Pharmaceuticals, Inc.*,
336 F.3d 1322 (Fed. Cir. 2003) ....................14

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*,
264 F.3d 1111 (Fed. Cir. 2001) ....................14

## INTRODUCTION

The Display Limitation requires representing the physical geometry of stacked furnace tubes. Strip charts cannot do that. The district court erred in concluding otherwise and, as a result, finding the claims anticipated by the strip charts in the Norco Reports. *See* Blue Brief ("BB") 29-46.

Nothing in Cokebusters's brief undermines that conclusion. Cokebusters largely ignores the claim language and instead argues that the claims do not require "a photographic quality replication" of the "entire furnace." Red Brief ("RB") at 30-31. That is a straw man—Quest never made such an argument. Rather, as Quest explained, the claim language recites "represent[ing]" the "specified physical geometry" of the stacked "tube segments," which at least requires depicting the tube segments to scaled length and in the proper orientation. Cokebusters ignores that the claim language mirrors the embodiments (such as Example 4, Figure 9) that depict such physical geometry. And Cokebusters ignores that the specification's discussion of strip charts (as in Example 1, Figure 3) states that they do *not* depict "the actual physical geometry." Appx89 (11:45).

Cokebusters also has no answer for the express statements in the prosecution history that the claims were amended to require representing "actual physical geometry." *See, e.g.*, BB35-38. Instead, it echoes the district court's conclusion that there was no prosecution history "disclaimer" or "disavowal" of strip charts. That,

too, misses the mark. As Quest explained, even if that exacting standard applies (and it does not), the prosecution history could scarcely be more clear. The claims' scope is determined by the plain language read in light of the intrinsic record, which requires representation of the actual physical geometry of stacked tubes. The district court's contrary conclusion is error.

The district court further erred in invalidating claim 30. Cokebusters now *concedes* that the key testimony relied on by the district court was about code that was not ready for release until "*July 8, 2004*" at the earliest—i.e., *well after* the Norco Reports were generated in 2003. RB47.[1] Moreover, contrary to this Court's precedent, Cokebusters (like the district court) bases anticipation on Quest's source code, rather than the compiled program that actually generated the Norco Reports. Yet it is clear that the BendDetect program was not used to insert composite data markers in the Norco strip charts, as conclusively shown by the lack of black "X"s in them.

The district court erred in invalidating claim 40 as well. It misread Mr. De Lorenzo's supposedly key testimony about axial sensor data. Cokebusters does not defend the court's decision on that score. Instead, Cokebusters suggests that the court *could* have relied on *other* testimony. But without that testimony from Mr. De

---

1 All emphases added unless otherwise noted.

Lorenzo, the district court originally *denied* summary judgment on claim 40 and only changed its mind on reconsideration after misreading it. The district court's finding on claim 40 cannot stand.

## ARGUMENT

## I. THE DISPLAY LIMITATION EXCLUDES STRIP CHARTS

### A. The Plain Claim Language Excludes Strip Charts

The plain language of the claims requires representing the known physical geometry of stacked furnace tubes. As Quest explained, the system: (1) inspects a furnace with a specified "physical geometry" including "stack[ed]" tube segments; (2) creates data markers to "correlate [the] inspection data to [the specific physical geometry of the] furnace" or "tube segments"; (3) "partition[s]" the data into subsets at the data markers; and (4) displays the partitioned data "arranged to represent [the specific] *physical geometry* of … [the] tube segments." Appx91-92 (cls. 1, 11, 24); *see* BB31-32.

Cokebusters largely ignores those textual requirements. Instead, it argues that the claims' use of the word "represent" means they do not require "a pictorial furnace presentation" or "a photographic quality replication" of the "entire furnace." RB30-31. But Quest never contended that the claims require depicting *photographic* quality or the *entire* furnace—just that the claims require accurately depicting the

physical geometry of the stacked tube segments, as, for instance, in Examples 2, 3, and 4 (Figures 4, 5, and 9). *See* Appx76-77, Appx81, Appx89-91.

Cokebusters also argues that the claims do not require displaying "the *actual* physical geometry of the furnace" (as in those examples) because they do not use the word "actual" (or other characteristics such as "to scale" or "correct orientation"). *See* RB31. In other words, Cokebusters echoes the district court's distinction between "physical geometry" and "actual" physical geometry. That distinction makes no sense, as Quest explained. *See* BB41-42. Representing the "physical geometry" of the furnace tubes necessarily means depicting the physical geometry of stacked furnace tubes in proper scaled length (i.e., to distance, not time) and in proper orientation (i.e., stacked accurately as in the furnace, not in a single long strip divided at arbitrarily selected time intervals with half-backward representations of the tubes). *See, e.g.*, BB31-34. But even if there were a distinction between "actual" physical geometry and "not actual" physical geometry (whatever that might be), the patentees made it 100% clear when amending the Display Limitation that they were referring to the "actual physical geometry." *See* BB35-38; *infra* at 14. So any contrived distinction would be irrelevant.

Moreover, Cokebusters admits that the preamble (which specifies that the furnace includes multiple stacked tube segments and bends) "describes what was being displayed." RB32. That confirms the claimed invention requires the display

of data arranged to represent the physical geometry of *stacked* tubes (i.e., represented in their correct stacked fashion). *See* BB36-37; Appx15038-15054.[2]

### B. The Specification Confirms That The Claims Exclude Strip Charts

#### 1. The Claimed Invention Tracks Non-Strip-Chart Examples

The claim language ties directly to the examples in the specification that require "tube segments [to be] displayed in a manner that matches the actual physical geometry of the furnace." Appx90 (14:65-66). Example 4, for instance, requires a computer to generate data markers, partition the data at the markers, correlate the partitioned data to tube segments and the "physical geometry of the furnace," and then display that data to allow an analyst to "visually detect problem areas within the furnace." Appx89-90 (12:59-13:4, 14:39-41). Those steps (along with those in Examples 2 and 3) mirror the claimed invention. *See* Appx91-93 (cls. 1, 11, 24, 30, 40); *see also* Appx89 (11:60-62, 12:6-17, 12:29-32) (Examples 2 and 3 require depicting proper physical geometry, including "proper orientation"). In contrast, Example 1 (the only example that describes a "strip chart") does *not* require displaying the data to "match[] the actual physical geometry of the furnace." Appx89 (11:42-46). Indeed, it still requires a separate "drawing of the physical

---

[2] Cokebusters does not dispute that the preamble's recitation of the tubes' stacked geometry is limiting. *See* RB31-32. For good reason: the "antecedent basis" for the "*said* tube segments" in the Display Limitation is the stacked tubes of the furnace with a "specific physical geometry" recited in the preamble. *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015).

layout of the furnace." Appx88-89 (10:58-11:5).

### 2. The Key Purpose Of The Claims Excludes Strip Charts

Cokebusters argues that Quest is improperly focusing on the purpose "of the '874 patent." RB44. Not so. Quest's focus is on the purpose of the particular *claims*—and that is entirely proper under well-established law. *See Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368-71 (Fed. Cir. 2014); BB35. If anything, *Cokebusters* (not Quest) is improperly extrapolating from a purported purpose. Like the district court, Cokebusters reads the '874 patent's inclusion of strip charts in a single example (Example 1) as mandating that *all* embodiments include strip charts. As Cokebusters tacitly admits, that is contrary to this Court's precedent: "there is *no* requirement that *every* claim" must "encompass *all* of" the "purposes" disclosed in the written description. RB44 (quoting *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003)).

And the purpose of the *claimed* invention clearly excludes strip charts. *See* BB34-35. Strip charts arrange data divided according to arbitrarily selected time intervals without regard to physical geometry and thus display an array of mismatched and half-backwards tubes that requires an entirely separate "mechanical drawing" to determine "*the physical layout of the furnace*." Appx89 (11:2-3); *see* BB43-46. The *claimed* invention, however, eliminates the need for that separate

drawing because it already depicts the inspection data arranged to represent the known physical geometry of the stacked tube segments. *See* BB4-16, 31-38.

### 3. Cokebusters's Reliance On The Specification Is Misplaced

Cokebusters's reliance on the specification is flawed in at least four respects.

First, while "strip chart[s]" are described in the original disclosure as related to "the present invention," *see* Appx85 (3:55-62) (Figs. 3-4 each show a "strip chart"), such descriptions are generally informative only if relevant "*claim elements* are explicitly adopted as the invention," as Cokebusters apparently acknowledges. RB32; *see, e.g.*, *Inpro II Licensing, S.A.R.L. v. T–Mobile USA Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir. 2006). But "strip charts" are not a "claim element" here.

Second, strip charts are not covered by the final claims simply because the written description states that "[a]ny aspect of the physical geometry of a furnace may be used to anchor data position," including "changes in tube thickness." RB33. Cokebusters does not (and cannot) explain how strip charts "anchor data position" on physical geometrical features. Strip charts display data as a function of arbitrary *time* intervals, not physical features of the furnace. *See* BB6-9, 43-46.

Third, it is irrelevant that "[n]one of the examples in the specification are *pictorially accurate* displays of the actual physical geometry *of a furnace*." RB33. The claims do not demand that. Nothing in the claims require "all return bends" to be "pictorially" displayed or tube widths to be displayed "to scale." RB33-34. The

claimed inventions only require the display of data arranged to represent the physical geometry of stacked tubes, and "stacking" is defined by tube lengths, not "widths." RB34; *see, e.g.*, Appx92 (cl. 24); BB31-38. And there is no requirement for displaying "the entire furnace." RB33.

Fourth, while the specification states how "known lengths of the various tube segments may be superimposed upon strip charts" (Appx89 (11:16-17); RB33), that only highlights how strip charts are scaled to *time*, not *physical distance*, and are difficult to interpret without the aid of an entirely separate "mechanical drawing" detailing the "physical layout of the furnace." Appx89 (11:2-5, 11:19).[3]

### C. The Prosecution History Leaves No Doubt That The Claims Do Not Cover Strip Charts

The prosecution history makes crystal clear that strip charts are outside the scope of the issued claims. *See* BB19-21, 35-38. Cokebusters nonetheless argues that the prosecution does not show that the claims require accurately displaying the known physical geometry of stacked furnace tubes because: (i) Winslow, which the patentees overcame by amendment, is not about strip charts; (ii) the prosecution history does not include the words "strip chart"; and (iii) the prosecution history does

[3] Cokebusters also contends that the "examples" presented in the specification were only "meant to highlight differences in bend detection methods, not limit the display to the examples accompanying them." RB32. Cokebusters's suggestion is nonsensical—it does not even explain what those might be, and none are apparent.

not meet the "exacting standard" for disavowal. RB27-29, 35-37 (alteration and citation omitted). Those arguments fail.

### 1. Winslow Discloses Strip Charts Like In The '874 Patent

Cokebusters contends that Winslow does not disclose strip charts and "had none of the characteristics of *any* of the [strip charts in] the specification." RB36-37 (emphasis in original). Cokebusters is incorrect.

Strip charts like the ones discussed in the '874 patent were a cornerstone of Winslow. Winslow identified a "need … for an automated analysis system" to "locate, identify, and quantify defects revealed by the raw [inspection] data" to make it more useable by inexperienced engineers. Appx50043 (4:18-25). Winslow's solution was strip charts. *See, e.g.*, Appx50020, Appx50035, Appx50040, Appx50055-50057 (Figs. 19, 39, 46; 27:30-32:25); *see also* Appx50057, Appx50059 (cls. 1, 29).

In the Winslow system, inspection data was presented in strip-chart displays after being "parsed into pipe-lengths" and analyzed. Appx50048, Appx50055 (14:15-29, 27:21-41). Using those displays, operators could identify features (such as joints, elbows, and changes in wall thickness), characteristics of defects (such as depth, "percentage wall thickness remaining," "circumferential" nature, and "location" relative to a joint), and color-code the data. Appx50028-50040, Appx50048-50056 (Figs. 31, 32-36, 39, 46; 13:48-54; 14:31-36; 15:25-28; 15:66-

16:28;18:22-28; 19:5-17; 24:38-55; 26:49-61; 28:15-35; 28:61-29:22; 30:12-14). Figure 39, for example, illustrates those features:




*Fig.39.*

Apppx50035; *see also* Appx50055 (28:63-65).

In addition, as shown in Figure 46 below, Winslow includes a strip-chart display that is strikingly similar to Example 1 of the ’874 patent, complete with pipe segments color-coded according to wall thickness and defect locations marked with graphical indicators (“two circles”) relative to each joint or bend:




*Fig.46.*

Appx50040; Appx50057 (Fig. 46; 32:13-25) (discussing color-coded Fig. 46); *see also* Appx50035-50038 (Figs. 39, 42-43); Appx50066.[4]

Thus, Winslow disclosed strip charts similar to those in Example 1 and the Display Limitation was specifically added to traverse them. *See* BB35-38; Appx15012-15020 (rejecting claims over Winslow, including Fig. 39).

---

[4] If anything, the Winslow system was *more* elaborate, as it created a "graphical drawing" of the pipes depicted in Figure 47 (*see* Appx50041, Appx50047, Appx50057 (Fig. 47; 11:2-3, 31:55-32:25)), which is akin to the "mechanical drawing" that the '874 inventors said was required *in addition to* the strip charts in Example 1, Appx89 (11:2-3); *see* Appx50041, Appx50057 (Fig. 47; 30:35-32:12).

### 2. The Prosecution History Need Not Address "Strip Charts" *In Haec Verba*

Relatedly, Cokebusters contends that the prosecution history does not exclude strip charts because the examiner and patentees did not discuss "strip charts" *in haec verba* or expressly identify the strip charts in Example 1 as prior art. *See* RB28. Such express lexicographical precision, however, is not the proper test for determining the scope of the claims. *See, e.g.*, BB40-41; *infra* at 13-14.

Here, the examiner understood that Winslow disclosed strip charts and repeatedly cited strip charts from the reference as prior art that taught generating a "two-dimensional or three-dimensional representation" of the data from the inspected "tube segments." *See, e.g.*, Appx14772, Appx14774-14776, Appx14837, Appx14867, Appx15017-15018 (citing Appx50035 (Fig. 39)); Appx50035, Appx50055 (Fig. 39; 28:61-65); *see also supra* at 9-11; Appx50044 (6:16-17). Indeed, Winslow disclosed a *color-coded rectangular-based* strip chart keyed to the wall thickness for each inspected pipe segment—just like in Example 1 of the '874 patent. *See supra* at 9-11; Appx50040, Appx50057 (Fig. 46; 32:13-25); Appx75-76 (Figs. 3-4). The claims were only allowed over that prior art after they were amended to require the display of partitioned data arranged to represent the physical geometry of *stacked* tube segments (i.e., how the segments are actually stacked in the furnace)—which strip charts do not do. *See* BB36-37.

### 3. The "Exacting" Disavowal Standard Does Not Help Cokebusters

Echoing the district court, Cokebusters also argues that the prosecution history does not satisfy "the exacting standard for disavowal of a claim scope." RB27 (alteration omitted) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012)); *see* Appx7; Appx66. That argument fails. As Quest consistently explained, the ordinary meaning of the claim language, read in light of the specification and prosecution history (as it must be), requires representation of the physical geometry of stacked tube segments and excludes strip charts. *See* BB29-38; Appx15354-15362. Thus, there was no need to "disclaim" or "disavow" that ordinary claim scope. *See* BB40-41.

Contrary to Cokebusters's suggestion (RB27-28), this Court's case law supports that conclusion. For example, in *Fenner Investments, Ltd. v. Cellco Partnership*, this Court held—*without referencing "disclaimer" or "disavowal"*—that statements during prosecution confirmed that the ordinary meaning of term "personal identification number" in the claims was directed to a user, not a device, because the patentee said the invention was "centered around" a user, not a telephone, when describing prior art during prosecution. 778 F.3d 1320, 1325 (Fed. Cir. 2015). This Court rejected the argument (repeated by Cokebusters) that this is the "cardinal sin of claim construction" (RB38), and instead emphasized that "[a]ny explanation, elaboration, or qualification presented by the inventor during patent

examination is relevant" to the ordinary meaning. 778 F.3d at 1322-23. And in *TorPharm Inc. v. Ranbaxy Pharmaceuticals, Inc.*, this Court held that "narrow[ing] … claims by amendment" confirms that the resulting claim scope is narrow. 336 F.3d 1322, 1330-31 (Fed. Cir. 2003); *see also Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 33-34 (1966) (same); *TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111, 1122-23 (Fed. Cir. 2001) (claims should be interpreted "[i]n accordance with [the patentee]'s characterization of his invention in the course of the prosecution").

The same principles control here. The narrowing amendments during prosecution confirm that strip charts are not part of the ordinary meaning of the Display Limitation. *See* BB35-38. Simply put, the patentees disclosed iterative generations of their invention in the specification (one with strip charts, several without) but only claimed the most advanced versions, not the basic strip-chart one. Claiming less than what the specification discloses is not unusual at all. *See* BB38. And, to be sure, even if the "exacting" standard for disavowal governed (and it does not), the patentees' statements were "clear and unambiguous" that the claims are not as broad as Cokebusters (like the district court) represents. *See* BB35-38. This Court should "take [Quest] at its word and … not construe the scope of the '[874] patent's claims more broadly than [Quest] itself clearly envisioned." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004).

### 4. Cokebusters's Other Prosecution History Arguments Fail

Cokebusters's other arguments on the prosecution history are also unavailing.

First, the "present invention" was not "defined" in the specification so that the term necessarily included strip charts when used in the prosecution history. *See* RB37. As the patentees repeatedly explained during prosecution, the language of the claims was "amended to clarify the scope *of the present invention*." Appx14949-14951, Appx15053-15054.[5]

Second, those amendments were not "just clarifying what the[] [inventors] always taught, namely that" the claimed invention "'generates a display of the partitioned inspection data that correlates the inspection data to the physical geometry of the furnace'" with no distinction between the correlation and display steps. RB7-8, 37-38; *see also* Appx31 n.32. Correlating the data to the physical geometry of the furnace or tube segments and then displaying the data to represent the physical geometry of stacked tube segments are two distinct claim steps. *See, e.g.*, Appx91-92 (cls. 1, 24). As the inventors explained, the data is "*not* merely correlated"; it is also "*displayed in such manner that the data is arranged to*

---

[5] The examiner also regarded the inventor's affidavit regarding commercial success as "not relevant to the issue of nonobviousness of the *claimed* subject matter." Appx15021.

*represent … actual physical geometry*." Appx14950-14951.[6]

Third, Cokebusters complains that "physical geometry" and "actual physical geometry" were not used consistently during prosecution. RB8, 38. However, the inventors clearly stated when amending the Display Limitation that it required the partitioned data to be displayed so that it was "arranged to represent the *actual physical geometry* of the furnace," rendering any illusory distinction irrelevant. Appx14950-14951; *see* BB36. And there was agreement that the claims were finally allowed because Winslow did "not teach or suggest the display of partitioned inspection data that is arranged to represent the physical geometry of a plurality of tube segments." Appx15053-15054; *see* Appx15037. The prosecution history is clear: the claims require displaying the physical geometry of the furnace tubes, not mere strip charts.

**D. Cokebusters's Reliance On "Extrinsic Evidence" Is Meritless**

As a last-ditch effort, Cokebusters also relies on extrinsic evidence—the strip charts produced by Quest's old technology (in the Norco Reports) and those referenced in Quest's old marketing materials. *See* RB39-41. According to Cokebusters, the Norco Reports' display of "2-D Piping Coil Layout Images" and "2-D Modeling" and the marketing materials' reference to a "2D view of the entire

[6] The quote Cokebusters provides to prove "the inventors" supposedly "equated" the two steps was from a customer—*not* the inventors. *See* RB37-38; RB7-8 (citing Appx14963-14964).

furnace piping network" demonstrates that the patentees intended for the Display Limitation to include strip charts. *Id.* (emphasis and citation omitted). That argument is meritless.

First, that "evidence" says nothing about the claim limitation at issue here ("arranged to represent the physical geometry of [the stacked] tube segments")—it does not mention that language, let alone define it. *See, e.g.*, Appx16546; Appx16689. Nor do the claims use terms like "Layout" or "Modeling." *See, e.g.*, Appx92 (cl. 24). And what Quest said about its old strip-chart technology does not define the patented invention as a matter of law. *See, e.g.*, *Int'l Visual Corp. v. Crown Mfg. Metal Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (reversing claim construction premised on patentee's commercial product); *see also* Appx18712-18715.

Second, strip charts (like in the Norco Reports) do not "represent[] physical geometry" merely because they assign consecutive numbers to tubes (RB15-16, 40) or show portions of inspected tubes in a "generally ascending structure" (RB16). That at most shows that the data has been partitioned to each tube segment. And, as Quest explained, despite a superficial appearance of "stacked" tubes, they do not accurately represent their physical stacked geometry because the "ascending" lines in a strip chart have no relationship to the actual orientation and length of the tubes or the location and direction of the tube bends. *See* BB43-46; Appx18711-18715.

The strip chart Cokebusters includes from the Norco Reports confirms the point:




RB16; Appx16404 (annotations added by Cokebusters).[7] If (as Cokebusters contends) this strip chart portrayed the actual physical geometry of the inspected tubes, tubes 9, 16, 22, and 26 would be stacked on top of one another in real life. But that is not the case—and indeed not even *close* to accurate—as the following mechanical drawing from the Norco Reports (which even Cokebusters's experts relied on) shows:

---

[7] The stacked furnace depicted in Cokebusters's brief alongside this strip chart was added by Cokebusters's experts. *See* Appx16404.




Appx16403. In real life (as depicted here), tube 9 is separated from tube 16 by *six* other vertically stacked tubes, tubes 16 and 22 are not even in the *same section* of the furnace, and tubes 22 and 26 are separated by *three* other vertically stacked tubes.[8] *See* Appx16403; *see also* Appx18708-18709. That difference is critical: only a depiction of the true stacked physical geometry of the tubes allows engineers to readily locate problem areas and avoid the expensive and dangerous mistakes (such as cutting into the wrong tube section) that the claimed invention was designed

---

[8] Also, tube 19 is not stacked at all—it is in a crossover section. Appx16403.

to prevent. *See* BB10-11. Strip charts cannot do that. At a minimum, displaying the "physical geometry of [the stacked] tube segments" cannot include strip charts.[9]

Nor did Quest concede that the Norco strip charts partitioned data "to known tube lengths tied to bends." RB17 & n.1 (citing only the report of Cokebusters's expert). To the contrary, Quest's experts consistently explained how they displayed "data in the order it was taken, from start to finish" with "breaks between lines" that "*correspond to no physical feature of the tube system*." Appx16933 (exhibit to declaration by *Cokebusters's* expert); *see also* Appx18696-18702. Cokebusters even admits that a separate non-strip-chart mechanical drawing was manually added to the Norco Reports to "reflect the physical geometry of the furnace under inspection" in a "scaled" fashion to "ensure accurate flaw positioning." RB20-21; *see* BB14. The takeaway is clear: strip charts alone do not represent the physical geometry of stacked tubes in the furnace, as the Display Limitation requires.[10]

The district court's contrary interpretation—and resulting summary judgment of anticipation—should be reversed.

---

[9] Quest never argued that the Display Limitation requires representing "every aspect of physical geometry of tube segments." RB43.

[10] Cokebusters also claims that the Aramco Project in January 2002 "embod[ies] each asserted claim." RB9. But the figure Cokebusters assigns to the Aramco report is from a different presentation, and that *foreign* project only offered that "[i]ndividual data values will be presented as color blob," with "each tube … represented as string of color encoded blobs rather than cylindrical surface"—hardly the claimed invention. Appx16470; *see* RB9-10 (citing Appx17145); Appx17125.

## II. THE NORCO REPORTS DO NOT ANTICIPATE CLAIM 30'S COMPOSITE DATA MARKER LIMITATION

The district court erred in finding that the Norco Reports anticipate the "composite data markers" in claim 30. *See* BB47-67. Cokebusters's response fails to show otherwise. Cokebusters (a) admits that the key testimony on which the district court relied as a supposed concession was about code that post-dated the Norco Reports, (b) erroneously focuses on Quest's source code, rather than the program that generated the Norco Reports (which lacked the ability to insert composite data markers), (c) ignores the lack of black "X"s in the Norco strip charts (which conclusively shows there was no such functionality), (d) does not justify exclusion of the summary judgment declarations, and (e) relies on a series of unavailing new facts. Reversal is warranted.

### A. Cokebusters Concedes That The Key Testimony The District Court Cited Was About Software That *Post-Dated* The Norco Reports

The district court held claim 30 invalid because it believed that Mr. De Lorenzo "acknowledged that a 'composite bend indicator' existed in [Quest]'s … source code *in August 2002*." Appx39-40 (citing Appx16325 (77)). As Quest explained, that was impossible because the relevant function being discussed in that testimony ("BendDetectRevA.m") did not even exist at the time of the Norco Reports (February and March 2003) and was still under development as of July 8, 2004. BB51; *see also, e.g.*, Appx16322 (65); Appx19059-19063.

Cokebusters now admits (as it must) the "fact" that, in the very "line of questioning" on which the district court relied, Mr. De Lorenzo was, indeed, being asked about the "*July 8, 2004* BendDetectRevA.m program." RB47. That alone warrants reversal on claim 30. Without Mr. De Lorenzo's supposed admission that the relevant functionality was in the commercial source code in August 2002, the district court's entire rationale (including the purported contradiction that led it to disregard the later declarations) falls apart. *See* BB61, 64.

Cokebusters tries to explain away that fatal "fact" by arguing that the same functionality supposedly existed in the source code as of August 28, 2002 (in a "vintage BendDetect.m counterpart"). RB47. That attempt fails. Cokebusters only presented two versions of the source code at Mr. De Lorenzo's deposition—the January 2002 Source Code and the April 2003 Source Code. BB50. Only the *latter* included the relevant BendDetect function, and that function was the only basis for the district court's judgment here. *See* Appx39; RB47 (citing Appx19192). And Mr. De Lorenzo and Cokebusters's counsel agreed that the April 2003 Source Code was only "available for the next commercial job done after April 25th, 2003"—*i.e.*, *after* the Norco Reports. Appx19212 (58); *see* BB71-72.

Thus, Cokebusters's concession ends any dispute over claim 30. Reversal is warranted.

### B. Only The Program Used To Generate The Norco Reports Is Relevant To Anticipation

According to Cokebusters, the content of Quest's source code is nevertheless dispositive because "appropriate programming need only be present in the programming not used or even accessible" to anticipate system claims under § 102(b)'s on-sale bar. RB56 (citing *Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010)). Cokebusters is incorrect.

As this Court recently reiterated, the on-sale bar turns on what was actually sold and commercialized: the "product for sale" must "embod[y] the claimed invention." *Helsinn Healthcare S.A. v. Teva Pharm. USA*, Inc., 855 F.3d 1356, 1370 (Fed. Cir. 2017). *Finjan* is not to the contrary. *Finjan* (which addressed infringement, not the on-sale bar) held that, in order to infringe system (or computer-readable medium) claims, a software product need not actually perform claimed functionality but must at least be "'capable of operating' in the described mode." 626 F.3d at 1204-05 (citation omitted). Thus, even if *Finjan* were extended to the on-sale bar context, it confirms (as Quest argued) that the relevant functionality would still have to be in the anticipatory product sold. *See* BB48-49, 72; *see also Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117-18 (Fed. Cir. 2002).

Here, it is uncontested that Quest never sold its source code or any software in the Norco Project. Thus, only the features of the specific executable program

compiled from Quest's source code that were actually *used* to generate the Norco Reports (the product sold), rather than the source code itself, were potentially commercialized during the Norco Project and potentially put into public use because of it. *See also, e.g.*, *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939).[11] Based on *those* features, there is no anticipation and the district court erred in holding otherwise. *See* BB50-67.

### C. The Undisputed Absence Of "X"s In The Norco Strip Charts Warrants Reversal

The BendDetect function uses "X"s as markers to designate bend locations on any outputted strip chart displayed by the final compiled program. *See* BB53-54; Appx16988; Appx19039-19046; Appx19051-19059; Appx19306. That was confirmed by Quest's experts:

---

[11] Quest never "represented that the source code it produced, whether of the 1999, 2002, or 2004 vintage, *was* the Norco job code." RB58. Cokebusters cites nothing (other than its own brief below) to support that baseless assertion. Cokebusters was clearly informed that the code Quest produced "wasn't programmed to do certain things" and that "some display information in the referenced reports and from [the] relevant time period was inserted manually." Appx17089.




**Annotated result from running the function "BendDetect" (including the sub-function plot(x,y,'xk')) on a simple test data set. The black 'x' symbols are clearly seen near the sample "bend" areas.**

Appx18725. No such "X"s appear in the Norco strip charts. *See* BB54-55. Cokebusters does not contest any of those facts. *See* RB45-58. That, too, warrants reversal on claim 30.

Cokebusters insists that the BendDetect function was nevertheless part of the product on sale because it was somehow used to mark bends in the Norco strip charts in an "auto-assisted" manner. RB47-48, 55. That is inaccurate conjecture. Mr. De Lorenzo testified that "you could call" the way bends were picked for the Norco strip charts "auto assisted" because he used a "mouse" to "put the cursor" over portions of the strip chart already generated by the computer to *manually* mark bends.

Appx16322 (66-67); Appx16324 (73-75).[12] But a turn of phrase does not trump facts. Indeed, both Cokebusters's counsel and Mr. De Lorenzo agreed that, if the draft BendDetect function were used, "black marks [would have] *automatically* appear[ed]" at bends on the Norco strip charts without any need for manual input. Appx16322 (68); Appx16324 (76). The absence of any such automatically generated black "X" marks in the Norco strip charts conclusively shows that the BendDetect function was not in the executable program used to generate the charts. Thus, there was no anticipation of the claimed "composite data markers" by the Norco Reports.

### D. Cokebusters Fails To Justify Exclusion Of The Inventor Declarations

As Quest explained, the district court erroneously excluded as shams the declarations of Quest's inventors (Mr. De Lorenzo and Mr. Bondurant) based on a purported contradiction with Mr. De Lorenzo's earlier testimony. BB58-65.

Cokebusters does not address the extensive testimony in the excluded declarations that are *confirmed*—rather than contradicted—by Mr. De Lorenzo's testimony, including when the BendDetect function was actually released (July 2004

[12] Contrary to Cokebusters's misleading suggestion (RB48), Mr. De Lorenzo only testified that, "as of the Norco Report" (i.e., at that time), Quest had developed software (Mr. Bondurant's draft function) that could mark bends automatically—not that such draft software was actually used for the Norco strip charts. *See* Appx16322 (66).

at the earliest), that the composite-data-marker function at line 42 of the BendDetect function relied on by the district court was commented out, and that the *April* 2003 Source Code was not even available for the *March* 2003 Norco Reports. *See* BB59-65. Nor does Cokebusters address the extensive evidence corroborating those facts, including the lack of "X"s in the Norco strip charts. *See* BB59-65, 53-55. Those uncontested facts establish that the on-sale bar question for claim 30 "cannot be decided adversely to [Quest]" as a matter of law. *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1359 (Fed. Cir. 2006); *see* BB59-65; *see also* Appx43 (excluding only the inventors' declarations, not those of Quest's experts).

In any event, Cokebusters's arguments do not justify the district court's exclusion. First, unlike in the case on which Cokebusters principally relies, there were no "false claims of confusion" here. RB50-51 (citing *Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1378, 1381 Fed. Cir. 2010)). Instead, as discussed, there was at least a plausible explanation for the purported contradiction. *See* RB47 (conceding that Mr. De Lorenzo was presented with 2004 code when asked about Quest's capabilities in 2002); *cf. Brand Mgmt., Inc. v. Menard Inc.*, 135 F.3d 776, *9 (Fed. Cir. 1998) (table) (jumping from "subject to

subject" during deposition can cause confusion that may justify otherwise untimely clarification).[13]

Second, this Court has never held that a "showing [of] confusion or deceptive questioning" is required before considering the "substance of the conflicting declarations." RB51 (citing *Brand Mgmt.*, 135 F.3d 776 at *10 n.6). Even the nonprecedential *Brand Management* opinion that Cokebusters cites did not hold that. Indeed, there was no corroborating evidence for the new testimony in that case. *See* 135 F.3d 776 at *8-9. Here, though, there is extensive corroborating evidence, which bars application of the sham-affidavit principle. *See Gemmy Indus.*, 452 F.3d at 1359; *Baer v. Chase*, 392 F.3d 609, 624-26 (3d Cir. 2004); *see also* BB61-63.

Third, Cokebusters contends that the testimony of a Rule 30(b)(6) witness "cannot be contradicted by anyone," including other witnesses. RB53. The Third Circuit has never made such a sweeping statement. In *Daubert v. NRA Group LLC* (the case Cokebusters cites), the court excluded testimony from a new witness on summary judgment that contradicted 30(b)(6) testimony when there was "no independent record evidence [to] corroborate[] [the] contradictory affidavit." 861 F.3d 382, 392 (3d Cir. 2017). Here, there is abundant corroborating evidence and

---

[13] Cokebusters also contends that "[a]ll three inventors declared that the Norco sale was not experimental." RB52. Not so. What the inventors said was that the Orion Norco Refinery paid for the Norco Project. *See* Appx19137-19139.

no one other than Mr. De Lorenzo could even potentially be seen as contradicting "*his* … own sworn testimony." *Baer*, 392 F.3d at 624; *see also Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (excluding testimony that conflicted with affiant's *own* testimony).

Fourth, Cokebusters's alternative reliance on Rules 16 and 30(e) (RB52-53) is misplaced. Those rules cannot justify exclusion because Mr. Bondurant was never offered as an expert (the declarations were necessary to counter Cokebusters's new argument concerning BendDetectRevA) and there was no prejudice to Cokebusters (which submitted responsive expert declarations on summary judgment), no chance of disrupting trial, and no bad faith for the submissions. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (discussing relevant factors); BB58 (reliance on BendDetectRevA was new); *see also EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 264-66 (3d Cir. 2010) (Rule 30(e) only concerns untimely errata sheets). Moreover, those rules afford the district court *discretion* to exclude, *see Konstantopoulos*, 112 F.3d at 719, which was not exercised here.[14]

---

[14] Cokebusters asserts that application of the sham principle is reviewable only for abuse of discretion. RB24-25. But summary judgment is reviewed de novo, and this Court has reviewed such exclusions that way before. *See Gemmy Indus.*, 452 F.3d at 1358-59 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Brand Mgmt.*, 135 F.3d 776 at *9; *see also Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 n.* (D.C. Cir. 2007); *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111-12 (2d Cir. 1998); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d

### E. Cokebusters's New Factual Allegations Cannot Support Affirmance

Out of other options, Cokebusters present a list of new (supposedly "straightforward") "facts." RB54-56. But none supports the district court's judgment.

First, contrary to Cokebusters's assertion, Mr. Bondurant never said that the BendDetect algorithm was "coded," "tested," and "proven" as of August 28, 2002. RB55 (quoting Appx16348). He said "visual clues" to detect bends had been "coded and tested." Appx16348. And he confirmed that he only started writing the BendDetect function on August 28, 2002—as the comment in the April 2003 Source Code shows and as Mr. De Lorenzo stated at his deposition. *See* BB51, BB59-61; Appx16323 (70-71); *see also* Appx19060-19063; Appx19212 (58-60).

Second, Cokebusters's contention that it never relied on the BendDetectRevA function to prove anticipation of claim 30 (RB47, 54-55) is also false. Cokebusters's primary argument below was that Mr. De Lorenzo "conceded" anticipation of claim 30 at page 77 of his deposition testimony. *See* Appx16203-16204 (relying exclusively on Appx16325 (77)); *see also* RB47 (quoting Appx16325 (77)). That is why the district court relied on that same testimony as the key proof of anticipation

1361, 1365 (8th Cir. 1983). *But see Daubert*, 861 F.3d at 389, 392; *Delaware Valley Floral*, 597 F.3d at 1379 (reviewing for abuse of discretion under Eleventh Circuit law).

for claim 30. *See* Appx39-40 (quoting Appx16325 (77)). Cokebusters cannot walk back that reliance now that it acknowledges (as it must) that the testimony was directed to code available only after the Norco Reports. *See* RB47; *supra* at 21-22.

Third, Cokebusters incorrectly asserts that the August 28, 2002 draft of the BendDetect function is "straightforward" evidence of anticipation. RB55. Cokebusters cannot keep its own story straight: it argues that the function was complete in August 2002 (RB54-55), but admits that its expert believed the function was not ready until February 2003 ("three days before the first Norco job began" (RB55)). Regardless, it was uncontested that the BendDetect function was not added to Quest's code and potentially available for compiling until April 25, 2003 at the earliest. *See* BB51. Indeed, Cokebusters's counsel and Mr. De Lorenzo agreed that the April 2003 Source Code (the only code with the BendDetect function in it) was only "available for the next commercial job *done after April 25th, 2003*"—i.e., after the Norco Reports. Appx19212 (58); *see* BB51; *see also* Appx19028; Appx19305-19306.

The district court's ruling on claim 30 should be reversed.

## III. THE NORCO REPORTS DO NOT ANTICIPATE CLAIM 40'S SENSOR DATA LIMITATION

The district court originally denied summary judgment on claim 40: it refused to find that the Norco Reports anticipated claim 40's limitation for generating data markers based on "sensor data." Appx52; *see* Appx93 (cl. 40). But then the court

changed course because Mr. De Lorenzo supposedly admitted that axial sensor data was used to locate bends and generate composite data markers in the Norco strip charts. Appx52. The court was right the first time. As Quest explained, that testimony does not relate to the use of sensor data to create the Norco strip charts and was thoroughly rebutted. *See* BB69-72. Cokebusters has no substantive response. Instead, it asks this Court to rely on *other* testimony and supposed facts to affirm the district court's decision. RB59-63. None of Cokebusters's new testimony or arguments, however, supports the district court's erroneous turnabout.

First, Cokebusters (like the district court) relies on Mr. De Lorenzo's purported admission about the use of axial encoding sensor data. *See* RB59-60 (citing Appx37710 (131-32)). But that testimony concerned extrapolating location data from information and bend indices in an Excel spreadsheet—not data markers in a strip chart based on the analysis of sensor data by a computer program compiled from the April 2003 Source Code. *See* BB71. Indeed, that testimony addressed the January 2002 Source Code, which, as discussed, lacked the relevant BendDetect function for composite data markers. *See* Appx52-53 (quoting Appx37710 (129-30)); BB71-72.

Second, Cokebusters suggests that sensor data was collected from "two sensors in the 2002-vintage Norco code" and then used as part of an "automatic bend selection using sensor data in the 1999 code." RB61. That makes no sense. A

compiled program is not stitched together ad hoc from different versions of source code released in different years. Also, Quest's experts never "conceded in deposition testimony" that the so-called "1999 code" "was present in the FTIS [furnace tube inspection system] computer during the Norco job" or that it provided "automated bend selection process using accelerometer data." RB61-62 (citing only its own experts in support). Indeed, Cokebusters's interpretation of the "1999 code" is misleading. Cokebusters equates that "code" to a published *article* from 1999. RB62; *see* Appx17058-17059. That article does not describe automatically detecting bends and has no bearing on the source codes files used to elicit the supposedly dispositive concession from Mr. De Lorenzo at his deposition. *See* Appx17059; Appx19370-19371; Appx37710 (131-32); *see also* Appx37710-37711 (132-33).[15]

Third, Cokebusters again relies on *Finjan* to argue that the Norco Reports anticipate claim 40 as a matter of law because Quest's *source code* included certain sensor data and functions. *See* RB63-64; Appx56. As discussed, however, that is contrary to this Court's precedent, including *Finjan* itself, which requires the "product for sale" to "embod[y] the claimed invention." *Helsinn Healthcare S.A.*,

[15] Cokebusters's claim (RB62) that Quest's experts never responded to the "1999 code" is also simply incorrect. As Cokebusters's experts acknowledged, Quest's experts discussed the article (referred to as "Cowling") and explained how Cokebusters's interpretation of it was wrong. *See* Appx16802-16803.

855 F.3d at 1370; *supra* at 23-24. Cokebusters's reliance on "Quest's operating manuals or its marketing materials" and sensor data collected for potential use in an Excel spreadsheet (RB63) fails for the same reason. *See* BB71-72. No such data was actually used by a BendDetect function in a compiled program to generate bend indicators in the Norco strip charts. *See* BB68-72. The lack of black "X"s as bend markers in those charts proves that fact beyond any doubt. *See* BB53-55. And those strips charts clearly display data scaled to *time*, not physical distance determined by an axial recorder. *See* BB11-13.

The district court erred in invalidating claim 40 on summary judgment.

## CONCLUSION

For the foregoing reasons and those in Quest's principal brief, the Court should reverse or vacate the district court's judgments.

Dated: June 13, 2018

Respectfully submitted,

*/s/ Michael A. Morin*

Michael A. Morin
Gabriel K. Bell
Robert J. Gajarsa
Abigail A. Rives
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Plaintiff-Appellant*
*Quest Integrity USA, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2018, I electronically filed the foregoing Reply Brief for Appellant Quest Integrity USA, LLC with the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Michael A. Morin*
Michael A. Morin

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Fed. Cir. R. 28(a)(13) and Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitations of Fed. Cir. R. 32(a) because it contains 6,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Michael A. Morin*
Michael A. Morin